**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

| | |
|---|---|
| In Re: | Chapter 11 |
| | |
| FOOD MANAGEMENT GROUP, LLC, | Case No. 04-22880 (ASH) |
| KMA I, INC. | Case No. 04-22890 (ASH) |
| KMA II, INC., | Case No. 04-22891 (ASH) |
| KMA III, INC., | Case No. 04-22892 (ASH) |
| BRONX DONUT BAKERY, INC, . | Case No. 04-20312 (ASH) |

                              Debtors.                    (Jointly Administered)
-----------------------------------------------------------------------X

FOOD MANAGEMENT GROUP, LLC
KMA, I, INC., KMA II, INC., KMA III,
INC., and BRONX DONUT BAKERY, INC.

                              Plainitffs,                 Adversary Proceeding
                                                          Case No. 05-8636 (ASH)

                  V.

MATRIX REALTY GROUP, INC.,

                              Defendants.
-----------------------------------------------------------------------X

### NOTICE OF APPEAL

     MATRIX REALTY GROUP, INC., the Defendant ("Matrix") by and through its counsel,

The Law Offices of Avrum J. Rosen, PLLC, hereby appeals to the United States District Court

for the Southern District of New York from the Final Judgment Against Matrix Realty Group,

Inc. ("Judgment") finding Matrix liable to the Plaintiff in the sum of Nine Million One Hundred

Ninety Six Thousand One Hundred and Fourteen Dollars and Eleven Cents ($9,196,114.11)

together with post-judgment interest to accrue on the unpaid balance at the prevailing rate of

interest in effect on May 28, 2008.  A copy of that Judgment is annexed hereto as Exhibit "A"

[Docket No. 120].  Matrix also appeals from the Final Order on Liability and Damages entered

by the Court [Docket No. 119] also on May 28, 2008.  A copy of that Order is annexed hereto as Exhibit "B".

1.    The entry of the Final Judgment and the Final Order on Liability and Damages brings up for appellate review the following interlocutory written orders and written and oral decisions of the Bankruptcy Court:

    (a)    the oral decision of the Bankruptcy Court, as set forth on the Record evidenced by the transcript of proceedings held on January 17, 2008 at pages 35-67, A copy of that Transcript is annexed hereto as Exhibit "C" [Docket No. 111].

    (b)    on several issues of damages on the decision of the Bankruptcy Court concerning the Decision Allowing Damages in Excess of the Bidding Deposit entered on December 10, 2007; Annexed hereto as Exhibit "D" [Docket No. 107].

    (c)    the Decision After Trial on liability entered by the Court on July 25, 2007. Annexed hereto as Exhibit "E". [Docket No. 95].

    (d)    the Memorandum and Order Denying Motion for Recusal entered by the Court on June 14, 2006.  Annexed hereto as Exhibit "F". [Docket No. 59].

    (e)    the handwritten Order denying the Notice of Motion by Submission for Reargument pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024 of this Court's Decision and Order Denying the Application by Matrix and the Chapter 11 Trustee for an Order Resolving the Adversary Proceeding Pursuant to Bankruptcy Rule 9019 dated April 4, 2006.  Annexed hereto

2

as Exhibit "G". [Docket No. 665 in the Main Case].

(f)    Order Denying Compromise and Settlement of Adversary Proceeding

Against Matrix Realty Group, Inc., dated March 10, 2006.  Annexed

hereto as Exhibit "H". [Docket No. 633 in the Main Case].

### PARTIES IN INTEREST

For    <u>Janice Grubin (Trustee/Plaintiff)</u>
Warren Von Credo Baker, Esq.
Drinker Biddle & Reath LLP
191 N. Wacker Drive
Suite 3700
Chicago, IL 60606-1698
Tel: 312-569-1000

For    <u>Matrix Realty Group, Inc.</u>
The Law Offices of Avrum J. Rosen, PLLC
38 New Street
Huntington, New York 11743
Tel: 631-423-8527

David Lazer, Esq.
Lazer, Aptheker, Rosella & Yedid, P.C.
Melville Law Center
225 Old Country Road
Melville, New York 11747
(631) 761-0800
(631) 761-0013 Fax
lazer@larypc.com

Dated: Huntington, New York
June 4, 2008

The Law Offices of Avrum J. Rosen, PLLC
Attorneys for Matrix Realty Co., Appellant

BY:    <u>S/Avrum J. Rosen</u>

3

Avrum J. Rosen (ARJ4016)

Fred S. Kantrow (FK3499)

38 New Street

Huntington, New York 11743

631 423 8527

ajrlaw@aol.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------X
In re                                              :        Chapter 11
                                                   :
FOOD MANAGEMENT GROUP, LLC,                         :        Case No. 04-22880 (ASH)
KMA I, INC.,                                        :        Case No. 04-22890 (ASH)
KMA II, INC.,                                       :        Case No. 04-22891 (ASH)
KMA III, INC.,                                      :        Case No. 04-22892 (ASH)
BRONX DONUT BAKERY, INC.,                           :        Case No. 04-20312 (ASH)
                                                   :
                              Debtors.              :        (Jointly Administered)
---------------------------------------------------X
                                                   :
FOOD MANAGEMENT GROUP, LLC,                         :
KMA I, INC., KMA II, INC., KMA III,                 :
INC., and BRONX DONUT BAKERY,                       :
INC.,                                              :
                                                   :        Adversary Proceeding
                              Plaintiffs,           :        Case No. 05-8636 (ASH)
                                                   :
          v.                                        :
                                                   :
MATRIX REALTY GROUP, INC.,                          :
                                                   :
                              Defendant.            :
---------------------------------------------------X

## FINAL JUDGMENT AGAINST MATRIX REALTY GROUP, INC.

**THIS MATTER** having come before this Court for the purpose of entering Final

Judgment against Matrix Realty Group, Inc. (the "Defendant") and in favor of Plaintiff Janice B.

Grubin, not individually, but solely in her capacity as chapter 11 Trustee (the "Trustee" or

"Plaintiff") of Food Management Group, LLC, KMA I, Inc., KMA II, Inc., KMA III, Inc.,

and Bronx Donut Bakery, Inc. (collectively, the "Debtors") in the above-captioned adversary

proceeding; and

**WHEREAS**, contemporaneously herewith this Court has entered its Order on Liability

and Damages,

**NOW THEREFORE**, it is hereby, **ORDERED, ADJUDGED, AND DECREED**, as follows:

1.     That judgment be entered against Defendant Matrix Realty Group, Inc. and in favor of Plaintiff Janice B. Grubin, not individually, but solely in her capacity as chapter 11 Trustee, in the judgment amount of Nine Million One Hundred Ninety-Six Thousand One Hundred and Fourteen dollars and Eleven Cents ($9,196,114.11), upon which post-judgment interest will accrue on the unpaid balance at the then-prevailing federal rate of interest from the date of entry of this Final Judgment until the Defendant's obligations to Plaintiff have been satisfied in full pursuant to 28 U.S.C. § 1961.

2.     This Court shall retain jurisdiction to enforce, implement, or construe this Final Judgment.

**DATED** and **ENTERED** this 28th day of May, 2008

**SO ORDERED**:

__/s/ Adlai S. Hardin, Jr._____

The Honorable Adlai S. Hardin, Jr.
United States Bankruptcy Court Judge
Southern District of New York

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------X
In re                                              :        Chapter 11
                                                   :
FOOD MANAGEMENT GROUP, LLC,        :        Case No. 04-22880 (ASH)
KMA I, INC.,                                       :        Case No. 04-22890 (ASH)
KMA II, INC.,                                      :        Case No. 04-22891 (ASH)
KMA III, INC.,                                     :        Case No. 04-22892 (ASH)
BRONX DONUT BAKERY, INC.,         :        Case No. 04-20312 (ASH)
                                                   :
                        Debtors.        :        (Jointly Administered)
---------------------------------------------------X
                                                   :
FOOD MANAGEMENT GROUP, LLC,        :
KMA I, INC., KMA II, INC., KMA III,     :
INC., and BRONX DONUT BAKERY,      :
INC.,                                              :
                                                   :        Adversary Proceeding
                        Plaintiffs,     :        Case No. 05-8636 (ASH)
                                                   :
        v.                                         :
                                                   :
MATRIX REALTY GROUP, INC.,         :
                                                   :
                        Defendants.     :
---------------------------------------------------X

## FINAL ORDER ON LIABILITY AND DAMAGES

**THIS MATTER** having come before the Court upon an adversary proceeding

commenced by debtors Food Management Group, LLC, KMA I, Inc., KMA II, Inc., KMA III,

Inc., and Bronx Donut Bakery, Inc. (collectively, the "Debtors") on July 21, 2005; and the Court

having denied Plaintiff Janice B. Grubin, as Chapter 11 Trustee (the "Trustee" or "Plaintiff") and

Defendant Matrix Realty Group, Inc.'s ("Matrix" or "Defendant") (Trustee or Plaintiff and

Matrix or Defendant are from time to time referred to herein collectively as the "Parties")

respective motions for summary judgment on the record of a hearing held on May 4, 2006; and

Matrix having moved this Court to recuse itself by motion dated June 6, 2006, and the Court

having denied the motion in a decision dated June 14, 2006, and the Court having conducted a

trial on the issue of Defendant's liability for breach of that certain Purchase and Sale Agreement between the Debtors and Matrix, dated as of April 15, 2005, for the sale of the Debtors' assets to Matrix for a purchase price of $26.77 million subject to adjustments (the "Matrix Contract") on June 16, 19, and 20, 2006; and the Court having ordered post-trial submissions on the issues raised at trial ; and the Court having issued a Decision After Trial, dated July 25, 2007 (D.I. # 95) (the Findings of Fact and Conclusions of Law of which are incorporated herein), finding that the Trustee, on behalf of Debtors' Estates, is entitled to judgment against Matrix on the issue of liability for breach of the Matrix Contract; and the Parties having submitted confidential damages analyses for *in camera* review by the Court pursuant to the Court's direction at a status conference held on August 22, 2007; and the Parties having submitted to the Court a Joint Statement of Issues of Fact and Law; and the Parties having briefed the issue of whether Plaintiff's damages are limited by the bidding deposit, (Memorandum of Law Submitted by Defendant in Connection with the Issues of Damages, D.I. # 99, and Chapter 11 Trustee's Memorandum of Law Regarding Damages, D.I. # 101); and the Court having issued its Decision Allowing Damages in Excess of the Bidding Deposit, dated December 10, 2008 (D.I. # 107); and the Parties having submitted additional briefing on the issue of damages on November 6, 2007 (Supplemental Memorandum of Law Submitted by Defendant in Connection with the Issues of Damages, D.I. # 103) and November 13, 2007 (Plaintiff's Response to Defendant's Supplemental Damages Issues Brief, D.I. # 105), respectively, as directed by the Court during the October 23, 2007 hearing; and hearings having been held on September 27, 2007, October 23, 2007, January 17, 2008, and April 3, 2008, respectively (collectively, the "Hearings"); and for the reasons stated on the record at the Hearings, including the representations of counsel during the April 3, 2008 hearing regarding entry of this order regarding liability and damages;

and proper notice to all parties entitled thereto having been given; and the Court having been otherwise apprised in the premises; and for good cause shown, it is hereby

**ORDERED**, that this Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and (b) and the standing order of referral to bankruptcy judges dated July 10, 1984 signed by Acting Chief Judge Robert J. Ward; and it is further

**ORDERED**, that Debtors are entitled to judgment against Matrix on the issue of liability for breach of the Matrix Contract; and it is further

**ORDERED**, that Debtors' Estates' damages are not capped or limited to the recovery of the $2.4 MM Bidding Deposit (the "Bidding Deposit") for Matrix' breach of the Matrix Contract; and it is further

**ORDERED**, that, by agreement of the Parties, and without prejudice to the appellate rights of any party as to liability,  the three remaining assets – 2501 Third Avenue, 57 N. Central, and 38 Mill Road – that were to be transferred pursuant to the Matrix Contract (the "Remaining Assets") be valued in the aggregate at $4,098,650; and it is further

**ORDERED**, that Debtors' Estates may not recover, as a part of their damages, losses from operations incurred after Matrix breached the Matrix Contract on June 10, 2005; and it is further

**ORDERED**, that Debtors' Estates may not recover, as a part of their damages, their legal fees, Trustee Fees, and other professional fees incurred to protect, preserve, and to sell the assets that should have been purchased by Matrix; and it is further

**ORDERED**, that pursuant to the terms of the Matrix Contract, Matrix is entitled to a credit in the amount of $750,000 for the 392 E. 149th St. lease; and it is further

**ORDERED**, that, by agreement of the Parties, Matrix is not entitled to any additional credit for 38 Mill Rd except as set forth above; and it is further

**ORDERED**, that Matrix is entitled to a credit in the amount of $850,000 for the 53 Spencer Place lease, which was the amount of the credit given to TBG Food Acquisition Corp. ("TBG") in the sale of this asset pursuant to sections 3.23 and 8.13(d) and Annex D of that certain Purchase and Sale Agreement, by and between the Trustee and TBG, dated as of November 7, 2005, as amended and modified (the "TBG Contract"); and it is further

**ORDERED**, that, by agreement of the Parties, and without prejudice to the appellate rights of any party as to liability, the lease extensions for 42 Lake St. and 260 Halstead Avenue are on terms substantially consistent to the terms of the original leases, and that, therefore, Matrix is not entitled to any credit for either of those properties; and it is further

**ORDERED**, that Matrix is entitled to a credit in the amount of $490,000 for 195 E. 161st Street, which was the amount of the credit given to TBG in the sale of this asset pursuant to sections 3.23 and 8.13(d) and Annex D of the TBG Contract; and it is further

**ORDERED**, that Matrix is not entitled to any credit for 200 Westchester Ave. and 987-A Central Park Ave., as these assets comprise two of the "Shops Not Yet Opened," per the Matrix Contract; and it is further

**ORDERED**, that, by agreement of the Parties, and without prejudice to the appellate rights of any party as to liability, Matrix is entitled to a credit of $50,000 for 307 S. Broadway; and it is further

**ORDERED**, that, by agreement and to the extent that Matrix has not already done so, and without prejudice to the appellate rights of any party as to liability, Matrix's request for a credit for any broker's fee that purportedly would have been incurred in selling the assets remaining after the sale to TBG is withdrawn; and it is further

**ORDERED**, that, by agreement of the Parties, and without prejudice to the appellate rights of any party as to liability, Matrix is entitled to a credit for the costs incurred in complying

with the Dunkin' Donuts' deficiency reports outstanding as of December 31, 2005, subject to an offset for amounts expended by the Trustee, in the amount of $400,000; and it is further

**ORDERED**, that Matrix is not entitled to a credit for any alleged or putative remodeling costs; and it is further

**ORDERED**, that, by agreement of the Parties, and without prejudice to the appellate rights of any party as to liability, there will be no additional credit for the alleged inability to provide a Certificate of Occupancy and CPL for the Commissary Bakery; and it is further

**ORDERED**, that Matrix is not entitled to any credit for the release of the bidding deposit tendered by 64 East 126th Street LLC ("64 East") in connection with 64 East's bid to purchase the Debtors' assets; and it is further

**ORDERED**, that Matrix is not entitled to any credit or set off for the Trustee's alleged refusal to consummate an alleged cash offer on or about December 15, 2005; and it is further

**ORDERED**, that, pursuant to Section E, entitled "Deposit Requirement," of the Bidding Procedures, which were approved by this Court by its February 22, 2005 Consent Order (D.I. #241), and as a result of the rulings in this matter as memorialized herein, the $2.4 MM Bidding Deposit, plus all interest accrued to date, is the sole and exclusive property of the Debtors' Estates and is hereby ordered released to the Trustee on behalf of the Debtors, to be credited, along with interest accrued up to the date of the entry of this Order, to the Final Judgment Against Matrix Realty Group, Inc. entered contemporaneously herewith (the "Final Judgment"); provided, however, that said funds shall be held by the Debtors in a segregated interest-bearing account pending the appeal of this matter and shall not be used by the Debtors or by the Trustee on behalf of the Debtors for any purpose without further order of this Court upon the motion of the Debtors, notice of which shall have been provided to Matrix, Matrix' attorneys, the United States Trustee and all creditors of the Debtors' Estates; and it is further

**ORDERED**, that the Parties' agreement on any of these issues is without prejudice to their rights to appeal this Court's decisions on liability and any other ruling adverse to them in this Adversary Proceeding, either contained herein or otherwise; and it is further

**ORDERED**, with this Order by the Court on liability and damages, including, *inter alia*, the Court's approval of those agreements between the Parties detailed herein, this Order on Liability and Damages and the Final Judgment entered contemporaneously herewith, and any interlocutory orders in this adversary proceeding, are now final and appealable.

Dated: May 28, 2008
      White Plains, New York

**SO ORDERED:**

/s/ Adlai S. Hardin, Jr.
Hon. Adlai S. Hardin, Jr.,
UNITED STATES BANKRUPTCY JUDGE

1                  UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF NEW YORK
2

3    ---------------------------------------X
                                            :
4    In Re the Matter of:                   :   04-22880
                                            :
5       FOOD MANAGEMENT GROUP, LLC.,        :   300 Quarropas Street
                                            :   White Plains, NY
6                    Debtors.               :   January 17, 2008
     ---------------------------------------X
7    FOOD MANAGEMENT GROUP, LLC.,           :
                                            :
8                         Plaintiff,        :
                                            :   Adv. No. 05-08636
9            v.                             :
                                            :
10   MATRIX REALTY GROUP, INC.              :
                                            :
11                       Defendant.         :
     ---------------------------------------X
12

13
             TRANSCRIPT OF STATUS CONFERENCE, APPLICATIONS,
14                AND FINAL ARGUMENT ON DAMAGES
           BEFORE THE HONORABLE ADLAI S. HARDIN, JR.
15                UNITED STATES BANKRUPTCY JUDGE

16   APPEARANCES:

17   For Matrix Realty Group:       AVRUM J. ROSEN, ESQ.
                                    38 New Street
18                                  Huntington, New York  11743

19   For Maws Corporation:          JEFFREY REICH, ESQ.
                                    Reich, Reich, and Reich, PC
20                                  175 Main Street
                                    White Plains, New York 10601
21
     As Chapter 11 Trustee:         JANICE B. GRUBIN, ESQ.
22                                  Drinker Biddle & Reath LLP
                                    140 Broadway
23                                  New York, New York 10005

24
              (Appearances continued on next page.)
25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

<pre>
1                      UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF NEW YORK
2


3
         APPEARANCES CONTINUED:
4


5

         For Chapter 11 Trustee:      JEFFREY SCHWARTZ, ESQ.
6                                     EDWIN BROOKS, ESQ.
                                      Drinker Biddle Reath LLP
7                                     191 North Wacker Drive, Suite 3700
                                      Chicago, IL 60606
8
         For Wingate Russotti &       PAULA GRECO, ESQ.
9          Shapiro:                   Wingate Russotti & Shapiro, LLP
                                      420 Lexington Avenue, Suite 2750
10                                    New York, New York 10170

11       For Questech:                AMISH DOSHI, ESQ.
                                      Pitney Day LLP
12                                    7 Times Square
                                      New York, New York  10036
13
         For the U.S. Trustee:        RICHARD MORRISSEY, ESQ.
14

15       For Executive Sounding       MICHAEL DuFRAYNE, ESQ.
          Board Associates:           1350 Broadway, Suite 702
16                                    New York, New York 10018

17       For O'Connor Davies:         DEAN HOTTLE, ESQ.
                                      STUART STENGEL, ESQ.
18                                    One Barker Avenue
                                      White Plains, New York 10601
19
         Richard Pu:                  RICHARD PU, ESQ., Pro Se
20                                    120 E. 90th Street, Suite 100
                                      New York, New York 10018
21
         Court Transcriber:           MARY GRECO
22                                    TypeWrite Word Processing Service
                                      356 Eltingville Boulevard
23                                    Staten Island, New York 10312

24


25
</pre>

3

```
 1              THE CLERK:   Food Management Group.

 2              MR. ROSEN:   Good morning, Your Honor.  You can't say

 3    this case has never been contentious.

 4              THE COURT:   No, that's true.  I can't.

 5              MR. ROSEN:   Avrum Rosen representing Matrix Realty

 6    Group.

 7              THE COURT:   Okay.

 8              MR. REICH:   Good morning, Your Honor.  Jeffrey Reich,

 9    Reich, Reich, and Reich, PC, representing the Maws Corporation.

10              THE COURT:   Okay, Mr. Reich.

11              MS. GRUBIN:   Good morning, Judge.  Janice Grubin, the

12    Chapter 11 trustee.  I'm here with my counsel, Jeff Schwartz.

13              THE COURT:   Okay.

14              MR. BROOKS:   Your Honor, Edwin Brooks on behalf of

15    the Chapter 11 trustee.

16              MR. DOSHI:   Good morning, Your Honor.  Amish Doshi

17    with Day Pitney on behalf of Questech Financial, LLC.

18              MS. GRECO:   Good morning, Your Honor.  Paula Greco

19    with Wingate, Russotti and Shapiro --

20              THE COURT:   The door closed on your name.  What was

21    it again?

22              MS. GRECO:   Paula Greco.

23              THE COURT:   Okay.

24              MS. GRECO:   With Wingate, Russotti and Shapiro,

25    special litigation counsel for Janice Grubin --
```

4

```
 1            THE COURT:  Okay.
 2            MS. GRECO:  -- the trustee.
 3            MR. MORRISSEY:  Richard Morrissey for the U.S.
 4  Trustee.
 5            MR. HOTTLE:  Dean Hottle from O'Connor Davies, a CPA
 6  firm.
 7            THE COURT:  Okay.
 8            MR. STENGEL:  Stuart Stengel from O'Connor Davies,
 9  both partners with O'Connor Davies.
10            THE COURT:  Okay.
11            MR. PU:  Richard Pu, creditor, pro se.
12            THE COURT:  Mr. Pu, good morning.
13            Okay.  Well, let's see, we have here a status
14  conference, applications, and final argument on damages on
15  Matrix; am I right?
16            MR. ROSEN:  Yes, Your Honor.
17            MS. GRUBIN:  Yes.  Judge, I think Mr. Reich had
18  wanted to speak up before we began today.
19            THE COURT:  Mr. Reich.
20            MR. REICH:  If I may, Your Honor.  I appreciate the
21  trustee indulging me on that.  I have a matter I need to tend
22  to on behalf of my son but --
23            THE COURT:  Okay.
24            MR. REICH:  Very briefly, Your Honor, I was informed
25  [inaudible] trustee's attorney on Monday that on Friday last
```

5

1   week the Gianopoulos' asked for an additional extension of time

2   to close on their preemptive -- there was an [inaudible]

3   preemptive bid that was on to close my understanding it was

4   Tuesday the 15th.  Your Honor, despite Your Honor asking, you

5   know, that the Gianopoulos' notify everybody and come to Court

6   and ask for an extension, do all these things, they failed to

7   do anything.  In fact, my understanding is as of this morning

8   they have not even contacted the trustee as to how they want to

9   go.  They want an extension but it's unclear what that is.

10  They remain to just leave everybody else's rights in their

11  tracks while the decide what they're going to do or if they

12  have the financing to close this deal, and it should come to an

13  end, Your Honor.

14          Maws has worked very hard with the trustee to keep

15  the status quo on the property in the Eastchester endeavor.

16  We'll indeed endeavor to resolve whatever issues they need to

17  with the trustee to help in trying to keep the asset there

18  which the estate has, the franchise agreement, intact.  But

19  it's got to come to an end.  The Gianopoulos', they don't seem

20  to care about anybody.  In fact, they're just litigating with

21  Maws in the State Court.  We have made another motion which

22  will be sent to the Eastern Court on Friday to vacate the

23  Yellowstone injunction.  Of course got a lengthy response

24  yesterday from the Gianopoulos' and they seem to want to put

25  this estate in jeopardy by letting the Court decide their fate

6

1  there and put pressure on everybody, and I would utter to say

2  dare the trustee to default them at this point.

3          THE COURT:  All right.  Thank you, sir.  Do you need

4  to leave?

5          MR. REICH:  If there's going to be any other

6  comments, otherwise I do need to leave.

7          THE COURT:  Well, all right.  I'm happy to excuse

8  you.  Well, I'm not  happy to excuse you but I will.

9          MR. REICH:  I appreciate that.

10          THE COURT:  Thank you, Mr. Reich.

11          Why don't we start with the status conference since

12  that's a fairly crucial part of the puzzle here.

13          MR. ROSEN:  Matrix?

14          THE COURT:  Yes.

15          MR. ROSEN:  Sure, Your Honor.

16          MS. GRUBIN:  No.  I believe, Judge, you mean the case

17  status --

18          THE COURT:  No, no --

19          MS. GRUBIN:  -- conference; is that correct?

20          THE COURT:  The status conference in the case.

21          MS. GRUBIN:  Right.  That's what I thought.

22          THE COURT:  Yes.

23          MS. GRUBIN:  Of course, Your Honor.  Your Honor, our

24  last status conference was with the Court on October 9th and as

25  you know a lot has happened since then.  I keep saying that

7

1    every time I'm before you and I say it again.  With respect

2    to --

3            THE COURT:  A lot always has happened in Food

4    Management Group since the last event and that's been so

5    always.

6            MS. GRUBIN:  That's true, Judge.  It's kept me

7    hopping.

8            THE COURT:  Long before you were involved.

9            MS. GRUBIN:  Yes.

10            THE COURT:  Okay.  Go ahead.

11            MS. GRUBIN:  Almost two and a half years ago

12    actually.

13            Your Honor, Mr. Reich spoke to some of the recent

14    developments with respect to the settlement.  Your Honor did on

15    November 3rd -- just as a little background --

16            THE COURT:  Yes.

17            MS. GRUBIN:  On November 13th, Judge, I received a

18    non-refundable preemptive offer, a deposit of $1.82 million

19    from Nicholas Gianopoulos as required under the Gianopoulos

20    settlement and purchase and sale agreements, and Court orders

21    which was an addition to the million and a half that I had

22    received on October 1 as the initial payment under the

23    Gianopoulos settlement agreement.  Your Honor granted my motion

24    to approve the private sale to Nicholas Gianopoulos after a

25    hearing on December 20th and an order was entered on December

8

1  28th if the Court will recall.

2        I have been actively working on consummating the

3  preemptive bid for a 1/15 closing and was ready, able, and

4  willing to close.

5        THE COURT:  On what day was this closing?

6        MS. GRUBIN:  That was Tuesday the 15th, Judge, two

7  days ago.

8        THE COURT:  Okay.

9        MS. GRUBIN:  As Mr. Reich indicated, on Friday

10  evening, January 11th, I was informed by counsel that they were

11  not prepared to close and they have asked for an extension and

12  we are considering the estate's options as we speak.

13        Your Honor, basically we did have a public sale

14  process in the works before the preemptive bid was submitted.

15  The Court had in connection with that -- on November 2nd the

16  Court entered an order approving Keen [Ph.], for me to retain

17  Keen to assist in the marketing and sale of the remaining

18  properties.  To that end there was another order that the Court

19  entered on November 7th after a hearing on November 6th when we

20  obtained Your Honor's approval of bidding procedures, form of

21  asset purchase agreement, form and manner of notice, the date

22  of the sale hearing and related relief.  Since then I have

23  worked with Keen in finalizing the due diligence package which

24  was distributed to over 90 interested parties including TBG,

25  and I ran surveys and I have phase one environmental and

9

1   property reports and other things of that ilk.

2           We had scheduled an auction on November 27th.  We

3   scheduled a sale hearing on November 30th and both were

4   adjourned without date when I received the Gianopoulos

5   preemptive bid.  Your Honor, we do --

6           THE COURT:  You say you do have a stalking horse bid?

7           MS. GRUBIN:  Right now I do not have a stalking horse

8   bid.

9           THE COURT:  Okay.

10          MS. GRUBIN:  If the Court has any more questions

11  about the sale or settlement process, I was going to turn to

12  operations.

13          THE COURT:  Well, where do we go from here?  You said

14  you and your advisors are considering the alternatives for the

15  estate?

16          MS. GRUBIN:  That's correct, Judge.  I mean there are

17  a variety of alternatives that I could explore.

18          THE COURT:  Let me ask you this.  Under the agreement

19  with the Gianopoulos' -- let's go back.  The settlement, the

20  global settlement with the Gianopoulos' included this

21  preemptory right to buy; is that correct?

22          MS. GRUBIN:  Correct, Judge.

23          THE COURT:  Putting aside the preemptory right, what

24  does the global settlement provide?

25          MS. GRUBIN:  Could I have Mr. Schwartz respond to

10

1   that?

2          THE COURT:  Yes.

3          MR. SCHWARTZ:  Your Honor, it provides that the

4   Gianopoulos' would have to pay the debtor's estate a total of

5   $9.1 million and they get a reduction of that amount from the

6   sale of the assets that the estate has and also from the sale

7   of the properties, the fee interest --

8          THE COURT:  Wait a second.  I didn't understand that.

9   They are required to pay $9.1 million.

10         MR. SCHWARTZ:  Right.

11         THE COURT:  Then I didn't understand the phrase and

12  they get a reduction from that amount for the sale of the

13  property.  So say that again in a way that I can understand it.

14         MR. SCHWARTZ:  Your Honor, we sell the remaining

15  assets to a third party and receive a net of $5 million.  The

16  $9.1 million gets reduced by that $5.1 million.

17         THE COURT:  Okay.

18         MR. SCHWARTZ:  It gets applied as a credit --

19         THE COURT:  All right.

20         MR. SCHWARTZ:  -- towards the purchase.  We've

21  received $3.3 million, a little over $3.3 million.

22         THE COURT:  3.32?

23         MR. SCHWARTZ:  Right, which means there's

24  approximately $5.8 million that's left outstanding for the

25  Gianopoulos' to pay.  So if we go ahead and obviously if we

11

1    sold to them, they would be paying us the full $9.1 million if

2    we go down that route.  If we go down a third party route and

3    say we net to the estate, and I'm just picking a number out of

4    the air, $4 million, we would still have our rights to go after

5    the Gianopoulos' for the deficiency between $4 million plus 3.3

6    would be 7.3, a deficiency of $1.8 million.

7              THE COURT:  You have security for that?

8              MR. SCHWARTZ:  We have mortgages that are being

9    recorded.  There are some timing issues in the settlement and I

10   can go after those things.  But I do have rights upon the event

11   of default to go ahead and have Your Honor enter a default

12   judgment, consent to file judgments that we have in all the

13   cases.

14             THE COURT:  Okay.  All right.  So basically the more

15   you sell the properties for in an auction, the lower the

16   Gianopoulos'' debt under the settlement will be?

17             MR. SCHWARTZ:  Correct.

18             THE COURT:  So it's kind of a [inaudible] as far as

19   that, except for the fact that a sale is cash in hand the

20   Gianopoulos'' debt is yet to be collected.

21             MR. SCHWARTZ:  Obviously we are dealing with the

22   Gianopoulos', Your Honor, which means that I don't see it being

23   an easy task due to the deficiency given what we've had to deal

24   with previously.

25             THE COURT:  All right.  But when are you going to

12

1  decide what to do?  Did you agree to adjourn your time

2  proposed?  The answer is yes or no?

3          MS. GRUBIN:  No, we have not, Judge.

4          THE COURT:  All right.  So they're in default right

5  now.

6          MS. GRUBIN:  That's correct.

7          THE COURT:  Okay.  All right.  How long will it take

8  you to reinstate the sale process?

9          MS. GRUBIN:  I would say a few days, within a few

10  days, Judge.  I mean I've already reached to Keen and told them

11  that the closing did not go forward.  I was planning to turn my

12  attention to that, Your Honor, by this afternoon.

13          MR. SCHWARTZ:  Your Honor, just to give you a flavor

14  of what some of the issues are, obviously we're trying to get a

15  better handle on what the issues are we're proposing and why

16  they needed this extension if it's just, you know, merely a

17  little timing issue or if there's bigger issues out there.

18          In addition, under the settlement agreement, the

19  Gianopoulos' were supposed to transfer the fee interest in the

20  two properties plus the leasehold interest in the Maws and get

21  out of the Maws issue.  That, typical of the Gianopoulos',

22  notwithstanding everything that we have done which includes

23  preparing the documents ourselves for them and do these things,

24  working with the title company, conditioning the previous

25  extensions that they've gotten, they still have not properly

13

1   done that.  They provided documents to the title company --

2          THE COURT:  Is their obligation with regard to Maws

3   contingent on their buying or not buying -- exercising rather,

4   or not exercising their purchase?

5          MR. SCHWARTZ:  That's right.  If the Gianopoulos' are

6   not the party, the estate will take that interest with Maws and

7   presumably we --

8          THE COURT:  Would resolve it with Maws?

9          MR. SCHWARTZ:  We've had numerous discussions with

10  them to resolve with Maws on that which would tie into our sale

11  process to a third party.  So everything is kind of related.

12          THE COURT:  It's truly not a problem, is it?  Because

13  if they don't up signing the documents that they're required to

14  sign you will get a court order deeming the documents to have

15  been signed.

16          MR. SCHWARTZ:  We've already worked through some of

17  those issues and are prepared if we don't get those quickly.

18          THE COURT:  At least you'll seek one.

19          MR. SCHWARTZ:  What they did was they tried to do it

20  by power of attorney, Your Honor, and in order to do it by

21  power of attorney you have to get original powers of attorney.

22  They didn't do any of these things.  So we got a list from the

23  title company of all the defaults weeks ago, had been trying to

24  work with them saying where is this, where is this?  We just

25  haven't made much progress.  That could slow down the sale

14

1  process.

2       THE COURT:  But you don't -- you will not get that if

3  they're the buyer?

4       MR. SCHWARTZ:  I would get the documents, Your Honor.

5  I will require -- I've always required from them the documents.

6  Whether or not I actually record the deed transfer if I think

7  they're going to close on their sale or --

8       THE COURT:  Let me put it this way.  If they close on

9  their preemptive right to purchase the assets and you get the

10  money in hand then you don't get Maws.  They continue their

11  litigation with Maws; is that right?

12      MR. SCHWARTZ:  That's correct, and the estate is

13  completely out.

14      THE COURT:  All right.  Well, that means you need to,

15  in the vernacular, fish or cut bait on that pretty soon, don't

16  you think?

17      MS. GRUBIN:  I intend to, Your Honor.

18      THE COURT:  Mr. Reich?

19      MR. REICH:  Yeah, I mean the only last point is --

20  and I appreciate Jeff's position and he explained it very well.

21  The only last point that I would say is, you know, the

22  Gianopoulos' are risking this estate's interest.  There is a

23  pending litigation and they don't care.  If we vacate the

24  Yellowstone, you know, everything could potentially change as

25  far as where the parties are, and enough said.  Certainly the

15

1  trustee is aware of that and is aware that the motion is

2  pending and will be [inaudible] as of Friday.

3          MR. SCHWARTZ:  Your Honor, just so you know, we've

4  already tried to take into consideration that outcome, and we

5  already have an agreement with Maws that in case the

6  Yellowstone is resolved and they get the property back from the

7  Gianopoulos', there's already an agreement that we get

8  [inaudible] on the property for a certain amount of time.

9          THE COURT:  I see.

10          MR. SCHWARTZ:  So we've tried to cover that issue

11 also.

12          MR. REICH:  Very well.

13          THE COURT:  Thank you, Mr. Reich.

14          MR. REICH:  Thank you, Your Honor.

15          THE COURT:  All right.  Anything else on status?

16          MS. GRUBIN:  Yes, Judge.  I'd like to speak about

17 operations it I might?

18          THE COURT:  Sure.

19          MS. GRUBIN:  Thank you.  Also cash since that's very

20 important.  As of December 31, Judge, I have about $4.4 million

21 that the estates are holding which doesn't include another

22 about $100,000.00 in payroll and operating accounts.  That $4.4

23 million includes the full $1.82 million from the Gianopoulos'

24 which would have to --

25          THE COURT:  Does it include the 1.5?

16

```
 1              MS. GRUBIN:  Yes, it does, Judge.

 2              THE COURT:  So it includes the total $3.32?

 3              MS. GRUBIN:  Yes, except I've already paid out

 4    Questech's portion on the 1.5 but I haven't paid out a portion

 5    on the 1.82 yet.

 6              THE COURT:  So that includes all the money you're

 7    going to get from TBG?

 8              MS. GRUBIN:  Yes, it does, because of the lease

 9    extension that Your Honor had granted.

10              THE COURT:  But it doesn't include the Matrix

11    deposit?

12              MS. GRUBIN:  Correct.  Matrix deposit is

13    $2,625,286.00 as of December 31.

14              THE COURT:  Okay.  So from the entire TBG sale you

15    got some fraction of $4.4 million left?

16              MS. GRUBIN:  That's correct, Your Honor.

17              THE COURT:  All the rest of it has been paid out in

18    attorneys fees and Questech; is that right?

19              MS. GRUBIN:  That's correct.  Not just --

20    professional fees, Judge.

21              THE COURT:  Professional fees I mean, yes.

22              MS. GRUBIN:  Obviously, the $4.4 million does include

23    Questech's portion which is not insignificant.

24              THE COURT:  You mean -- why don't you say that again?

25              MS. GRUBIN:  The $4.4 million, Judge, includes --
```

17

1          THE COURT:  Is net of what you've already paid.

2          MS. GRUBIN:  But it does not include Questech's

3    portion of the $1.82.

4          THE COURT:  You mean Questech is going to get how

5    much of the 4.4 out of the --

6          MR. SCHWARTZ:  At most, Your Honor, one half of the

7    $1.82 million because of what's called recovery costs under

8    that number is likely going to go down.

9          THE COURT:  So the 4.4 isn't 4.4, it's 3.5?

10         MS. GRUBIN:  At the most.

11         MR. SCHWARTZ:  Somewhere between 3.5 and 4, or 3.5

12   and 4.4.

13         MS. GRUBIN:  I guess that's right.

14         MR. SCHWARTZ:  We just [inaudible] with the recovery

15   cost and we get the charge back again [inaudible].

16         MS. GRUBIN:  Judge, in terms of the operations, the

17   three stores remain stable.  For the week ending January 12th,

18   '08 retail sales were $56,579.00 versus last week of

19   $55,414.00.  In terms of the wholesale operations for the

20   bakery, production for the week ending 1/12 was $40,499.00

21   versus last week of about $42,000.00.  In anticipation of the

22   January 15 closing with Nicholas Gianopoulos, TBG has already

23   started to reduce the amount of donuts it is purchasing from

24   the bakery.  They have another facility which they are building

25   up.  To date, however, the bakery is fully serving 19 stores

18

1  which includes my three, and partially serving six of their

2  stores.

3          Just as a matter of interest, customer count at my

4  three stores this past week, week ending 1/12, was 14,335

5  versus last week which was 13,354.  Payroll was $29,209.00 for

6  all three stores and the bakery versus last week of $29,858.00,

7  and all insurance is in full force and effect.

8          Judge, you may recall that on October 1st when I was

9  last here before Your Honor I reported about allegations of

10  possible inappropriate behavior on the part of one of my

11  employees at the bakery and at that store at 2501 Third Avenue.

12  Your Honor entered an order on 11/16 authorizing me to retain

13  an HR consulting firm who is basically conducting an

14  investigation and put together a report for me.  As a result of

15  that report, which I received in late October, in November I

16  determined it best to terminate the employment of that

17  employee.  With the assistance of FAC Management I revised and

18  distributed an employee handbook and conducted employee

19  training.

20          THE COURT:  Okay.

21          MS. GRUBIN:  Since the last status, Judge, I've

22  visited the stores and the bakery twice.  Your Honor may recall

23  that by order entered December 27th this Court authorized me to

24  pay my employees stay bonuses because of the anxiety that had

25  been reported by FAC that the employees were feeling due to the

1  pending Gianopoulos closing and the interest from other

2  franchisees in the area.  I'm happy to report that the work

3  force has remained stable.  The employees were very

4  appreciative.  Right now I'm obligated to pay, the earlier of

5  March 1 or a closing, their stay bonuses which is a week pay

6  for the rank and file and two weeks for the assistant manager

7  and the manager.

8            THE COURT:  Okay.

9            MS. GRUBIN:  Your Honor, just briefly, obviously the

10 lease extensions that Your Honor entered an order on November

11 27th has authorized me to accept the payment of $504,200.00,

12 and that was -- the money came in and half of that went to

13 Questech under the Questech settlement agreement.  Basically,

14 Your Honor, Your Honor was fully apprised of all else that's

15 going on in the case including the Matrix litigation we'll

16 conference today, including the 64 East matter which is before

17 Judge Glenn where we're still waiting for an opinion on the

18 Motion to Dismiss which was argued on September 26th.

19            If the Court has no further questions of me, I'm

20 concluding my status report.

21            THE COURT:  Okay.  Anybody else have any questions,

22 comments?  Mr. Morrissey?

23            MR. MORRISSEY:  Your Honor, Richard Morrissey for the

24 U.S. Trustee.  The Court -- well I guess everyone you might

25 say, is owed a couple of operating reports.  I have been

20

1  discussing that with Ms. Grubin.  I believe she is close to

2  catching up in that particular department.  I believe in light

3  of the fact that Ms. Grubin had shared with the Court and the

4  parties present the numbers available in the estate I think for

5  purposes of today's proceedings the absence of the operating

6  report shouldn't get in the way.

7          THE COURT:  All right.

8          MR. MORRISSEY:  Again, the U.S. Trustee, as is

9  everyone else, is certainly concerned about what is happening

10  with the Gianopoulos' and the closing that did not happen.

11  Unfortunately, I don't think anyone here could say that this

12  turn of events was not foreseeable, but I do believe that the

13  trustee's judgment was correct that in light of the fact that

14  the primary sale, or the preemptive sale, was going to bring in

15  more for the estate than any auction would have, that the

16  trustee did take the right course.  Hopefully, the obstacle to

17  the closing was minor as opposed to major and the two

18  alternatives suggested by Mr. Schwartz a little while ago, and

19  that this can still go forward.  But I also understand as I

20  believe does the Court, that Ms. Grubin is certainly going to

21  fish or cut bait sooner rather than later.  She has indicated

22  in light of the fact that she has already discussed this with

23  Keen, that she has already taken steps to embark on plan B so

24  to speak if necessary.

25          THE COURT:  All right.  All right.  If there's

21

1    nothing else then the fee applications -- I take it there are

2    no objections to the fee applications other than a very

3    significant holdback.

4           MS. GRUBIN:  If Mr. Schwartz could speak to the fee

5    applications, Judge?

6           THE COURT:  All right.

7           MR. SCHWARTZ:  Your Honor, the U.S. Trustee had some

8    minor objections --

9           THE COURT:  Right.

10          MR. SCHWARTZ:  -- to certain of the fee applications.

11   Those have all been --

12          THE COURT:  Resolved.

13          MR. SCHWARTZ:  -- resolved.  The only remaining

14   objection I believe is Mr. Pu filed an objection to Drinker,

15   Biddle, and Reath's fee application.  We had filed a short

16   response --

17          THE COURT:  I'm sorry, I didn't see it.

18          MR. SCHWARTZ:  -- yesterday which --

19          THE COURT:  I overlooked it I guess.

20          MR. SCHWARTZ:  -- which I can hand up, Your Honor, if

21   you like.

22          THE COURT:  Oh, give me the two-sentence version of

23   your objection.

24          MR. PU:  The blended rate contemplated by the trustee

25   is too high.  If you look at the market -- I annexed -- may I

22

1   give you my copy?

2           THE COURT:  No, no.  What is the blended rate?

3           MR. PU:  The blended rate that they contemplate is

4   336.  I annexed a book that tabulates all of the fee awards by

5   the Courts in the Second Circuit.  The average partner rate is

6   about 296.  The average associate rate is probably 175.  Now,

7   those are not bankruptcy cases but if you look at those rates,

8   the 336 is much too high.

9           Secondly, I look at the performance in my little

10  corner of the case.  Let me just make three or four points.  I

11  assume that you're still mindful of the adversary involving Mr.

12  D'Attomo which you sanctioned him $5,000.00.  You used the word

13  shocking for the acts of concealment five or six times over the

14  course of five minutes.

15          Secondly, the trustee used, in bringing the adversary

16  proceedings, the trustee used an improper shotgun approach.

17  That is they used a form complaint that sued every conceivable

18  defendant without alleging any facts other than the fact of the

19  payment.  There's a [inaudible] in my papers in which lawyers

20  are sanctioned for that.  Now, I say that if you use that

21  approach and you recover for the estate, then all right, you're

22  entitled to payment.  But if you use that approach in which you

23  shoot blind and you do not recover for the estate, then you

24  shouldn't be seeking payment.  The law requires that you make

25  inquiry --

1    THE COURT:  Well, did they recover or not?  Did they

2  recover?

3    MR. PU:  Well, that's what we don't know.  I served

4  some interrogatories.  We don't know with respect to each of

5  the adversary proceedings how much did they spend and how much

6  did they recover.  I say that that information should be

7  provided before the fee application is granted.

8    Just one more point.  If you look at the performance

9  itself, it's been derelict.  For instance, they miss the

10  statute of limitations in challenging my claim to a security

11  interest.  Secondly, when they sued me, they sued the wrong

12  party even though their own documents show that the right party

13  was Richard Pu.  In other respects as well.  In settling with

14  Questech they never consulted me.  I had been litigating with

15  Questech for about a year and a half prior to the bankruptcy

16  filing.  I knew of the defense that they should have taken into

17  consideration.

18    Similarly with respect to objecting to claims, Mr.

19  Tallo [Ph.] has submitted a $3 million claim.  Totally

20  frivolous.  I know it's frivolous because I represented the

21  Gianopoulos'.

22    THE COURT:  Has it been objected to?

23    MR. SCHWARTZ:  Your Honor, no claims except for Mr.

24  Pu's has been objected to because we don't know if there's

25  going to be an issue with unsecured creditors.  The only reason

24

1  why Mr. Pu's claims have been objected to is because, Your

2  Honor, [inaudible] as part of their own adversary proceeding.

3  So if we hadn't gone that route, as we cite in our reply, we're

4  happy to sit down with Mr. Pu and we can explain whatever we

5  think those claims are.

6          MR. PU:  So to sum up, if you look at the market rate

7  as reflected in that work that I annexed to my papers, and if

8  you look at the performance, the 336 rate is too high.  I say

9  that it ought to be about 200.  Let me offer again my papers.

10 I would urge that you take a look at it.

11         THE COURT:  All right.  What was the defense in the

12 Questech matter?

13         MR. PU:  The defense was that questech was engaged in

14 a bait and switch.  The salesperson would say we'll give you

15 rate X and then the Gianopoulos' would go out and get a

16 construction loan where they were locked in to opening that

17 store.  When it came time to sign the papers Questech would say

18 oh, I'm sorry that rate is no longer available.  The rate is

19 going to be higher.  There was a man in South Carolina who

20 killed himself because he desperately needed that loan and when

21 Questech did the switch part of the bait and switch, he

22 couldn't handle it and he took his own life.  I had made

23 arrangements for that man to come to New York and testify at

24 the trial but the bankruptcy proceeding intervened.  They

25 should have -- the trustee should at least have given me a call

25

1  at a minimum.  I can document the bait and switch.  May I

2  please hand up my papers?

3          THE COURT:  Sure.  What was the security for the

4  Questech loan?

5          MR. PU:  It was liens on everything [inaudible].  The

6  only tangible thing was the equipment in the shops.

7          THE COURT:  What about the franchise agreements.

8          MR. PU:  You cannot get a meaningful lien on

9  franchise agreements and that's because the franchisor has got

10  a veto on the franchisee.  It's like getting a lien on a lease

11  where the landlord can nix whoever you assign the lease to.  So

12  the only meaningful lien was that on the equipment in the

13  stores.  It's not so clear whether Questech would have been

14  able to sell the shop as a going concern.  Needless to say, if

15  you can sell the shop as a going concern you get a lot more

16  money than if you sell the microwave ovens in the shop.  It's

17  not so clear that Questech would have been able to do that

18  because Dunkin' Donuts has got the right to nix whoever the

19  prospective buyer is.

20          THE COURT:  Did the security agreement purport to

21  convey a security interest in the franchise agreements, the

22  business as a whole?

23          MR. PU:  It said everything, so the answer is yes.

24          THE COURT:  All right.  That's helpful to me, Mr. Pu.

25  Well, I thank you.

26

1          MR. PU:  Would you like to see some of the litigation

2  papers?

3          THE COURT:  No, no, not at this point but I thank

4  you.  Do I have a response?

5          MR. SCHWARTZ:  We have filed one and had one to your

6  chambers.  I can hand one up [inaudible].

7          THE COURT:  If you would hand it up.  I'm sorry, I

8  just haven't looked at these things and I think I better look

9  at them before I make a ruling.  All right.  Aside from that,

10  aside from Mr. Pu's objection, which I'm going to reserve on,

11  tell me where do we stand?

12          MR. SCHWARTZ:  Your Honor, we have no other

13  objections to our fee application.

14          THE COURT:  What about the holdback?

15          MR. SCHWARTZ:  The holdback is a 50% holdback so when

16  you add that on to our previous 50% holdback, we have well

17  over -- quite close to $2 million of holdbacks to cover any

18  future issues that come up.

19          THE COURT:  So the $4.4 million which is really more

20  like $3.5 million is subject to professional fee holdbacks of

21  another two and a half million?

22          MR. SCHWARTZ:  Total holdbacks probably closer to

23  about $3.8 million.

24          MS. GRUBIN:  Which would not include today's ruling,

25  Judge.

27

```
1              MR. SCHWARTZ:  So $4.8 million.

2              THE COURT:  So the total holdbacks exceed by far the

3    amount of money in the estate?

4              MR. SCHWARTZ:  Currently in the estate, yes, that's

5    correct.  It doesn't include obviously the remaining properties

6    that we have to sell.  It doesn't include the Matrix matter and

7    it doesn't include the 64 East matter.  I think we settled 27

8    of 31 of the adversary proceedings.  There's four other --

9              THE COURT:  Is that referred to in your response?

10             MR. SCHWARTZ:  I believe we do -- I don't know if we

11   specifically say that.  Your Honor, with respect to the

12   adversary proceeding, we sent demand letters out.  We sent over

13   50 demand letters out.  We ended up suing 31 parties.  Some --

14             THE COURT:  31?

15             MR. SCHWARTZ:  -- prior to that.  It wasn't shotgun

16   approach.  It's typical and proper fraudulent conveyance

17   claims.  Complaints are usually similar.  We were very

18   successful in resolving, as I said, almost all of those

19   complaints up to now.  We've recovered well in excess of

20   $500,000.00 on those and actually have done very well on those

21   matters.

22             THE COURT:  Okay.

23             MR. PU:  Judge, may I just make a comment --

24             THE COURT:  Yes, sir.

25             MR. PU:  -- about the results?  The reason that the
```

28

1  trustee does well is because the amounts in dispute are less

2  than the cost of defense.  So it's basically a shakedown.  I've

3  had other creditors in this proceeding tell me we gave the

4  trustee money because it was more expensive to stay and

5  litigate.  So that I don't believe that a lot of accolades are

6  due to the trustee for engaging in what amounts to a shakedown.

7        THE COURT:  Well, preference claims often do, I

8  guess.

9        MR. SCHWARTZ:  Your Honor, obviously there have been

10 many settlement motions that have been filed before Your Honor

11 that laid out everything.

12       THE COURT:  Okay.

13       MR. SCHWARTZ:  I would also say, Your Honor, the

14 Questech matter that was [inaudible] Mr. Pu [inaudible] it's

15 only now is a litigation [inaudible] that he brings it up.

16       THE COURT:  Okay.  Anything else on this?

17       MS. GRUBIN:  Your Honor, just one point.  In the

18 application to approve Wingate Russotti's final fee

19 application, they've also asked for permission to withdraw from

20 the case as special counsel.  So I have prepared a separate

21 proposed order in that regard.  There's been no objections to

22 that at all and --

23       THE COURT:  No objections?  That will be signed.

24       MS. GRUBIN:  So I --

25       THE COURT:  Give it to Jerry.

29

1          MS. GRUBIN:  I will.  I will.

2          THE COURT:  All right.  Anybody else?  Mr. Doshi?

3          MR. DOSHI:  Yes.  Good morning, Your Honor.  Amish

4    Doshi.  I just want to make one point.  I don't want to just

5    get into a debate here but since Mr. Pu mentioned Questech I

6    just want to state for the record that we dispute any

7    wrongdoing by Questech.  As Mr. Schwartz also said with respect

8    to the Questech settlement, it was noticed out.  If there was

9    any issue with the settlement, any party could have raised it.

10   In fact, it was a long hearing.  I have the settlement here.

11   There were various objections filed and the Court had overruled

12   those objections as well.  So I just wanted to get that on the

13   record.

14         THE COURT:  Okay.  All right.  Subject to ruling on

15   Mr. Pu's objection on the Drinker, Biddle, and Reath

16   application, I will sign an order providing for 50% holdback.

17   Mr. Morrissey, that's acceptable from the UST's point of view?

18         MR. MORRISSEY:  Yes, it is.  Also, just a technical

19   point on the Wingate fee application to which, by the way, the

20   U.S. Trustee did not object, they are withdrawing from the case

21   but it's not -- the parties are not seeking a final order on

22   that.  It's technically an interim order --

23         THE COURT:  I understand.

24         MR. MORRISSEY:  -- approving the fees.

25         THE COURT:  Right.  All right.  Are we up to Matrix?

30

1          MS. GRUBIN:  Judge, if I just might ask for some

2    clarity here?  You did say subject to ruling on Mr. Pu's

3    objection to my firm's fee application you would grant 50% fees

4    requested.

5          THE COURT:  Yes.

6          MS. GRUBIN:  Shall we submit -- does that mean you

7    have approved a 50% payment to Drinker Biddle or -- I'm just

8    unclear about --

9          THE COURT:  What will the total payments be under

10   this?

11         MS. GRUBIN:  $1,013,000.00 approximately.  That would

12   be 100% of expenses requested and 50% of the fees.  The precise

13   number is $1,013,471.36.

14         THE COURT:  I will approve that because there's ample

15   cushion in the holdbacks too --

16         MS. GRUBIN:  Thank you, Judge.

17         THE COURT:  -- to take care of Mr. Pu's objection if

18   it's sustained.

19         MS. GRUBIN:  Just so the Court knows, that would give

20   Drinker Biddle -- we would then have about a $2.8 million

21   holdback in this case which we believe is more than ample to

22   address any concerns.

23         THE COURT:  Of course.  Of course.

24         MS. GRUBIN:  So I have an order that I've prepared.

25   I'd submit --

31

```
 1          THE COURT:  Hand it up, hand it up.

 2          MS. GRUBIN:  Thank you very much, sir.

 3          THE COURT:  Now, are we on the Matrix?

 4          MS. GRUBIN:  Your Honor, we have also provided that

 5   the Pu objection is overruled in the proposed order.

 6          THE COURT:  Strike that part out.

 7          MS. GRECO:  Your Honor, just based on the issues

 8   being resolved for Wingate, Russotti and Shapiro, may I be

 9   excused?

10          THE COURT:  Yes.

11          MS. GRECO:  Thank you.

12          THE COURT:  Yes.  Whatever language you have in there

13   you can say the Court reserves decision on the Pu objection;

14   all right?

15          MS. GRUBIN:  Very good, Your Honor.

16          THE COURT:  All right.

17          MR. PU:  May I also be excused?

18          THE COURT:  Yes, indeed, Mr. Pu.  Thank you.

19          MALE SPEAKER:  Judge, may O'Connor Davies be excused?

20          THE COURT:  Yes, sir.

21          MALE SPEAKER:  Thank you, Your Honor.

22          THE COURT:  Okay.  On to Matrix.  Well let's see,

23   what -- I think we've had a fairly fruitful process here and I

24   gather there have been a number of resolutions.

25          MR. ROSEN:  At least we're trying to be --
```

32

1          MR. BROOKS:  Judge, I can report on the status of

2    that.

3          THE COURT:  Good.

4          MR. BROOKS:  There's actually one since we tendered

5    the order yesterday as well.

6          THE COURT:  All right.

7          MR. BROOKS:  I would add that we need to amend that

8    order that we submitted to you with respect to the

9    substantially similar lease issue which is in 5D and E to

10   reflect that we agreed on that, that there'll be no credit

11   there.

12         THE COURT:  Okay.

13         MR. BROOKS:  So we can tender an order on that as

14   well.  So the only open issues now, Judge, are the deficiency

15   report credits.  Okay?

16         THE COURT:  The deficient --

17         MR. BROOKS:  We agreed on -- I'm sorry.

18         THE COURT:  Say it again.

19         MR. BROOKS:  The deficiency report credit, Your Honor

20   ruled that there needs to be a credit for the deficiency

21   reports, the fixing of the various things in the stores.  We

22   agree, Mr. Rosen and I, on a way or a methodology to do that

23   which would be to have a neutral value those.  What I would

24   propose is that we have 30 days to do that.

25         THE COURT:  That's fine?

1        MR. ROSEN:  Yes, Your Honor.  Just so you understand,

2  we're doing this again to try and cut down on legal costs for

3  both parties in this case.

4        THE COURT:  Right.

5        MR. ROSEN:  The deficiency report is about

6  [inaudible] for each store and it doesn't give dollar values.

7  It's a checklist --

8        THE COURT:  I see.

9        MR. ROSEN:  -- of what has to be done.

10        THE COURT:  I see.

11        MR. ROSEN:  So rather than it would be a week's long

12  trial --

13        THE COURT:  Better to have some neutral who has some

14  expertise to put the dollar figures on it.

15        MR. ROSEN:  What we've done is --

16        MR. BROOKS:  We've reached out --

17        MR. ROSEN:  -- we've reached out to Dunkin' Donuts to

18  see who they're using in resolving these --

19        THE COURT:  Good.

20        MR. ROSEN:  -- or to see if we could find someone who

21  actually knows [inaudible].

22        THE COURT:  Terrific.

23        MR. BROOKS:  So the only other two issues are rulings

24  from Your Honor; one relating to the remodel issue.

25        THE COURT:  Right.

34

1            MR. BROOKS:  Then another relating to the 64 East

2    issue.

3            THE COURT:  Okay.

4            MR. BROOKS:  That's the only two other issues because

5    we reached an agreement on the CPL and CO issue --

6            THE COURT:  Good.

7            MR. BROOKS:  -- that Your Honor had before him.

8            THE COURT:  Good.  What is that agreement by the way?

9            MR. BROOKS:  That there'll be no credit.

10           THE COURT:  All right.

11           MR. ROSEN:  Because it's subsumed in the credit for

12   the Gianopoulos sale.

13           THE COURT:  Okay.  Have you resolved that?

14           MR. ROSEN:  Yes.

15           MR. BROOKS:  Yes.

16           MR. ROSEN:  We've come to a dollar number on that.

17           THE COURT:  You have.  Terrific.  Well, you need not

18   spread that on the record now if you don't wish to.

19           MR. BROOKS:  In terms of the dollar value?

20           THE COURT:  Yes.

21           MR. BROOKS:  It's in the order.

22           THE COURT:  Oh, it is?

23           MR. ROSEN:  It's in the order.  You have it.

24           MR. BROOKS:  You have it reflected in the order.

25   Would you like me to spread that on the record?

35

1          THE COURT:  Jeremy, do I have that order?

2          MR. BROOKS:  Did you say need not spread it?

3          THE COURT:  Do I have an order?

4          MR. ROSEN:  Okay.  Your Honor, that number I think

5    they're going to want to redact out.  I have no objection.

6          THE COURT:  I meant to say, and I think I did, you

7    need not spread that on the record.

8          MR. ROSEN:  Thank you.

9          MS. GRUBIN:  Thank you, Judge.

10         MR. BROOKS:  Yeah, okay, because we have a sale

11   process.

12         THE COURT:  Exactly.  All right.

13         MR. BROOKS:  Right.  Okay.  We can do that.

14         MR. ROSEN:  Your Honor, that was also based, just so

15   it's clear on the record, that was based upon information that

16   was provided [inaudible] confidentiality agreement --

17         THE COURT:  Fair enough.

18         MR. ROSEN:  -- that was signed, so --

19         THE COURT:  Very good.

20         MR. ROSEN:  -- that's probably the more cohesive way

21   to put it.

22         THE COURT:  Okay.  Good.  Well, that's excellent.  So

23   why don't we have a brief argument on the two points that are

24   in issue?  I've read the submissions.  Do you want to basically

25   summarize your position on -- let's take the remodeling first.

1          MR. BROOKS:  Yeah.  Judge, I mean I would stand on

2    our papers other than to say that, you know, we think 5.6,

3    Section 5.6 is expressed that the purchaser, Matrix, would

4    assume all the obligations under the franchise documents that

5    includes the remodeling.  Your Honor found that at the hearing

6    on the damages.  We cited to the findings in the order.  Mr.

7    Krischer also testified, and we cited to that in our paper as

8    well, where he acknowledged that obligation and in fact, as I

9    recall the testimony, he acknowledged that he had to do that

10   stuff.  We cited his testimony in our papers.  So we think it's

11   quite clear that that's an obligation that Matrix has, and

12   therefore, no credit should be on that.

13          On the other issue, the 64 East issue, that's just an

14   issue of, you know, whether funds should have been released by

15   the trustee.  As we said in our papers, and I'll just summarize

16   that, there was no knowledge of any fraud or any reason to

17   withhold that, so we don't think that's an appropriate credit

18   as well.  That's all I have, Judge.

19          THE COURT:  Okay.  Mr. Rosen, deal with remodeling

20   first.

21          MR. ROSEN:  Yes, I will.

22          THE COURT:  You both agree, you both point to 5.6.

23          MR. ROSEN:  Your Honor, I don't agree.  Well --

24          THE COURT:  Well, you both point to 5.6.

25          MR. ROSEN:  We both point to 5.6, Your Honor, and

37

1  what it says is purchaser does not assume any obligations

2  except those arising after the closing date unless explicitly

3  provided for in this agreement.  The issue becomes, and as we

4  said in the papers, this was an obligation, and there's a

5  confusion in the paper, in the responsive papers.  There were

6  remodels that came due after the closing, some of which were

7  going to become due within weeks after the closing.  There were

8  approximately four.  If you look at the testimony of Mr.

9  Krischer which is quoted on the next page of the papers, he's

10  talking about the reality of the situation was that we were

11  going to be responsible for those four remodels, and that's

12  what he's talking about in his testimony.  He specifically said

13  we know there were some that we were going to do.  Not all,

14  some, and that we have the money to do them because that was

15  one of Dunkin' Donuts' concerns in approving that.  If you look

16  at the language there that they quote in the papers --

17         THE COURT:  Is this something different than I quoted

18  at various

19         MR. ROSEN:  This is what they have on Page 3 -- the

20  trustee -- Page 3 of her response to my brief.

21         THE COURT:  Okay.

22         MR. ROSEN:  Okay?  You'll see this paragraph says, "I

23  believe this paragraph talks to the actual remodeling of some

24  of the existing restaurants.  We had always been told that it

25  was a few, four or five, and we have always been told that it

38

1    would be required to do these remodels which we agreed to."

2    I'm not disputing that we had to do the remodels that came due

3    after closing.  That's what that section in the contract says.

4    Any obligation that comes due after closing we were responsible

5    for.

6            The issue in this case is -- and that's what the rest

7    of that talks about.  The rest of that issue is that it came to

8    light that there were some 10 other remodels approximately that

9    were required to be done that had never been done.  Dunkin'

10   Donuts was now saying we want those done now.  Our client was

11   going to have to do them.  The issue of who was going to have

12   to pay for those, because those were obligations that had

13   become due under the franchise agreement prior to closing and

14   they were specifically excluded under the contract from being

15   an obligation of the purchaser unless they were expressly set

16   forth.  I mean they've got -- and the proof is in the pudding

17   because in the TPG --

18           THE COURT:  What about the April 30th e-mail?

19           MR. ROSEN:  Your Honor, that goes to my client's

20   understanding.  You ruled on that in terms of my client's

21   understanding of what was going to happen.

22           THE COURT:  But put aside my ruling.  The April 30th

23   e-mail from Krischer says, and this is Krischer, quote, "From

24   what I can read at least five of the ten shops you are talking

25   about were due to be remodeled in 2003 and two more in 2005.

39

1   As I said in my previous correspondence to you, my company has

2   every intention of doing these remodels and construction of

3   shops.  We (Dunkin and my company) just have to come up with a

4   schedule that is equitable and fair to both of us."

5        MR. ROSEN:  Right.  Your Honor, that doesn't speak --

6   it was clear for the closing at that point Dunkin' Donuts was

7   not going to get their approval unless the remodels were done

8   forward.  My client was going to have to do that.  That e-mail

9   doesn't talk to who's going to pay for that.  That e-mail

10  couldn't override the expressed terms of the contract.  Mr.

11  Krischer, all right, in an e-mail, all right, could not -- is

12  talking about getting Dunkin' Donuts' consent to the sale, and

13  they're saying we want -- we're not consenting to -- the issue

14  was at the meeting in there, we're not consenting to the sale

15  unless all these defaulted remodels get done.  All right?  And

16  we want them done.

17       So our client is saying -- and you remember, and it's

18  not part of the damages I'm looking for in reliance on your

19  decision.  My clients were then -- Dunkin' Donuts was demanding

20  that we close all of those stores immediately.  So the damages

21  would have been, that you cut off in your decision, would have

22  been our lost profits for having to close down all of those

23  stores at once while the remodels were done, not the fact of

24  who was going to have to pay for it.  There was nothing in that

25  e-mail that waives the provision of who is responsible for it,

40

1  of paying for it.  The obligations that became due under the

2  franchise agreements beforehand, all right, beforehand had to

3  be cured.

4          You've already ruled in a number of cases in this --

5  over my strenuous objection, that even though there were not

6  allocations in this contract that after the fact allocations

7  could be come up for for things that the debtor could not

8  provide.  I've strenuously objected to that through this case.

9  You know that.  But you've ruled that way.  So it has to be

10 consistent.

11         In the TBG contract which had the same language, they

12 knew this issue is out there, they gave TBG a credit of $5

13 million for doing these build outs because they still hadn't

14 been done.

15         I will grant to you, Your Honor, that in that interim

16 I think one, I think one more build out may have become due.

17 As I stand here thinking about the case, and unfortunately I

18 know this case way too well, I think that the schedules in the

19 back of my brain I think -- and to be -- you know I'm always

20 straight with you.  I think there is one more build out that

21 came due to TBG that my client would have had to do, so maybe

22 there's a deduct off that 5 -- you know, I think they were

23 estimated at $500,000.00 each.  So many the credit is

24 $4,500,000.00 instead of $5 million.  You know, I know today

25 has been a distressing and disturbing day in terms of the state

41

1   of this case, but the damages for my client are still --

2   they're entitled to the credits.  They would -- one way or the

3   other you have to add that 5 -- whether it's a credit to us or

4   you add that $5 million or $4.5 million onto the TBG contract,

5   that's a real economic picture here and my client is entitled

6   to that credit.  It still leaves the trustee with a big damage

7   award which we're going to, you know, we're going to have to

8   fight out, but they're entitled to that credit because it was

9   something -- when it came down to the closing and they were

10  looking at that, the lawyers were at the table, and they were

11  looking at that document.  That was something the debtor had to

12  perform.  There is no doubt from the testimony in the trial

13  that the obligations on however many of those stores were came

14  due prior to closing and it was the debtor's obligation.

15          It's no different, Your Honor, than the deficiency

16  reports.  The debtor was supposed to, which you've already

17  ruled on because the contract is clear on that, the deficiency

18  reports --

19          THE COURT:  I thought I hadn't ruled on the

20  deficiency because you settled it.

21          MR. ROSEN:  No, the deficiency reports you've already

22  ruled.  You ruled we're entitled to the credit.  You just

23  haven't -- we just haven't determined the amount.  The

24  deficiency reports were things the debtor was supposed to fix

25  all along.  There were defaults on things that had to be under

42

1  the franchise agreements, and any deficiencies that existed

2  under the contract as of the last date of the reports had to be

3  fixed.  In a legal concept way this is no different.  These

4  were defaults under the franchise agreements that had to be

5  cured and there was to be a credit at the closing.  As I said

6  earlier, there's nothing that Mr. Krischer said that's

7  inconsistent with that position.

8          So should I turn to the other one or do you have --

9          THE COURT:  No, no.

10         MR. ROSEN:  Okay.

11         THE COURT:  Well Paragraph 5.6 says in the first

12 sentence, "Purchaser shall assume all obligations of debtor

13 under all franchise documents and in accordance with the

14 bidding procedures approved by the Court in connection with the

15 sale of the assets."  Now the next sentence -- and that's one

16 that the trustee relies on; right?  Hello?

17         MR. BROOKS:  The first sentence is the one the

18 trustee relies on, Your Honor.

19         THE COURT:  That's what I just read.  The second

20 sentence is the one you rely on, Mr. Rosen, and that says,

21 "Purchaser does not assume any obligations, except those

22 arising after the closing date, unless explicitly provided for

23 in this agreement or the bidding procedures approved by the

24 Court."  Now, that's what you rely on; right?

25         MR. ROSEN:  Yes.

43

1          THE COURT:  I don't have to worry about the rest of

2    5.6.

3          MR. ROSEN:  I had your transcript in front of me.  I

4    don't have it in front of me.  I don't think so, Your Honor.

5          THE COURT:  It doesn't seem to be relevant.

6          MR. ROSEN:  Right.  I didn't think it was.

7          THE COURT:  Now, is part of your agreement -- who's

8    arguing this?

9          MR. BROOKS:  I am, Your Honor.

10         THE COURT:  Is part of your agreement with regard to

11   the second sentence that the bidding procedures makes clear

12   that there are remodeling obligations?  Is that part of your

13   agreement?

14         MR. BROOKS:  I don't know the answer to that, Judge.

15   My argument is that the first sentence is very expressed and

16   says that the purchaser shall assume all obligations under the

17   franchise documents and those obligations include remodeling

18   obligations.  I would also point out that Section 3.12 dealing

19   with the deficiency reports, Your Honor, when it was intended

20   by the parties that the seller shall cure something or

21   remediate something, it was expressed in here.  That's what

22   happened in 3.12.

23         THE COURT:  Oh, 3.12 expressly addressed --

24         MR. BROOKS:  Right.

25         THE COURT:  -- the deficiency.

44

1          MR. BROOKS:  Exactly.

2          THE COURT:  Okay.

3          MR. BROOKS:  That would support our argument as well

4   that if there was the intention that we had to cure, or handle,

5   or take care of the remodeling obligations, it would also be

6   expressed just like it was in 3.12.  In fact, it would be in

7   that paragraph.  The parties didn't do that.

8          MR. ROSEN:  To address your issue about the bidding,

9   I don't think there was anything -- I remember there was -- and

10  we may have to go back to the trial testimony on this, but

11  there was extensive trial testimony on the issue of what was in

12  the bidding documents about the remodels.  While there was a

13  chart of when they were supposed to be done, there was nothing

14  in there as to whether or not they were done or not, and there

15  was no way from looking at them whether or not the remodels had

16  been done.  Dunkin' Donuts never raised the issue or it wasn't

17  brought up.  So I don't think there's anything in the bidding

18  documents one way or the other that resolves this issue.  I'm

19  doing this from memory.

20         THE COURT:  I thought the bidding -- my recollection

21  of the bidding documents -- what do we call the body of

22  documents?  Come on, what do we call the body --

23         MS. GRUBIN:  Was that the offering memorandum, Judge?

24         THE COURT:  There was the offering memorandum and

25  then there was all the backup documents.  What do you call

45

 1   that?  Oh, come on.

 2            MR. ROSEN:  We're all losing gray matter on this.

 3            MS. GRUBIN:  No, no, I believe it's the offering

 4   memorandum with all the attachments.

 5            MR. ROSEN:  I don't recall what it was called, Your

 6   Honor.  I don't think that's it but I don't recall.

 7            THE COURT:  That's not it.  Anyway, the [inaudible],

 8   the --

 9            MR. BROOKS:  The due diligence?

10            THE COURT:  The due diligence level two, the level

11   two due diligence materials included documents which showed

12   what the remodeling obligations were as of that time.

13            MR. ROSEN:  But what did it matter?  If I may pose a

14   question, what did it matter?  If it showed -- it would still

15   require -- if I'm right on the second sentence -- and Your

16   Honor, to say that --

17            THE COURT:  If they had been --

18            MR. ROSEN:  -- I'm not right on this sentence --

19            THE COURT:  Excuse me, excuse me.  If they had been

20   remodeled in 2002 or 2003 --

21            MR. ROSEN:  I don't think the --

22            THE COURT:  -- then they wouldn't have been listed.

23   The documents that I recall were lists of current obligations

24   unfulfilled.

25            MR. ROSEN:  I don't recall it that way, Your Honor.

46

1   It was just a chart that had been prepared previously that had

2   them all out from the beginning of all the leases going far out

3   into the future is my recollection.  But the issue --

4           THE COURT:  Well, what is your recollection?

5           MR. BROOKS:  Well actually, I happen to remember

6   this, Your Honor.  There were piles of documents sitting right

7   there by the podium and I had Mr. Krischer go through it and

8   point out everything in there.  I recall that.  I think they

9   were exhibits.  They were a group of exhibits.

10          MR. ROSEN:  I think that was on -- that was on the

11  leases I think.  Well, we're both talking about a transcript

12  that's part of the record.  But Your Honor, if I go back to the

13  second sentence of that and I pose this question, let's assume

14  for the second that there was even something in there that said

15  that these were not done.  All right?  Under that reading of

16  the contract there was still something if they were not done

17  that my client was not obligated to pay for it because to read

18  that --

19          THE COURT:  Okay.  You know, there's an ambiguity at

20  best between these two sentences with regard to the remodeling

21  obligations.

22          MR. ROSEN:  It gets construed in favor of my client.

23  We're not the drafter of the contract.

24          THE COURT:  Excuse me, excuse me.

25          MR. ROSEN:  Okay.  Sorry, Your Honor.

47

```
 1        THE COURT:  First of all, I don't know who drafted
 2   the contract but putting that aside, assuming that it was
 3   drafted, I guess it was the form used, yes.  An ambiguity is
 4   going to be resolved by what the parties' testimony was as to
 5   what their actual views were.  When I went through these e-mail
 6   exhibits I came upon the two e-mails that I have quoted at
 7   length on Page 39 of the decision, the typewritten version of
 8   the decision.  They make very clear that Krischer acknowledged
 9   that Matrix had an obligation to do the remodeling.
10        MR. ROSEN:  To get the Dunkin' Donuts approval but
11   not -- Judge, I'm repeating myself now but I don't think there
12   was anything in the record that says that they were willing to
13   pay for those.  They talk about the ones, in the language that
14   they have set, the four or five that they knew were coming up
15   that they were going to have to pay for and they showed that
16   they had the money to do it.  Then the dispute came up.
17   Dunkin' Donuts said you have to do all of these and we're going
18   to require you to close all the stores.  If you go through the
19   testimony in the trial --
20        THE COURT:  But he says in the April 30 e-mail, "As I
21   said in my previous correspondence to you, my company has every
22   intention of doing these remodels and construction of shops."
23        MR. ROSEN:  Well, they had to be -- my client had to
24   do them if the matter was to close because Dunkin' Donuts
25   wasn't going to approve the transaction at that point unless it
```

48

1  did.  But it didn't resolve -- all of this came up at the

2  meeting, if you go back to it, when my client met with Dunkin'

3  Donuts and Dunkin' Donuts raised the remodels as a condition of

4  agreeing to the approval of the franchise.  That meeting the

5  debtor was not at, was not a party at, and didn't --

6           THE COURT:  All right.  Is there anything further on

7  this?

8           MR. ROSEN:  No, Your Honor.  I think I made my point.

9  I think if you go back -- if you think it is a parole evidence

10 issue that you have to go through, I'd just say there's a lot

11 more testimony in the records of this and the e-mails other

12 than taking it out of that one context.

13          THE COURT:  Well, wait a second.  I'm not aware of

14 any testimony in the records or contemporaneous e-mails that

15 suggest Krischer saying well sure, we have to do these e-mails

16 [sic] but we don't have to pay for them.  They have to be taken

17 in a reduction of purchase.  There's no intimation of that at

18 all.

19          MR. ROSEN:  But his e-mails were with Dunkin' Donuts.

20 It would be completely -- the debtor is not in this

21 communication with Dunkin' Donuts.  This is part of the

22 approval process with Dunkin' Donuts.  That's not their issue.

23          THE COURT:  Is there any document at all in which

24 Krischer, or anybody else from Matrix, raises a question as to

25 who was supposed to, as between the debtor's estates and

49

1  Matrix, who was supposed to actually pay for the cost of the --

2          MR. ROSEN:  No, because the disapproval, the

3  rejection letter from Dunkin' Donuts came down three or four

4  days after this, so the issue never got resolved.

5          THE COURT:  It was never raised.

6          MR. ROSEN:  Your Honor, it was --

7          THE COURT:  I don't recall any evidence or testimony

8  that it was ever raised.

9          MR. ROSEN:  With the debtor?

10          THE COURT:  Yes.  None.

11          MR. ROSEN:  The supervening events came in, but the

12  issue comes in, Judge, that if you've got the language in the

13  contract, you've got an ambiguity there that requires -- it

14  says my client is not liable for this.  Then Dunkin' Donuts

15  raises the issue as well it's going to have to be done.  It

16  never got to the point -- the issue is in terms of the

17  performance of the debtor -- here's the issue before the Court.

18  If it had come down to closing on the language under the

19  contract who would have been responsible for paying for the

20  past due build outs under the interpretation of the contract.

21  You may or may not agree with me but I think under a plain

22  reading of -- unless you're going to interpret the contract to

23  completely weave that second sentence out of it, which under

24  construction is not something that should happen, my client is

25  entitled to that credit.

50

1          THE COURT:  Anything further from either side on this

2  issue?

3          MR. ROSEN:  No.  The other issue I can --

4          MR. BROOKS:  Just a comment that we filed briefs on

5  this, Your Honor, and Matrix had an opportunity if there was

6  any documents that contradicted what we said in ours, or

7  provided support for any -- even ambiguity, they had the

8  opportunity to do so.  I frankly don't think 5.6 is ambiguous.

9  I think the second sentence doesn't create an ambiguity

10  relative to the first one because the first one is the

11  expressed, in my view, is the expressed assumption of that

12  obligation which is an exception as you read the second

13  sentence.  I think the second sentence is simply a catchall.

14          THE COURT:  All right.  This is my ruling, if you're

15  done.  Are you both done?

16          MR. BROOKS:  Yes.

17          MR. ROSEN:  On this issue?  Would you like me to

18  finish the 64 issue or --

19          THE COURT:  I'll get to that.  With regard to the

20  remodeling obligation and whether or not there should be a

21  credit in respect to the cost to the remodeling obligation, my

22  views on the remodeling obligation are as set forth under the

23  heading E, quote, "The shop remodeling obligation," which

24  appear on Pages 38, 39, and part of 40 of my July 25, 2007

25  decision on the question of liability.  I see no reason based

51

1  upon the subsequent submissions of the parties to change any of

2  the findings that appear under heading E at Pages 38 to 40.

3         I found then, and it is my ruling now, that Matrix

4  certainly in the point -- from the perspective of Matrix

5  employee or person who was doing their due diligence and was

6  engaged on a direct basis with the debtors and with Dunkin'

7  Donuts clearly understood prior to the entering into the

8  agreement and after, and he acknowledged in writing that Matrix

9  had the obligation to do the remodeling.  No evidence, no

10 document, no testimony has been called to my attention from the

11 trial record that suggested in any way at all that Dunkin'

12 Donuts recognized that it had the obligation to do the

13 remodeling but it didn't have the obligation to pay for the

14 remodeling.

15        Based upon my findings and upon the evidence that was

16 the predicate for those findings at Pages 38 to 40, it's my

17 view that under the contract, assuming even that there is an

18 ambiguity as between the first sentence of 5.6 and the second

19 sentence of 5.6, any ambiguity as to what Matrix's obligation

20 was with regard to the remodeling was laid to rest by the

21 evidence, the testimony and the evidence at the trial.  Matrix

22 knew -- Matrix at least as far as Krischer was concerned, knew

23 that it had the obligation to do the remodeling.  There is no

24 suggestion anywhere in the record that I can recall or that has

25 been recalled to me in connection with this hearing supporting

52

1   the notion that although Matrix recognized that it had the

2   obligation to do the remodeling, it didn't have the obligation

3   to pay for it.

4         So I also think that there is much to the trustee's

5   argument that there really is no ambiguity created by the first

6   and the second sentences of 5.6 and that construed as well

7   articulated by counsel of the trustee, those two sentences can

8   be read harmoniously to require, or to not shift to the trustee

9   or to the debtor's estates the cost of the remodeling

10  obligation.  Nonetheless, if there is an ambiguity then it

11  seems to me looking at the testimony and the documentary

12  exhibits, documentary evidence at the trial, it was perfectly

13  clear that Matrix knew that it had the obligation not just for

14  four or five stores but for five, at least five of the ten

15  shops that the remodeling were due in 2003 and two more in

16  2005.  So seven of the ten shops that required remodeling all

17  preceded the date of the agreement.  Krischer recognized that

18  Dunkin' Donuts had the duty to do those.  There is no

19  suggestion anywhere in the record that I'm aware of or that I

20  can recall, or that has been called to my attention in which

21  there was any suggestion or intimation by anybody on behalf of

22  Matrix that -- well sure, we have to do the -- we, Matrix, have

23  to do the remodeling but the debtors have to pay for it.  There

24  is no such evidence in the record that I'm aware of.

25         The controversy was not over whether Matrix had the

53

1   obligation to do the remodeling including the obligation to pay

2   for the remodeling.  The controversy related to whether or not

3   the stores had to be closed.  That was certainly an issue as

4   between Dunkin' Donuts and Matrix.

5           So that's my ruling.  There should be no credit in

6   respect to the remodeling obligation.

7           Now, as far as 64 East is concerned, I'm not really

8   sure, Mr. Rosen, that I understand the argument.

9           MR. ROSEN:  Okay.  There's two parts --

10          THE COURT:  Let me just try to articulate it as best

11  I understand and then you can say no Judge, you don't have it.

12          What happened was that a bid was put in by this

13  entity controlled by Mr. Borek which evidence long after the

14  fact revealed was financially backed up by the Gianopoulos

15  brothers and their wives.  That was a letter that was delivered

16  to me by the U.S. Attorney's Office.  It was revealed to me

17  unfortunately after the trustee, without requesting Court

18  approval, returned the 64 East bidding deposit.  Had the

19  trustee, or certainly had the Court known that there was really

20  a genuine fraud inherent in the 54 East bid because it was a

21  bid that was backed up by, and if you will, provoked it appears

22  by the Gianopoulos brothers contrary to the bidding procedures,

23  there would certainly have been litigation, what the outcome

24  would have been, I don't know, about the question of whether or

25  not that bid could be returned.

54

1          Now, what that has to do with Matrix, I don't have

2    any idea.

3          MR. ROSEN:  Okay.  I'll --

4          THE COURT:  So you've got to help me on that.

5          MR. ROSEN:  I'll try to help, Your Honor.

6          THE COURT:  Yes.  Of course if there had been

7    litigation and the Court had ruled that because it was a

8    fraudulent bid the bidding deposit could not be returned, yes,

9    the debtor's estates would have been richer by whatever the

10   amount the bid was.  What was it, the bidding deposit?

11         MS. GRUBIN:  It was a $20 million bid, Judge.

12         THE COURT:  So is it --

13         MR. ROSEN:  No, no, the deposit was 1.8 I think on

14   that case.

15         THE COURT:  It was less than 20.  Well, whatever the

16   bidding deposit was --

17         MR. ROSEN:  I think the deposit that was returned was

18   $1.8 million if I recall correctly.  It was an $18 million bid

19   so I think it was --

20         THE COURT:  Okay.  So the estate would have been a

21   million whatever --

22         MR. ROSEN:  Correct.

23         THE COURT:  -- richer than it is.

24         MR. ROSEN:  I have --

25         THE COURT:  What does that have to do with Matrix?

55

1          MR. ROSEN:  I have a two or three part argument to

2  that.

3          THE COURT:  All right.

4          MR. ROSEN:  The first thing, based on the analysis

5  that you just did, Your Honor will recall that the trustee did

6  go after Borek on that in 64th Street and did, over the release

7  of that deposit and the claim, and did receive a $350,000.00

8  cash payment in terms of the return.  So my first argument is

9  at the least I'm entitled, my client is entitled to the credit

10  for that 350 that came back --

11          THE COURT:  But why?  But why?

12          MR. ROSEN:  Because it's money that came back on

13  account of the sale of the same assets.  It was part of the

14  bid.  Otherwise, what were the damages, Your Honor, if it

15  wasn't for the bid on the sale of the assets?  That's what it

16  arose from.  If the trustee -- would there be any doubt if we

17  found out beforehand, and I don't think it relates to the

18  fraud, but for whatever reason that deposit was defaulted --

19          THE COURT:  Right.

20          MR. ROSEN:  -- after my contract.  Would my client be

21  entitled to a credit for that defaulted contract?

22          THE COURT:  Yes, that's the issue.

23          MR. ROSEN:  So I think the answer is yes because it's

24  a --

25          THE COURT:  Why?

56

1              MR. ROSEN:  Because it's a sale, because it's a

2     deposit that was received on account of the sale of the same

3     assets.

4              THE COURT:  Anything else?

5              MR. ROSEN:  Well, the second part of it is, Your

6     Honor, and then they got the 350, and then the second part of

7     that is again, I don't think and I've always maintained that it

8     should not have been released because it was, and I think you

9     made a ruling on this already and you'll tell me if you did, it

10    was released for the same reason that the Matrix deposit was

11    retained, and that was 64th Street's bid was rejected by

12    Dunkin' Donuts because Mr. Borek had a criminal record.  The

13    trustee did not say to Mr. Borek, did not say to 64th Street go

14    get a new principal who's acceptable to Dunkin' Donuts and

15    proceed with the contract.  They just gave him his money back

16    without a Court order.

17             THE COURT:  So what?

18             MR. ROSEN:  Because he should have been forced to

19    have either gone through with that contract or to do the same

20    thing my client was required to do, and then there would be

21    another damage action.  Or at the very least my client should

22    be credited for the amount of that deposit because it should

23    have been retained.

24             THE COURT:  Anything else?

25             MR. ROSEN:  No, Your Honor.

57

1           THE COURT:  Okay.  My ruling is that there should be

2  no credit either in respect of the totality of the Borek

3  deposit that was returned or the $350,000.00 that was recovered

4  by the estate in a settlement with Borek, or any other monies

5  that might relate in the future, or might not relate in the

6  future, to the 64 East bidding deposit matter.  Nothing in

7  relation to the 64 East bidding deposit has anything to do with

8  the damages suffered by the debtor's estate as a consequence of

9  Matrix's breach of its contract.  Nothing.  There is simply no

10  causal relationship, there's no connection at all.

11          The bidding deposit, I may point out also, with

12  regard to Matrix, has been withheld by the trustee and I have

13  ruled that it is forfeited not because Krischer was rejected

14  but because Matrix breached its contract.  The Borek matter has

15  nothing to do with the damage claim of the debtor's estates in

16  the Matrix matter.  It's just completely unrelated.  So there

17  is no basis at all either theoretically or causally for holding

18  any monies that the estate should have retained or did retain

19  or derive relating to the 64 East bidding deposit.  There's

20  simply no connection between those funds and the damages

21  suffered by the debtor's estate in connection with the Matrix

22  agreement.

23          That's my ruling.  You'll do an order that conforms

24  to that on both of those outstanding issues.

25         MR. ROSEN:  Well, Your Honor, do you want to -- I

58

1  think your intent -- and we're probably going to stand up and

2  say the same thing -- I think your intent in this matter had

3  been to have one order because you didn't want to have -- you

4  wanted everything preserved for appeal.

5         THE COURT:  Fine.  I think that's right.

6         MR. ROSEN:  So I assume that these rulings will be

7  incorporated.

8         THE COURT:  I think that's right.

9         MR. ROSEN:  Obviously, I disagree with them.  I think

10  I've made that clear on the record.

11         THE COURT:  Of course.  No, no --

12         MR. ROSEN:  All right?

13         THE COURT:  -- your record is --

14         MR. ROSEN:  In all respects, Your Honor.

15         THE COURT:  Sure.

16         MR. ROSEN:  But I think they will be incorporated in

17  the order he has.  Run them by me --

18         THE COURT:  Yes.

19         MR. ROSEN:  -- and then we can submit it.

20         THE COURT:  No, absolutely, absolutely.  There

21  should be one order.

22         MR. ROSEN:  I don't know if you want --

23         THE COURT:  Really the only thing we're waiting on --

24         MR. ROSEN:  You're waiting on the other issues.  You

25  probably don't --

59

```
 1              THE COURT:  -- is the reserve, is the thing they were

 2    going to have --

 3              MR. ROSEN:  Deficiency reports.

 4              MS. GRUBIN:  Deficiency reports.

 5              THE COURT:  The deficiency reports.

 6              MR. ROSEN:  You have to --

 7              THE COURT:  That's it; right?

 8              MR. ROSEN:  Yeah.  You may not want to enter this

 9    order until that's done.

10              MR. BROOKS:  No, there's language in the order

11    reflecting that the parties have agreed to [inaudible].

12              MR. ROSEN:  But you still -- there's a single order

13    with all that.

14              MR. BROOKS:  Oh, I see what you're saying.  Then it

15    won't be a complete --

16              MR. ROSEN:  It won't be a complete.  I think we

17    should incorporate this and then --

18              THE COURT:  Yes.

19              MR. ROSEN:  -- you can see it but you probably don't

20    want to enter it until we've resolved that other issue.

21              THE COURT:  It seems to me it makes sense.  It's only

22    going to take what, a month?

23              MR. ROSEN:  Hopefully.

24              THE COURT:  The neutral is supposed to -- have you

25    identified a neutral?
```

60

```
 1          MR. ROSEN:  No, not yet.  We really, on Friday I shot

 2   an e-mail to Ron Degen and he got back to me on Saturday saying

 3   he would have his client look into it.  It's Thursday and I

 4   haven't heard back from him yet, but he's doing me a favor so I

 5   can't really yell at him.  I think the trustee made the same

 6   request.

 7          MS. GRUBIN:  Mr. Degen is prepared to cooperate with

 8   us —

 9          MR. ROSEN:  Yeah.

10          MS. GRUBIN:  -- and his client as well.  I've spoken

11   to him as well about this.

12          THE COURT:  Yes.

13          MS. GRUBIN:  So I mean they don't move as quickly

14   as -- you know, it may take a little time.

15          THE COURT:  The point is I think there does need to

16   be one or -- actually, that's not going to be contested though;

17   is it?

18          MR. BROOKS:  Well --

19          THE COURT:  Or is it?

20          MR. BROOKS:  Actually no because the --

21          THE COURT:  If you've agreed that whatever the --

22          MR. BROOKS:  Right.

23          THE COURT:  -- the honest broker decides is going to

24   be binding on you both then that would not be a subject for

25   appeal anyway.
```

61

1          MR. BROOKS:  That's the whole point of it.

2          MR. ROSEN:  But you're still going to have one --

3     right, Your Honor, but you can't enter an order and judgment --

4          THE COURT:  Sure you can.

5          MR. ROSEN:   until we know what the monetary amount

6     is.

7          THE COURT:  Sure you can.  You can enter an order

8     that provides for a final number subject to decrease by an

9     amount decided by the neutral.

10         MR. ROSEN:  When does --

11         THE COURT:  So you can have a final order.

12         MR. ROSEN:  Then the appeal time runs from the entry

13    of that order or --

14         THE COURT:  Yes.

15         MR. ROSEN:  -- or from when the final order comes in?

16         THE COURT:  It is the final order.  It will be a

17    final order.  It will be self-fulfilling.  It will --

18         MR. ROSEN:  Your Honor, my only problem with that

19    that I would raise on this --

20         THE COURT:  Yes.

21         MR. ROSEN:  -- my client is going to then -- if

22    you're going to enter that order, if the judgment is going to

23    be entered on it and we don't know what the amount of that

24    credit is going to be -- my client thinks it may be as high as

25    $2 million.  There's not going to be any document.  My client

62

1  wants to try and bond this.

2            THE COURT:  Oh, I see.

3            MR. ROSEN:  What's the number?  We need to know.  We

4  need a final judgment number.

5            MR. BROOKS:  I think it might be cleaner to do one

6  order --

7            THE COURT:  I do too.

8            MR. BROOKS:  -- in this process.

9            THE COURT:  You know, it might be cleaner to get it

10  done.  I'm just thinking about from everybody's point of view.

11  Get a final order.  Can't you just split a baby on this?

12            MR. ROSEN:  I can't on this for my client because I

13  don't -- Your Honor, I think you have to, unlike in other

14  situations, I think you have to give both sides credit where we

15  could agree on things --

16            THE COURT:  Oh, I do, I do.

17            MR. ROSEN:  We have not --

18            THE COURT:  No, no, I give both sides great credit.

19            MR. ROSEN:  I mean if I were playing the delay game

20  here, we would have --

21            THE COURT:  No, no, I know you're not.

22            MR. ROSEN:  -- we would have been litigating all

23  kinds of things.

24            THE COURT:  No, I --

25            MR. ROSEN:  We could have had a three day trial --

63

1            THE COURT:  Please, I completely understand that.

2            MR. ROSEN:  -- over the leases.  All right?

3            THE COURT:  Well, if you can't settle it then you'll

4    have to wait.  No, I'm not --

5            MR. ROSEN:  Okay.

6            THE COURT:  -- I'm not suggesting any effort to delay

7    because clearly there's been a very great deal of constructive

8    work to resolve issues.  So I guess we are where we are.

9            What you can do is work out the order that will

10   simply await that final blank.

11           MR. ROSEN:  That's what I suggest.

12           THE COURT:  Yes.

13           MS. GRUBIN:  Your Honor, do you want to schedule

14   another conference just for control purposes on this matter?

15           THE COURT:  If you think it's needful.

16           MS. GRUBIN:  It doesn't hurt, Your Honor.

17           MR. ROSEN:  As long as you don't make it during the

18   winter break in February, Your Honor --

19           MS. GRUBIN:  It doesn't hurt.

20           MR. ROSEN:  -- because I will not be here.  After

21   that would be fine.

22           THE COURT:  Early March.  Get a date.

23           MS. GRUBIN:  Perhaps that date can also be the next

24   status conference, Judge?

25           THE COURT:  Yes.

64

```
 1          MR. ROSEN:  All right.  Then I'll --

 2          THE COURT:  I think that's good.  Why don't you make

 3  it in mid-March?  All right?  Make it in mid-March.  That way I

 4  think you'll be well done with that.  Fair enough?

 5          MS. GRUBIN:  I'll go get a date from your --

 6          THE COURT:  Yes.  We can pick a date now I would

 7  imagine.  Let's see.  I'm going to suggest --

 8          MR. ROSEN:  Just stay away from I think it's the 16th

 9  to the 19th I think.

10          THE COURT:  What is that, spring vacation?

11          MR. ROSEN:  Yeah.

12          MS. GRUBIN:  [Inaudible].

13          MR. BROOKS:  Yeah, I think I have the same problem.

14          MR. ROSEN:  What?  Maybe we're going to the same

15  place?

16          MR. BROOKS:  No.

17          MR. ROSEN:  Wouldn't that be fun?

18          THE COURT:  Should we make it the 13th?

19          MR. ROSEN:  Your Honor, I don't have my book with me

20  but that sounds fine.

21          THE COURT:  Or Wednesday the 12th or the 13th?

22          MS. GRUBIN:  Either day works for me, Judge.

23          MR. ROSEN:  Either day I think will work.

24          THE COURT:  It's just a status conference.  Why don't

25  we make it the 13th?
```

65

1          MS. GRUBIN:  That's fine.

2          THE COURT:  What time works?

3          MR. BROOKS:  10 a.m. is fine.

4          THE COURT:  Okay.

5          MR. ROSEN:  The 13th?

6          THE COURT:  Yes.

7          MS. GRUBIN:  So that would be the status conference

8  on the Matrix matter as well as a case status conference?

9          THE COURT:  Yes.  But hopefully you will have an

10  order --

11          MS. GRUBIN:  Right.

12          THE COURT:  -- for me before then.  I do hope very

13  much that you'll have the order for me before then.

14          MR. ROSEN:  In which case we may not see you on that

15  day.

16          THE COURT:  Okay.

17          MR. ROSEN:  But just for the record, Your Honor, we

18  objected to both the Questech settlement and the settlement

19  with the Gianopoulos' for a lot of the reasons that popped up

20  today.

21          THE COURT:  I understand.  Okay.  Thank you very

22  much.

23          MR. BROOKS:  Thank you, Judge.

24          MS. GRUBIN:  Judge, I'd like to hand up [inaudible].

25          THE COURT:  Okay.  Thank you.

66

1          MS. GRUBIN:  May I approach?

2          THE COURT:  Yes.

3                        *  *  *  *  *  *

67

1    I certify that the foregoing is a court transcript from an

2 electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5    _____

6                              Mary Greco

7 Dated:   January 21, 2008

**UNITED STATES BANKRUPTCY COURT**    <u>**NOT FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| FOOD MANAGEMENT GROUP, LLC, | Case No. 04-22880 (ASH) |
| KMA I, INC., | 04-22890 (ASH) |
| KMA II, INC., | 04-22891 (ASH) |
| KMA III, INC., | 04-22892 (ASH) |
| BRONX DONUT BAKERY, INC., | 04-20312 (ASH) |

(Jointly Administered)

Debtors.

------------------------------------------------------------------------x

FOOD MANAGEMENT GROUP, LLC,
KMA I, INC.,
KMA II, INC.,
KMA III, INC.,
BRONX DONUT BAKERY, INC.,    Adversary Proceeding

Plaintiffs,    Case No. 05-08636 (ASH)

v.

MATRIX REALTY GROUP, INC.,

Defendant.

------------------------------------------------------------------------x

**A P P E A R A N C E S :**

**DRINKER BIDDLE & REATH LLP**
**Attorneys for Plaintiff, Janice B. Grubin as Chapter 11 Trustee**
**By:**    **Edwin E. Brooks**
        **David S. Almeida**
**191 North Wacker Drive, Suite 3700**
**Chicago, IL 60606**

**LAW OFFICES OF AVRUM J. ROSEN**
**Attorneys for Defendant, Matrix Realty Group, Inc.**
**By:**    **Avrum J. Rosen**
**38 New Street**
**Huntington, New York 11743**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

### DECISION ALLOWING DAMAGES IN EXCESS OF THE BIDDING DEPOSIT

This decision follows a lengthy post-trial decision (the "July 25 Decision") in which I ruled that Matrix Realty Group, Inc. ("Matrix") was liable to the plaintiffs-debtors ("FMG") for damages arising from its anticipatory repudiation of a contract to purchase substantially all of the debtors' assets for $26.77 million.  (See In re Food Mgmt. Group, LLC, 372 B.R. 171 (Bankr. S.D.N.Y. 2007).)  This decision relates solely to the issue of whether the debtors' claim for damages is capped by the amount Matrix forwarded to the debtors as a bidding deposit.  I hold that it is not for the reasons set forth herein.

### Facts

The Court's jurisdiction and the facts giving rise to the dispute are set forth in great detail in the July 25 Decision.  The facts presented here merely aim to amplify discussion of the sole issue considered in this decision.

On April 18, 2005, Matrix executed a Purchase and Sale Agreement (the "Matrix Contract") with the debtors to purchase substantially all of the debtors' assets.  The total purchase price of the Matrix Contract was $26,770,000 – with $2,400,000 to be paid immediately as a deposit (the "Bidding Deposit"), $21,600,000 due at closing and the remaining $2,770,000 to be paid with interest over ten years.  Matrix delivered the $2,400,000 Bidding Deposit but subsequently repudiated the contract and has not advanced any additional funds to the debtors.  In the July 25 Decision I held Matrix liable for its anticipatory breach of the Matrix Contract and reserved judgment on damages pending further argument.  Matrix now contends that the damages that may be awarded in connection with its breach are limited to the amount of its $2,400,000 Bidding Deposit as a matter of law.

As a sale of substantially all of the debtors' assets, the Matrix Contract was subject to the jurisdiction and approval of this Court.  The Matrix Contract expressly incorporated this Court's February 22, 2005 order that approved, *inter alia*, certain auction bidding procedures (the "Bidding Procedures Order").  Section 9.8 of the Matrix Contract reads as follows:

> 9.8    <u>Entire Agreement</u>.  This AGREEMENT sets forth the entire agreement and understanding of the parties hereto and supersedes any and all written or oral agreements or representations between parties hereto relating to the transactions contemplated by this AGREEMENT or related documents, except that *this AGREEMENT incorporates those certain Court Orders approving the BIDDING PROCEDURES and approving the Bankruptcy Code Section 363 sale pursuant to this AGREEMENT.*  (emphasis added)

The Matrix Contract therefore duly incorporated the following language in Step Two, subparagraph (C) of the "Bidding Procedures" as approved on page 3 of the Bidding Procedures Order:

> *Without limiting the right of the Debtors to seek recovery of actual or additional damages*, the Debtors shall be entitled to retain the Deposit of any Successful Bidder who fails to close the transaction because of a breach or failure by such Successful Bidder and such Deposit shall be deemed forfeited by such defaulting Successful Bidder and shall not be credited against the purchase price paid by the Backup Bidder. (emphasis added)

Neither the Bidding Procedures Order nor the Matrix Contract ever uses the term "liquidated damages."  There is no language in the Matrix Contract, the Bidding Procedures or any Order of the Court that in any way purports to limit the "right of the debtors to seek recovery of actual or additional damages" expressly reserved for the debtors in the Bidding Procedures and incorporated in the Matrix Contract.

However, the term "liquidated damages" does appear once in the motion to approve the Bidding Procedures.  Paragraph 52(b) of the motion states in relevant part: "In the event a Successful Bidder defaults, Debtors are entitled to retain any deposit of the Successful Bidder as liquidated damages."  Nothing in this statement suggests an intent to preclude the debtors from

recovering actual damages greater than the Bidding Deposit.  Normally one would construe such language merely to mean that the debtors would be entitled to retain the Deposit "as liquidated damages" even if the debtors could not prove actual damages.  But Matrix asks the Court to turn this normal inference on its head.  This reference to liquidated damages and an overly broad interpretation of selected case law have led Matrix to argue that the recoverable damages should be limited to the amount of its deposit.

<u>Discussion</u>

**A. Actual damages are the standard measure of damages under New York law**

It is a well-settled principle of black letter contract law that absent a contract provision to the contrary, the damages that may be recovered by a non-breaching party are the actual damages suffered by that party.  (<u>See, e.g.</u>, <u>U.S. Naval Inst. v. Charter Commc'ns, Inc.</u>, 936 F.2d 692, 696 (2d Cir. 1991); <u>Long Island Contracting & Supply Co. v. City of New York</u>, 204 N.Y. 73, 81-82 (N.Y. 1912) ("'The prima facie measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby.'") (quoting <u>United States v. Behan</u>, 110 U.S. 338, 344 (1884)).  <u>See generally</u> Restatement (Second) of Contracts § 347 (1981).)  The restitution is "intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed."  (<u>Brusthon-Moira Cent. School Dist. v. Fred H. Thomas Assocs., P.C.</u>, 91 N.Y.2d 256, 261 (N.Y. 1998).  <u>See also</u> 11-55 Corbin on Contracts § 55.3 (2007).)  Thus New York courts have acknowledged the general rule that:

> [I]n the absence of a liquidated damages clause the measure of seller's damages is the difference in contract price and the price at which the vendor subsequently sells the property, or the difference in selling price and market value at the time of the breach.  Where the purchaser has given the vendor a down payment, the vendor is entitled to keep it upon purchaser's breach, and he may additionally recover up to the amount of his actual and consequential damages.

Where, on the other hand, a liquidated damages clause has been inserted in the contract, it will be upheld, unless it is determined to be a penalty and seller's recovery is limited to the amount provided for.

(Shulkin v. Dealy, 504 N.Y.S.2d 342, 344 (N.Y. Sup. Ct. 1986) (noting the rule in both the real estate and the UCC context) (citations omitted).  Accord McLean v. Kessler, 426 N.Y.S.2d 704 (N.Y. Civ. Ct. 1980).)  Accordingly, in order for FMG's damages to be limited to Matix' Bidding Deposit, the contract must have so provided.

**B. The Matrix Contract does not contain a liquidated damages provision**

The term "liquidated damages" does not appear anywhere in the Matrix Contract or in the incorporated Bidding Procedures Order or the Bidding Procedures themsleves, nor does the Matrix Contract in any way provide that the Bidding Deposit is a cap on the amount of damages the debtors may recover.  Quite the contrary, language expressly incorporated by the Matrix Contract states that upon the purchaser's breach, the debtors are entitled to retain the Bidding Deposit "[w]ithout limiting the right of the Debtors to seek recovery of actual or additional damages."

The only reference to "liquidated damages" that can be found in any relevant document is a statement in the Bidding Procedures motion that "[i]n the event a Successful Bidder defaults, Debtors are entitled to retain any deposit of the Successful Bidder as liquidated damages." While it would appear self-evident that this colloquial reference was intended to do no more than make clear that the debtor would be entitled to retain a defaulting purchaser's deposit without proving actual damages, it is sufficient to note that the statement is found *only* in the motion; it is not found in the actual Bidding Procedures Order, or in the Bidding Procedures, or in any other Court order, or in the Matrix Contract, and it is consequently irrelevant to the interpretation of the Matrix Contract.

Matrix perceives the liquidated damages reference in the motion to be in conflict with the provision incorporated by the Bidding Procedures Order that expressly contemplates the debtors' right to seek actual damages. Thus Matrix argues, "where there are completing clauses [sic – should read "competing"?]…the Courts will follow the traditional rule that in the event of default, the seller may retain the deposit and nothing further." (Memorandum of Law Submitted by Defendant in Connection with the Issue of Damages at 11-12 (the "Matrix Memorandum of Law").) While Matrix does not cite any case or other authority for this proposition, it seems that Matrix is arguing that in the event of a conflict between a liquidated damages provision and a provision calling for actual damages, the liquidated damages provision prevails. If so, Matrix is wrong. In the case where a contract contains both a liquidated damages provision and a provision calling for actual damages, it is the liquidated damages provision that is read out of the contract. (See Chateau D'If Corp. v. City of New York, 641 N.Y.S.2d 252, 254 (N.Y. App. Div. 1996) (holding that because "a liquidated damages clause and a provision entitling a nondefaulting vendor to further damages are incompatible and cannot coexist," the liquidated damages provision is rendered unenforceable) (citing Todt Hill Homes v. City of New York, Index No. 45735/89 (N.Y. Sup. Ct., NY County, Apr. 14, 1990) (DeGrasse, J.) (unreported)).)

Matrix argues that because the language of the contract itself is silent on the issue of damages,[1] the Court should look to the motion and read a liquidated damages clause into the contract. I decline such an invitation because it is contrary to the express terms of the Matrix Contract[2] and because New York law does not permit such an endeavor: "A liquidated damages

---

[1] As noted above, this contention is wrong. The Matrix Contract expressly incorporated language that contemplated actual damages: "Without limiting the right of the Debtors to seek recovery of *actual or additional damages*…." (See the Bidding Procedures, annexed to the Bidding Procedures Motion as Exhibit 'A,' that were approved by the Court in the Bidding Procedures Order on page 3 and incorporated into the Matrix Contract by Section 9.8 (emphasis added).)

[2] See footnote 1, supra.

provision may not be implied and must be agreed to." (Consolidated Rail Corp. v. MASP Equip. Corp., 486 N.Y.S.2d 4, 6 (N.Y. App. Div. 1985) (citing Winkelman v. Winkelman, 203 N.Y.S. 63 (N.Y. App. Div. 1924)).)

The Bidding Deposit was given as security to ensure that Matrix would consummate the transaction, not as a limitation on the damages recoverable by the debtors in the event of Matrix' default.

## C. The Bidding Deposit is not otherwise an appropriate measure of damages

The above discussion definitively establishes that the debtors are entitled to damages in excess of Matrix' Bidding Deposit. I will nonetheless address Matrix' argument that a line of cases[3] beginning with the case of Maxton Builders v. Lo Galbo, 509 N.Y.S.2d 507 (N.Y. 1986) establishes a principle whereby the "ten percent" Bidding Deposit[4] is the correct measure of damages.[5] Matrix contends that Maxton Builders and its progeny stand for the proposition that

---

[3] The following cases were cited by Matrix: Cipriano v. Glen Cove Lodge #1458, B.P.O.E., 1 N.Y.3d 53 (N.Y. 2003) (holding that where a purchaser of real estate fails to consummate the transaction pursuant to a lawful excuse, the purchaser may recover her deposit); Maxton Builders v. Lo Galbo, 509 N.Y.S.2d 507 (N.Y. 1986) (allowing the seller to retain the deposit of a defaulting purchaser where the subsequent sales price was equal to the contract price); Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc., 41 N.Y.2d 420, 423-24 (N.Y. 1977) (upholding a liquidated damages clause that was a reasonable forecast of damages); Lawrence v. Miller, 86 N.Y. 131 (N.Y. 1881) (establishing the rule that a defaulting purchaser of real estate may not recover its deposit); (Gillette v. Meyers, 839 N.Y.S.2d 584 (N.Y. App. Div. 2007) (allowing seller to recover the deposit of a defaulting purchaser without discussion of actual damages); Verolla v. Beechwood Carmen Building Corp., 841 N.Y.S.2d 610 (N.Y. App. Div. 2007) (holding that the defendant was entitled to retain a 14% deposit pursuant to the terms of the real estate contract following the plaintiff's default); Gardiner v. Carlson, 171 N.Y.S.2d 494 (N.Y. App. Div. 1991) (holding that in the absence of a contract provision allowing them to retain the deposit, the sellers could only recover their actual damages, which were less than the significant deposit); NYCTL 1996-1 Trust v. Viola, 2003 N.Y. Misc. LEXIS 1188 (N.Y. Sup. Ct. 2003) (allowing the plaintiffs who foreclosed upon the defendants' property to retain the deposits of defaulting foreclosure sale purchasers pursuant to liquidated damages clauses in the foreclosure sale agreements rather than applying those deposits to the defendants' deficiency or remitting them to the defendants).

[4] In its Memorandum of Law, Matrix argues that a ten percent deposit is an appropriate measure of damages and refers to the Bidding Deposit as "the ten percent deposit provided by Matrix to the Debtor." (Matrix Memorandum of Law at 5.) However, it should be noted that the deposit forwarded by Matrix was not ten percent of the total purchase price. The Bidding Deposit was $2,400,000 and the total purchase price was $26,770,000. Thus even if Matrix were correct that damages should be capped at a 10 percent deposit, Matrix would still owe the debtors $277,000.

[5] In addition to its argument based on Maxton Builders, Matrix makes two other arguments that are equally without merit. First, Matrix argues that because the Matrix Contract contained a provision that allowed the purchaser (Matrix) to recover its deposit in the event that Dunkin' Donuts exercised its contractual right of first refusal, the debtors should be similarly limited to recovery of the Bidding Deposit in the event of Matrix' default under the

where a purchaser defaults on its purchase obligation, the seller may retain a ten percent deposit

as damages, *and recover no more*.  Matrix' argument is simply wrong.  <u>Maxton Builders</u> and its

progeny *do not* stand for the proposition that a seller's recoverable damages arising from a

prospective buyer's breach are limited to a ten percent down payment.[6]

 <u>Maxton Builders</u> held that the aggrieved seller could retain a ten percent deposit in a case

where the property was subsequently sold for an amount *equal to* the amount of the breached

contract.  Significantly, the seller was not even seeking damages in excess of the deposit amount.

(509 N.Y.S.2d at 508.)  The court based its ruling on the contracts principle that "a party who

defaults on a contract cannot recover the amount or value of part performance."  (<u>Id.</u> at 510

(citations omitted).)  The purpose of the <u>Maxton Builders</u> rule is not, as Matrix seems to suggest,

to replace actual damages as a measure of damages by judicially imposing a liquidated damages

provision in all real estate contracts.  In no way does this case or any other case cited by Matrix

limit the amount of damages that a seller may be awarded when a purchaser defaults to the

amount of a deposit.  Instead, the cases cited by Matrix allow an aggrieved seller of real estate to

retain a ten percent deposit where the actual damages, as measured by the difference in the

contract price and the eventual sales price, are substantially *less* than the deposit.  Courts have

even held that the deposit can be retained where the eventual sales price is greater than the

---

"doctrine of mutuality."  (<u>See</u> Matrix Memorandum of Law at 9.)  Again, Matrix fails to cite any proposition of law
supporting this contention, which is incorrect.  The doctrine of mutuality of remedy (it is assumed that Matrix is
referring to this doctrine rather than the doctrine of mutuality of consideration, mutuality of obligation or mutuality
of assent) generally pertains to the availability of specific performance as a remedy.  (<u>See</u> 12-65 Corbin on Contracts
§ 1178 (2007).)  Accordingly, the doctrine of mutuality of remedy has no bearing on the present matter because no
party is seeking specific performance.  Second, Matrix asserts that if the debtors are awarded the Bidding Deposit
and actual damages, the debtors will be in effect obtaining an impermissible double recovery.  This assertion is
wrong because if actual damages are awarded in excess of the Bidding Deposit, the total amount recoverable will be
reduced by the amount of the Bidding Deposit that the debtors have already retained.
[6] The debtors have argued that the <u>Maxton Builders</u> line of cases is inapposite because those cases involve sales of
real estate, whereas the Matrix Contract was the sale of a business.  I need not consider whether the Matrix Contract,
which included sales of leasehold interests, was or was not a contract for the sale of real estate such that the <u>Maxton
Builders</u> cases are on point because those cases simply do not support Matrix' contentions, even in the real estate
context.

breached contract price. (See Johnson v Werner, 407 N.Y.S.2d 28, 30 (N.Y. App. Div. 1978);

Silverstein v United Cerebral Palsy Ass'n of Westchester, 232 N.Y.S.2d 968, 973 (N.Y. App.

Div. 1962).)  These cases simply do not establish a rule whereby damages cannot be recovered in

excess of the ten percent deposit.  This is especially true in cases such as the one at bar where the

contract did not contain a liquidated damages provision that may otherwise limit damages in

excess of the liquidated damages.

### Conclusion

In light of the foregoing, the debtors are entitled to seek actual damages in excess of the

Bidding Deposit.

Dated:  White Plains, New York
       December 10, 2007

                                    **/s/ Adlai S. Hardin, Jr.**
                                    UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT                              **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FOOD MANAGEMENT GROUP, LLC, | : | Case No. 04 B 22880 (ASH) |
| KMA I, INC., | : | Case No. 04 B 22890 (ASH) |
| KMA II, INC., | : | Case No. 04 B 22891 (ASH) |
| KMA III, INC., | : | Case No. 04 B 22892 (ASH) |
| BRONX DONUT BAKERY, INC., | : | Case No. 04 B 20312 (ASH) |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| FOOD MANAGEMENT GROUP, LLC, | : | |
| KMA I, INC., KMA II, INC., | : | |
| KMA I | : | |
| and BRONX DONUT BAKERY, INC., | : | |
| | : | |
| Plaintiffs, | : | Adv. Proc. No. 05-8636A |
| | : | |
| -against- | : | |
| | : | |
| MATRIX REALTY GROUP, INC., | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>**A P P E A R A N C E S**</u> :

**DRINKER BIDDLE & REATH LLP**
**Attorneys for Plaintiff, Janice B. Grubin as Chapter 11 Trustee**
**By:  Edwin E. Brooks, Esq.**
**      David S. Almeida, Esq.**
**191 North Wacker Drive**
**Suite 3700**
**Chicago, IL 60606**

**LAW OFFICES OF AVRUM J. ROSEN**
**Attorneys for Defendant, Matrix Realty Group, Inc.**
**By:  Avrum J. Rosen, Esq.**
**      Fred S. Kantrow, Esq.**
**38 New Street**
**Huntington, NY 11743**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**Table of Contents**

Page

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

The Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    (a)    Background — the Gianopoulos factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    (b)    Preparations for an auction of the franchised properties . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    (c)    Stalking horse bidders; adjournment of the auction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    (d)    The Matrix Contract; cancellation of the auction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    (e)    The Matrix/ZPG relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    (f)    Sale "as is, where is"; disclaimers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    (g)    Dunkin' Donuts' conditional approval of Matrix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    (h)    Matrix' repudiation of the Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    (i)    Sale of the assets to The Beekman Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.    Elements of plaintiffs' claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.    The existence of a valid and enforceable contract . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.    Anticipatory breach of Contract by Matrix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        C.    The debtors' willingness and ability to perform . . . . . . . . . . . . . . . . . . . . . . . . . 22

        D.    Damages resulting from the breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    II.    Matrix' affirmative defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        A.    The divisibility of the Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        B.    The debtors' alleged inability to deliver certain assets . . . . . . . . . . . . . . . . . . . . 32

        C.    The CPL and the CO for the Bronx Donut Bakery . . . . . . . . . . . . . . . . . . . . . . . 36

        D.    Assumption of the 2002 Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . 37

        E.    The shop remodeling obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        F.    The argument that Matrix did not repudiate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        G.    The argument that a closing was not set and Matrix still had time to cure . . . . . . . . . . . . . . . . 41

        H.    Dunkin' Donuts' rejection of Krischer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        I.    The argument that the Dunkin' Donuts' Rider was not yet signed . . . . . . . . . . . . . . . . . 44

        J.    Fraud in the inducement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        K.    The fraudulent 64 East bid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        L.    Impossibility/frustration of purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        M.    The December 15 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

        N.    Failure to join ZPG as a necessary party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

## DECISION AFTER TRIAL

Plaintiffs-debtors entered into a contract (the "Matrix Contract" or, in context, the "Contract") dated April 15, 2005 with Matrix Realty Group, Inc. ("Matrix") for the sale of the debtors' assets to Matrix for a purchase price of $26.77 million subject to adjustments.  In accordance with the Contract, Matrix delivered to debtors' counsel a cash deposit of $2,400,000 (the "Matrix Deposit").  In June 2005 Matrix repudiated the Contract and demanded return of the Matrix Deposit.   The debtors commenced this adversary proceeding seeking damages for Matrix' anticipatory breach of the Contract and a declaratory judgment that the Matrix Deposit was forfeited to the debtors' estates.

By orders dated September 1 and 2, 2005, the Court authorized and confirmed the appointment of Janice B. Grubin as Chapter 11 Trustee (the "Trustee").  Since her appointment the Trustee has operated and controlled the debtors' assets and affairs and has prosecuted the adversary proceeding on behalf of the debtors' estates.

The adversary proceeding was tried to the Court without a jury, followed by two sets of post-trial submissions in accordance with schedules set by the parties.  This Decision sets forth the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## Jurisdiction

The Court has core jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and (b) and the standing order of referral to bankruptcy judges dated July 10, 1984 signed by Acting Chief Judge Robert J. Ward.   The Bidding Procedures (referred to below) states:

> Any and all disputes related to the Auction or the sale of any of the Assets or the assignment of any of the Leases shall be adjudicated solely by the United States Bank-ruptcy Court for the Southern District of New York, White Plains Division.  The sub-mission of a Bid shall constitute an express consent to the exclusive jurisdiction of the Court for all matters related to the Auction and/or the sale of any Asset or Lease.

**The Facts**

**(a)**     **Background — the Gianopoulos factor**

The assets which were the subject of the Matrix Contract consisted of 24 existing

Dunkin' Donuts stores or shops and associated equipment and lease and franchise agreements in the

Westchester area, a bakery approved and authorized by Dunkin' Donuts to supply the stores (the bakery

premises included one of the 24 shops), and three "Shops Not Yet Opened."   These assets were held until

2002 by twenty companies (the "Gus Companies") owned and controlled by Constantine Gianopoulos

("Gus").

For a variety of reasons Dunkin' Donuts desired to terminate the Gianopoulos' interest in

the Dunkin' Donuts franchise stores in question.  An agreement dated October 18, 2002 (the "2002

Settlement Agreement") was entered into between Dunkin' Donuts Incorporated, Baskin-Robbins USA

Co., Baskin-Robbins Incorporated and Third Dunkin' Donuts Realty, Inc. (collectively "Dunkin'

Donuts"), the Gus Companies, Gus, and his brother Anastasios Gianopoulos ("Tom").   The 2002

Settlement Agreement resolved three separate lawsuits pending in Federal District Court between the

parties to the Agreement.   The 2002 Settlement Agreement provided, in relevant summary, that the

franchise agreements of the Gus Companies were terminated and that new franchise agreements would be

entered into between Dunkin' Donuts and "new entities" to be owned by Tom and/or Gus which were to

operate the Dunkin' Donuts franchise stores and bakery from the locations previously franchised to the

Gus Companies.   Thereafter, the corporate debtors were formed and constituted the "new entities"

referred to in the 2002 Settlement Agreement, and these entities operated the 24 Dunkin' Donuts stores

and bakery.   The new entities were owned and controlled by Tom and have been colloquially referred to

in these proceedings as the "Tom Companies" or the "debtors."

The 2002 Settlement Agreement required that the "new entities," *i.e.*, the Tom

Companies, sell all of the franchise stores and the bakery to purchasers having no affiliation with the

Gianopoulos family pursuant to purchase and sale agreements to be submitted to Dunkin' Donuts on or

before March 31, 2005 (the "Mandatory Sale of Franchises").  Specifically, paragraph 4 of the 2002

Settlement Agreement provided as follows:

> **Mandatory Sale of Franchises**: On or before March 31, 2005 Franchisees shall submit purchase and sale agreements to [Dunkin' Donuts] for all of their franchises.  If Franchisees are unable to close on the sale of any of their franchises by July 31, 2005 for which a purchase and sale agreement was submitted on or before March 31, 2005, then [Dunkin' Donuts] shall extend the closing date as reasonably necessary to complete the transfer(s), provided that all the parties, including the prospective transferee(s), are proceeding diligently and in good faith to closing.

In the event that the "new entities" did not comply with the Mandatory Sale of Franchises

provision, Dunkin' Donuts had the right under paragraph 6 of the 2002 Settlement Agreement to purchase

the franchises for a purchase price to be determined by the Dunkin' Donuts "business evaluation formula"

in effect at the time.

Shortly before June 2004, in an action brought by Questech Financial LLC ("Questech")

as secured creditor against the Gus Companies in Federal District Court (Westchester), the District Court

ordered the appointment of a receiver for the Gus Companies and the Tom Companies for alleged

misconduct by Gus and Tom and their counsel.   As a consequence of the appointment of the Receiver, on

June 1 and 2, 2004 the Tom Companies filed voluntary petitions under Chapter 11 and thereby became

the debtors in this Court.

Questech promptly moved for the appointment of a trustee under 11 U.S.C. § 1104,

alleging multiple acts of fraud and wrongdoing by Tom and Gus.   The motion was granted to the extent

that the Court entered an order dated June 28, 2004 for the appointment of an examiner (the "Examiner").

As noted above, the appointment of the Trustee was ordered and approved in early

September 2005 in response to the latest in a series of motions for the appointment of a trustee filed by

Questech following revelations of a continuing series of misconduct by Tom as owner and principal of

the debtors, many of which were disclosed in Interim Reports filed by the Examiner.

**(b)**         **Preparations for an auction of the franchised properties**

Mindful of the Mandatory Sale of Franchises provision of the 2002 Settlement Agreement, the debtors retained Keen Strategic Advisors ("Keen") to develop a marketing plan designed to reach as broad a spectrum of potential purchasers as possible.  An Amended Stipulation and Order was entered by this Court on December 3, 2004 approving and confirming the assignment to and assumption by the debtors of all the assets and liabilities of the Gus Companies, inter-corporate "formalities" which were never attended to by Gus and Tom.  Despite little cooperation from Tom or Gus, on the evidence before me it appears that the debtors' professionals, principally debtors' counsel, Keen, and the Examiner and her accounting and legal professionals, acted diligently, responsibly and in good faith to rationalize the debtors' books and records and financial affairs, which were in a state of disarray resulting from chronic inattention, and perhaps intentional obfuscation by Gus and Tom, and to prepare for sale(s) of the debtors' assets in compliance with the 2002 Settlement Agreement.

Keen, with input from other professionals, prepared an offering memorandum (the "Offering Memorandum") containing broad disclaimers made necessary by the deficiencies in the debtors' books and records.  The debtors' professionals and Keen assembled as comprehensive a collection as possible of the debtors' books and records, financials and other corporate documents and franchise, lease and other agreements relating to the franchised property offered for sale (collectively "Level II Due Diligence Materials"), all of which were made available to prospective purchasers to enable them to conduct their own due diligence.

On January 11, 2005, the debtors filed a motion seeking the Court's approval for an auction of their assets and the bidding procedures that would govern the auction.  On February 24, 2005 the Court entered a consent order (i) authorizing the debtors to sell substantially all of their assets, (ii) scheduling the bidding deadline, the auction, and the sale confirmation hearing for March 21, March 28 and May 26, 2005, respectively, (iii) approving the auction bidding procedures (the "Bidding Proce-dures") and (iv) granting a 2.5% break-up fee to potential stalking horse bidders, subject to certain conditions (the "Bid Procedures Order").

**(c)**    **Stalking horse bidders; adjournment of the auction**

On or about March 18, 2005, the debtors executed a stalking horse purchase and sale agreement with Matrix pursuant to which Matrix would acquire the debtors' assets for $16 million, with a $400,000 break-up fee (the "March 18 Matrix Sale Agreement").

Before a hearing on the motion to approve Matrix as the stalking horse bidder, an entity named 64 East 126th Street LLC ("64 East") submitted to the debtors a $21 million bid for the debtors' assets.    The same day, March 23, 64 East and the debtors entered into a purchase and sale agreement and rider to sell substantially all of the debtors' assets to 64 East, subject to higher and better bids, with a $525,000 break-up fee (the "64 East Sale Agreement").

The conflict arising from the dual break-up fees to be provided in connection with the March 18 Matrix Sale Agreement and the 64 East Sale Agreement was resolved by a consent Order entered March 31, 2005, pursuant to which the Court authorized (i) ZPG, a Matrix alter ego, to be paid a $50,000 break-up fee if the Court approved the sale of the assets to a person or entity other than ZPG, and (ii) 64 East to be paid a $250,000 break-up fee if the Court approved the sale of the assets to a person other than 64 East.    Since, as amplified below, ZPG and Matrix were corporate affiliates and *de facto* alter egos under common ownership and control, ZPG's putative entitlement to a $50,000 break-up fee under the March 31, 2005 Order was rendered moot when the Court approved the Matrix Contract.    Moreover, ZPG withdrew its bid before the adjourned date for the auction, and the deposit under the March 18 Matrix Sale Agreement was returned to Matrix, which had funded the deposit.

With discussions ongoing suggesting the possibility of soliciting a higher bid or bids for the debtors' assets, on March 25, 2005 the debtors filed a Notice of Adjournment and Change of Venue of Auction and Extension of Deadline to Submit Qualified Bids, giving notice that the bidding deadline and auction were rescheduled for April 15 and April 21, 2005, respectively.

**(d)**    **The Matrix Contract; cancellation of the auction**

   The Matrix Contract, although dated "as of" April 15, was actually executed by the parties on Monday, April 18, 2005.   The Contract provided for a purchase price of $26,770,000, payable as follows:   (i) $2,400,000 as the Bidding Deposit; (ii) $21,600,000 at closing by certified check, cashier's check or irrevocable wire transfer and (iii) $2,770,000 as a promissory note payable, with interest, over ten years.  The same date, April 15, Matrix delivered a check for $2,400,000 as the Bidding Deposit to counsel for the debtors.

   In the Matrix Contract the debtors and Matrix agreed to cancellation of the auction scheduled for April 21, and thereafter they jointly sought and obtained an order to cancel the auction and proceed with the private sale.  The parties disagree as to whether the auction was cancelled at the instance of the debtors, or Matrix insisted upon cancellation of the auction as a condition of its agreement.  It is not clear that this conflict need be resolved in order to determine the issues before me.  Nevertheless, I find as a fact that the auction was cancelled at the instance of Matrix as a condition of its agreement to purchase the debtors' assets at the Contract price.  This conclusion is based upon my assessment of the credibility of the witnesses who testified on the point and the fact that no reason (other than Matrix' insistence) has been suggested why the debtors would wish to cancel the auction scheduled to take place on April 21, just six days later.  By contrast, it would obviously be in Matrix' interest to forestall further competition for the debtors' assets.  The Matrix offer at $26.7 million was provoked not by the $21 million bid by 64 East but by apprehension on the part of Matrix that a competing bulk bidder (The Beekman Group, or "TBG") was contemplating a bid of up to $24 million for the assets.

   Any doubt on the issue is resolved by the debtors' "EMERGENCY APPLICATION FOR AN ORDER" authorizing the debtors to cancel the auction and proceed with a private sale of the debtors' assets to Matrix, dated April 18, 2005.  The Emergency Application states that "a third 'bulk bidder' that has been conducting due diligence . . . indicated that its final bid on the assets would not exceed $24,000,000.00, subject to a private sale, which is measurably less than the Matrix Offer."  The Emergency Application represented to all parties in interest and to the Court that "as a condition to the

Matrix Offer, Matrix *requires* a private sale and the cancellation of the existing auction sale scheduled for April 21st" (emphasis supplied).   Matrix never sought to correct or gainsay this representation.

The cancellation of the auction undoubtedly had major adverse consequences to the debtors' estates.   But for the cancellation, it is certain that there would have been an auction.  While the future, which was foreclosed by cancellation of the Auction, can never be known, it is virtually certain that there would have been some competitive bidding, perhaps ending lower than $26.7 million but on better terms for the debtors' estates than the ultimate sale for $18 million to The Beekman Group, referred to below.  And there would have been at least one other bidder whose ten percent deposit and contractual obligation would have backed up the winning bidder in case the winner defaulted or repudiated, as Matrix did.

In any event, by Order entered April 27, 2005 this Court approved the cancellation of the auction and deemed Matrix to "be the Successful Bidder."

**(e)**    **The Matrix/ZPG relationship**

The Matrix Contract recites in the first four lines under the heading on page 1 as follows:

This Purchase and Sale Agreement, made as of the 15th day of April, 2005, (hereinafter "AGREEMENT"[*sic*], by and between ZPG RESTAURANT ASSOCIATES, LLC, an corporation/individual with its/his principal place of business located at 732 Route 347, Suite 200, Smithtown, NY 11787 (hereinafter "PURCHASER"), . . . .

The words "ZPG RESTAURANT ASSOCIATES, LLC" have been stricken out and the following words interlineated in place of the deleted language: "MATRIX REALTY GROUP, INC and/or its affiliates."   As stipulated in the Joint Pretrial Order (Undisputed Facts ¶ 18): "The Contract was modified in the Preamble to be between the Debtors and Matrix Realty Group, Inc., and/or its affiliates."

On the signature page of the Matrix Contract (page 16), the following appears:

PURCHASER

ZPG RESTAURANT ASSOCIATES, LLC

By:  _____[illegible]_____
Name: Glen Nelson
Title:  Managing Member

Paragraph 9.4 of the Matrix Contract, concerning notices necessary or desirable to be given under the Contract, provided that notices should be addressed to "PURCHASER at:

> ZPG RESTAURANT ASSOCIATES, LLC
> 732 ROUTE 347, SUITE 200
> SMITHTOWN, NY 11787
> (631) 979-2777
> Attn: Glen Nelson, Managing Member
> and Richard Nieto, Esq.

As noted just above, the executed Purchase and Sale Agreement dated March 18, 2005 was between the debtors and Matrix. The March 18 Agreement was signed under the name "Matrix Realty Group, Inc." by Glen Nelson as President, and Section 9.4, the Notice provision, required Notice addressed to Matrix at its Smithtown address "Attn: Glen Nelson, President and Richard Nieto, Esq.," just as in the Matrix Contract. However, on the same date, March 18, debtors' counsel filed an "Emergency Application" for an order granting counsel authority to sign a stalking horse purchase and sale agreement on behalf of the debtors in the form annexed to the Application as Exhibit A. The Purchase and Sale Agreement annexed as Exhibit A was between the debtors and ZPG Restaurant Associates, LLC, with the address the same as the Matrix address. The signature block under the name ZPG Restaurant Associates, LLC called for signature by Glen Nelson, Managing Member, and the Notice provision in Section 9.4 called for a Notice addressed to ZPG Restaurant Associates, LLC at the Matrix address "Attn: Glen Nelson, Managing Member and Richard Nieto, Esq."

In addition, it should be noted that the March 31, 2005 Consent Order resolving the conflicting entitlements to break-up fees of Matrix and 64 East provided for a break-up fee payable to ZPG, not Matrix, although the Purchaser party to the March 18 Matrix Sales Agreement was Matrix, not ZPG.

The debtors asserted, and Matrix admitted that Matrix was the contracting party and was in identity of interest with ZPG in the following allegations in the complaint in this adversary proceeding:

> 39.     . . . ZPG is a party with an identity of interest with Matrix, the current contract vendee.   . . .

- 10 -

43.    Thereafter, just four (4) business days before the Auction, Matrix, a party in identity of interests with ZPG, made an offer of $26,770,000.00 composed of a $24,000,000.00 cash component at closing and the balance to be paid over ten (10) years.

45.    Thus, on or about April 15, 2005, Plaintiffs and Defendant [*i.e.*, Matrix] entered into a contract of sale (the "Matrix Contract"), a copy of which is annexed hereto as Exhibit "6".

In his affidavit submitted on the cross-motions for summary judgment, Glen Nelson swore that he was a shareholder of Matrix and managing member of ZPG, and that ZPG had an "identity of interest with Matrix."

Finally, assuming without concluding that ZPG was in fact an entity organized and existing in 2005 (there is no evidence in the trial record establishing such fact), it is clear from the testimony of the witnesses on behalf of Matrix that ZPG had no assets or property of any kind and no business, and that Matrix funded the deposits under both the March 18 Matrix Purchase and Sale Agreement and the Matrix Contract and received the refund of the deposit for the March 18 Agreement.

In short, the admissions of Matrix in its answer and in the Undisputed Facts section of the Joint Pretrial Order and the evidence summarized above all demonstrate conclusively that Matrix was the contracting party under the April 15 Matrix Contract and is the proper party defendant in this adversary proceeding, and that ZPG, if it existed at all, was the creation and tool of and was controlled by Matrix and its principals, Glen Nelson and Richard Nieto.

**(f)**    **Sale "as is, where is";  disclaimers**

The Offering Memorandum and the Bidding Procedures made clear that the debtors' assets were to be sold "as is, where is" and that there were no representations or warranties other than as expressly set forth in the Purchase and Sale Agreement.

Consistent with the Offering Memorandum and the Bidding Procedures, the Matrix Contract included both the "as is, where is" limitation and an integration clause.  Sections 1.5 and 9.8 of the Contract stated:

1.5    Condition of Assets.  All of the tangible and intangible assets to be transferred hereunder are hereinafter collectively referred to as the "ASSETS" and shall be delivered at closing "as is where is", in substantial working order, without

- 11 -

representation or warranties of any kind except as expressly provided herein or in the offering memorandum, and any amendments thereto ("OFFERING MEMORANDUM") heretofore provided to PURCHASER.

9.8. <u>Entire Agreement</u>. This AGREEMENT sets forth the entire agreement and understanding of the parties hereto and supersedes any and all written or oral agreements or representations between parties hereto relating to the transactions contemplated by this AGREEMENT or related documents, except that this AGREEMENT incorporates those certain Court Orders approving the BIDDING PROCEDURES and approving the Bankruptcy Code Section 363 sale pursuant to this AGREEMENT.

As a consequence of these quoted provisions of the Matrix Contract and the two Court Orders referred to therein, the Bidding Procedures by their own terms were made part of the Contract and were binding on Matrix.

The Bidding Procedures contained disclaimers of unusual breadth and scope.  Because of Matrix' defenses of misrepresentation and non-performance by the debtors, it is important to read and understand the full import of the disclaimers in considering the Trustee's response to the Matrix defenses. Quoting from the Bidding Procedures:

<u>Page 2</u>

Each bidder (a "Bidder" and collectively, the "Bidders"), as a consequence of submitting a Bid for any or all of the Assets, shall be deemed to acknowledge (a) that any sale, assignment or other disposition of each of the Assets shall be without representations or warranties of any kind, nature or description by the Debtors, their agents, representatives, consultants and/or attorneys, (b) that it is bound by these Bidding Procedures, (c) that it had an opportunity to, or waived any right to, inspect and examine the applicable Lease and all other pertinent documents with respect thereto prior to making its Bid and that each such Bidder relied solely on that review and upon its own investigation and inspection of the Assets in making its Bid and (d) that the Bidder is not relying upon any written or oral statements, representations, or warranties of the Debtors, their agents, representatives, consultants and/or attorneys.

<u>Pages 17-19</u>

D.   <u>Disclaimer</u>

1. <u>As Is, Where Is</u>.  Any sale, assignment of (*sic*) other disposition of each of the Assets shall be without representations or warranties of any kind, nature or description by the Debtors, their agents, representatives, consultants and/or attorneys. Each of the Assets shall be transferred on an "as is" and "where is" basis.

2. <u>Information for Informational Purposes Only</u>.  Any and all information and/or documentation provided to prospective Bidders":

(a)  has been prepared for informational purposes only;

(b)  has been prepared from materials supplied by the Company; and

(c)  is being furnished through Consultant solely for use by prospective buyers in considering their interest in acquiring the Assets.

By accepting documents and data from the Company and/or Consultant ("Data"), the recipient acknowledges and agrees that:   The information provided by Company and/or Consultant has been prepared to assist interested parties in making their own evaluation of the Assets and does not purport to be all-inclusive or to contain all of the information that a prospective buyer may desire.   In all cases, interested parties should conduct their own investigation and analysis of the Company's assets, conduct site inspections and scrutinize the Data.  The Consultant has assumed no responsibility for independent verification of any of the information contained herein and has not in fact in any way audited such information.  The Company, its officers, directors, employees, and its professional advisors, including but not limited to Consultant, legal counsel, and/or other advisors and their respective affiliates and representatives (collectively, the "Professionals") are not making nor will they make and expressly disclaim making any written or oral statements, representations, warranties, promises or guarantees, whether express, implied or by operation of law or otherwise, with respect to the Assets and with respect to the accuracy, reliability or completeness of the Data, except as expressly stated in a contract executed by Company.  The Company and its Professionals expressly disclaim any and all liability based on or relating or pertaining to any written or oral statements, financial information, projections, representations, warranties, promises or guarantees, with express, implied or by operation of law or otherwise.

The Offering Memorandum, the specific terms of which "are incorporated into the

[Matrix] Contract" (Joint Pretrial Order, Undisputed Facts ¶ 15), also contained sweeping disclaimers

which are important to Matrix' defenses.  Quoting:

<u>Page i</u>

. . . No representation or warranty, express or implied, is made by FMG, its counsel, Rattet Pasternak & Gordon Oliver, LLP ("RP&GO"), KEEN, Dunkin' Donuts Incorporated, Baskin-Robbins USA, Co. and Third Dunkin' Donuts Realty (collectively "Dunkin' Donuts Co.") or by any of their respective affiliates, agents, employees or representatives as to the accuracy or completeness of such information or/of any other written or oral communication transmitted or made available to a prospective buyer of FMG.

In all cases, interested parties should conduct their own investigation and analysis of FMG and of the information contained in this Memorandum.   Nothing contained in this Memorandum is, or shall be relied upon as, a promise or representation by FMG, RP&GO, KEEN, Dunkin' Donuts Co. or any of their respective affiliates, agents, employees or representatives as to the past or the future performance of FMG.   The contents of this Memorandum have not been independently verified by FMG, RP&GO, KEEN, Dunkin' Donuts Co. or any of their respective affiliates, agents, employees or representatives.

In fact, all financial information contained herein is unaudited and is derived from FMG's books and records, which have not been reconciled since August, 2003.

FMG, RP&GO, KEEN and each of their respective affiliates, agents, employees or representatives expressly disclaim any and all liability relating to the use of the Memorandum, or such other information as may be provided (whether communicated in oral or written form), to a prospective buyer or any of its affiliates, agents, or representatives.  Any estimates, projections and forward-looking statements contained herein (a) have been prepared by, and are based on information currently available to FMG and (b) involve significant known and unknown risks, uncertainties and other factors, including subjective assumptions, judgments and analyses.  No representation or warranty can be made by FMG, RP&GO, KEEN, Dunkin' Donuts Co. or any of their respective affiliates, agents, employees or representatives as to their attainability.  Accordingly, actual results may differ substantially and materially from the estimates, projections and forward-looking statements contained in this Memorandum.  FMG or any person acting on its behalf, including RP&GO, KEEN, & Dunkin' Donuts Co. undertakes no obligation to update these estimates, projections and forward-looking statements.  All financial information contained in this Memorandum should be read in conjunction with the accompanying discussion points.  Only those representations and warranties to the extent made in a definitive, written agreement, subject to such limitations and restrictions as may be specified therein, shall have any binding or legal effect.

<u>Page 7</u>

Exhibit E — Franchise and Lease Expiration Dates:  Each location is subject to both a real estate lease and a franchise agreement.   As part of the bankruptcy proceeding, certain non-residential real property leases and furniture, fixtures and equipment were transferred to the bankruptcy estate of the debtors pursuant to a stipulation so ordered on December 3, 2004.  The underlying leases may or may not include options, subleases, percentage rent and/or escalating rent.[10]   Certain franchise agreements include an Enterprise Business Offer ("EBO") agreement executed with Dunkin' Donuts® that allows the franchisees to vest extra time on their franchise agreements at a discounted price if the franchisees agree to remodel the locations at a future date.  The EBO's have been paid for; however, certain necessary improvements have not yet been completed.   It is estimated that the additional costs to remodel would fall between $75,000 and $125,000 per location.[11]   Thus, the buyer(s) of these locations would have the option to complete the remodels, as per the respective EBO's, and thereby automatically extend the term of the respective franchises through various periods up until 2022.  **Note:** No representation is being made that the franchise agreements can or will be renewed with Dunkin' Donuts Co. to correspond with the expiration of existing leases.

_____

[10]     FMG management is currently seeking the extension of short term leases.   Updated information will be made available to interested parties.

[11]     Estimate is per company management.

<u>Page 9</u>

Exhibit N — Historical Fixed Assets:  . . .  Additionally, some stores may require additional capital expenditures for remodeling should their franchise agreements be extended per the EBO's discussed above.   . . .

**(g)**    **Dunkin' Donuts' conditional approval of Matrix**

The debtors' franchise agreements with Dunkin' Donuts (which were expressly incorporated into the Matrix Contract) required the debtors to obtain the consent of Dunkin' Donuts in order to transfer their franchises. By the same token the Matrix Contract conditioned the sale on the approval of the prospective purchaser by Dunkin' Donuts. Sections 4.2 and 6.2 of the Matrix Contract provided:

> 4.2  <u>Dunkin' Donuts Approval</u>. DUNKIN' DONUTS shall have either actually or by judicial decree of the Court consented to this AGREEMENT (including, but not limited to, approval of PURCHASER) as provided in the FRANCHISE DOCUMENTS, OFFERING MEMORANDUM, the AUCTION APPROVAL ORDER and the Court approved BIDDING PROCEDURES established with respect to the Bankruptcy Code and shall have not otherwise have exercised [sic] its right of first refusal (subject to acknowledgement and approval by the Bankruptcy Court).

> 6.2  <u>Dunkin' Donuts Approval</u>. DUNKIN' DONUTS shall have either actually or by judicial decree of the Court, consented to this AGREEMENT (including, but not limited to, approval of PURCHASER) as provided in the FRANCHISE DOCUMENTS and the BIDDING PROCEDURES.

By letter dated May 25, 2005 (the "May 25 letter") Dunkin' Donuts initially rejected Matrix as a prospective franchisee on the grounds (i) that Dan Krischer, whom Matrix had hired as operations manager of the franchises, was not morally or ethically fit to operate a Dunkin' Donuts franchise,[1] and (ii) that the purchase price under the Matrix Contract was too high.[2]

However, by letter dated June 8, 2005 (the "June 8 letter") Dunkin' Donuts reversed its position and agreed to approve Matrix as prospective franchisee conditioned only on Matrix hiring an

---

[1]    Krischer had testified in a prior bankruptcy case in the Southern District of New York (Manhattan) that, while acting as operations manager of several franchisees (not Dunkin' Donuts), he had knowingly understated the revenues of the franchisee. The false financial statements were used to defraud both the franchisor and the taxing authority, inasmuch as the franchise fees and the taxes were both calculated on the basis of the false (understated) franchise revenues. In addition, Krischer had accepted payments in cash off books from his former franchisee-employer, had submitted a false or misleading personal financial statement to Dunkin' Donuts in connection with his part of the Matrix application and had given evasive and deceitful answers when interviewed by Dunkin' Donuts.

[2]    The Dunkin' Donuts concern with respect to the purchase price was that Matrix had agreed to pay too much for the debtors' franchises and that Matrix would be unable to operate the franchises at a profit and still service their debt, make the necessary franchise payments to Dunkin' Donuts and comply with their obligations under the franchise leases, including their obligations to remodel the stores. These concerns were communicated to the Matrix principals, Richard Nieto and Glenn Nelson.

appropriate operations manager in place of Krischer, thereby withdrawing its financial objection based on the purchase price. After noting Dunkin' Donuts' prior objection to the financial aspects of the Matrix purchase, the June 8 letter stated:

> Be that as it may, and notwithstanding our objections, to persist would place us in the peculiar position of expending our own resources to protect sophisticated and highly-capitalized businesspersons (Messrs. Nelson and Nieto) from entering into a transaction which they are apparently determined to pursue. We choose not to spend our money this way. Therefore, [Dunkin' Donuts] no longer object[s] to the proposed purchase based on the price or the structure of the payment. The principals of the would-be Buyer have been generally apprised of our position, and will receive a copy of this letter. Apparently, they have conducted their own financial analysis and concluded that they will be able to operate at a profit, service debt, make all payments, and comply with all obligations under the Franchise Agreements and leases, including, without limitation, their remodel obligations. The choice to go forward is theirs.

One of Matrix' controversies with Dunkin' Donuts which arose during Matrix' post-April 15 meetings with Dunkin' Donuts representatives concerned the franchisee's obligations to remodel the shops under existing Dunkin' Donuts franchise agreements and written policies. In the June 8 letter, Dunkin' Donuts agreed to permit Matrix to complete the remodeling obligations on a modified and extended schedule, stating:

> Another source of our objection was and is the Buyer's apparent failure to plan for the cost of completing long-overdue remodels of approximately eleven locations. The Buyer expressed concern about the need to close the stores simultaneously, and stated its intention to remodel on its own timetable, and to sell food while the work is being done in each store. We will permit the overdue remodels to be completed on a staggered basis within eighteen (18) months from the date of closing. The Buyer can choose the order in which the stores will be remodeled, but it must start by remodeling two (2) stores within two months of the closing and must remodel two (2) stores every two months thereafter, until the remodeling is complete. Each store must close and remain closed during the remodel. Naturally, all other remodels must be completed as and when they become due, according to the respective Franchise Agreements.

Dunkin' Donuts did not relinquish its objection to Matrix' employment of Krischer to manage the franchises. The June 8 letter stated:

> Our position with regard to Mr. Krischer remains unchanged. He may not become a franchisee or assume a management role in a franchise. Mr. Krischer admitted under oath that he intentionally underreported sales to another franchisor and to the taxing authorities, both of which are crimes and violations of our Franchise Agreements. Together and separately, they have been the basis for termination on past occasions. Without more, Mr. Krischer is disqualified, but we would add that he supplied materially inconsistent information concerning his net worth and liquidity, and was generally

evasive in the application and interview process.  Under the circumstances, he may not become a franchisee.

The June 8 letter then stated unequivocally that Dunkin' Donuts would approve Matrix if Matrix' principals, Nelson and Nieto, would bring in a new, qualified manager for the shops to replace Krischer. The letter stated:

> If Messrs. Nelson and Nieto wish to move forward with the deal without Mr. Krischer, we would be willing to accept them if they brought in a new principal with the skills and experience sufficient to operate such a large network of Dunkin' Donuts and Baskin-Robbins franchises.

Despite this express approval by Dunkin' Donuts, Matrix made no effort to replace Krischer with another employee to manage the Dunkin' Donuts shops.

Prior to Dunkin' Donuts' conditional approval of Matrix in the June 8 letter, the debtors filed an application for a preliminary injunction which sought, among other relief, a declaration that Dunkin' Donuts had unreasonably withheld its consent to the sale to Matrix.[3]  A hearing on the debtors' motion was held on June 29, 2005 solely on the issue whether Dunkin' Donuts' refusal to approve Krischer as manager of the franchises on behalf of Matrix was reasonable.  At the conclusion of the June 29 hearing, this Court concluded that Dunkin' Donuts' rejection of Krischer as manager of the franchises was entirely appropriate in view of Krischer's self-confessed fraudulent conduct as manager of another franchise business.

**(h)**    **Matrix' repudiation of the Contract**

By letter dated June 10, 2005 (the "June 10 letter"), just two days after Dunkin' Donuts' June 8 letter approving Matrix as a franchisee conditioned only on Matrix' replacing Krischer, Matrix unequivocally informed the debtors' counsel that Matrix would not close on the purchase contemplated by the Contract.  The June 10 letter stated in full:

[Matrix Realty Group, Inc. Letterhead]

\*   \*   \*

---

[3]    The debtors' motion was filed June 1, 2005, after Dunkin' Donuts' May 25 letter but before its June 8 letter.

Dear Messer [*sic*] Rattet and Shure:

We have received the correspondence of Dunkin Brands, dated May 27, 2005 and June 8, 2005. Based on said correspondence we respectfully request a cancellation of the underlying Purchase and Sale Agreement dated April 11, 2005 and request an immediate return of our full contract deposit of $2,400,000 being held in escrow by the debtor's [*sic*] legal counsel.

This decision is based on two separate justifications.  Firstly, the express written disapproval of our buyers group by Dunkin Brands.   More specifically, its rejection on several grounds of our managing partner, Daniel Krischer.  This is fatal to our continuing interest since Mr. Krischer is the sole person with retail experience in our investment group.  From the beginning he has been key to our interest in the acquisition of the Dunkin Donuts Franchises.

Secondly, the financial reality of the proposed transaction differs significantly and materially from when it was presented and proposed to Matrix by the Seller via the Offering Memorandum and pursuant to several personal meetings with the debtors and Mr. Rattet.  Numerous and varied false and misleading statements and misrepresentations of fact, both written and oral, as well as fraud in the inducement, is clearly evident.  All parties are familiar with many of these issues and they have been the subject of many contentious and discouraging conversations among the parties, Mr. Rattet and Mr. Shure.

Considering the above, I regret to inform Mr. Rattet that it would be pointless at this time to have a meeting with the debtors and/or their legal counsel in order to resolve differences over the purchase price for the purpose of offering a unified position against Dunkin Brands.  We are conscious of the fact that the back-up bidder has also become aware of many misrepresented facts and false financial information, which have come to light in the past two months, and has adjusted its interest accordingly.  We understand that they are also no longer willing to proceed under the price and terms of its original stalking horse back-up bid.

In light of the above, we respectfully request return of our original contract deposit of $2,400,000 with all accrued interest.  Please forward your escrow check for this amount to Matrix Realty Group, Inc. within 2 business days.  We will waive any claim for expenses and/or damages if said check is received within said 2-day period.   If our request is wrongfully declined or ignored we will initiate legal proceedings for its return and pursue all of our rights accordingly to the laws of the State of New York.  This will include damages related to Sellers [*sic*] misrepresentations, for our expenses while working on this transaction, as well as consequential damages for the loss of use of our investment funds.  The protection of our cash deposit will also compel us to file liens against all assets of the debtor's [*sic*].

Your prompt attention to this matter is appreciated.   Please guide yourself accordingly.

Sincerely,

/s/
Richard Nieto, Esq.

Matrix' repudiation of the Contract was confirmed at the June 29 hearing at which the debtors (but not Matrix) challenged Dunkin' Donuts' rejection of Krischer as manager of the shops. Matrix appeared at the hearing by counsel and one of its principals in an effort to dissuade the Court from holding the hearing, asserting that the issue (Krischer's fitness to serve as manager of a franchise

business) was immaterial and moot because of Matrix' decision not to close under the Contract regardless of the outcome of the hearing.  Thus, Matrix' attorney stated:

> MR. KERA: Matrix is not interested any further in pursuing this offer.  They feel there have been a lot of misrepresentations on the stores that are available and financials.  So it's kind of irrelevant whether Mr. Krischer is acceptable or not because they just did not want to pursue this deal any further.

One of Matrix' principals, Richard Nieto, appeared during the June 29 hearing, prior to the examination of any witnesses, and informed the Court that:

> There's so many, I don't want to get into it right now but it's clear that no one is expecting us to go through with this transaction based on the purchase of sale agreement that was executed two months ago and we feel its [sic] moot to have this big effort as to whether [Krischer] is properly rejected or not when I think everybody knows we're not going through with the deal. . . .

**(i)        Sale of the assets to The Beekman Group**

In November 2005 the Trustee moved for approval of an agreement to sell the debtors' assets to an affiliate of The Beekman Group ("TBG").  The TBG Sale Agreement contained numerous provisions adverse to the debtors which were not in the Matrix Contract and the prior stalking horse sale agreements required under the Bidding Procedures.  On December 15 the Court entered a series of orders approving the TBG Sale Agreement for a purchase price of $18 million subject to certain downward adjustments.

**Discussion**

**I.        Elements of plaintiffs' claim**

Under New York law, in order to prevail on a breach of contract claim, a plaintiff must prove (1) the existence of a contract, (2) breach of the contract by the defendant, (3) performance by plaintiff unless excused or precluded and (4) damages resulting from that breach.[4]    *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004); *RIJ Pharm. Corp. v. Ivax Pharms., Inc.*, 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004).  Each of these elements must be proven by a preponderance of the credible evidence.  *Republic Corp. v. Procedyne Corp.*, 401 F. Supp. 1061, 1068 (S.D.N.Y. 1975).  For

---

[4]        In a conference call prior to trial, it was established between counsel and the Court that the trial would be limited to the determination of liability, and the issue of damages was reserved for later determination.

New York cases, *see Furia v. Furia*, 116 A.D.2d 694, 498 N.Y.S.2d 12, 13 ( N.Y. App.Div. 1986) ("[t]he complaint states a valid cause of action against defendant based upon breach of a contract. The pleading clearly specifies the terms of the agreement, the consideration, the performance by plaintiffs and the basis of the alleged breach of the agreement by defendant."); *Ledain v. Town of Ontario*, 192 Misc.2d 247, 746 N.Y.S.2d 760, 763 (N.Y. Sup. Ct. 2002), *aff'd*, 305 A.D.2d 1094, 759 N.Y.S.2d 426 (N.Y. App. Div. 2003) ("The common law elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, and (4) resulting damage (citations omitted)); *WorldCom, Inc. v. Sandoval*, 182 Misc.2d 1021, 701 N.Y.S.2d 834, 836 (N.Y. Sup. Ct. 1999) ("An action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages" (citing *Rexnord Holdings v. Bidermann*, 21 F.3d 522 (2d Cir. 1994)); *Lehmann v. Lehmann*, 182 Misc.2d 22, 696 N.Y.S.2d 663, 665 (N.Y.City Civ.Ct. 1999) ("To state a claim for breach of contract a party must establish (1) the existence of an agreement; (2) due performance of the contract by the party alleging the breach; (3) a breach; and (4) damages resulting from the breach." (citing *Reuben H. Donnelley, Corp. v. Mark I. Mktg.Corp.*, 925 F. Supp. 203, 206 (S.D.N.Y. 1996)); *J&L Am. Enters., Ltd. v. DSA Direct, LLC*, 10 Misc.3d 1076(A), 814 N.Y.S.2d 890 (Table) (N.Y. Sup. Ct. 2006), 2006 WL 216680, *5 (unpublished decision) ("The elements of a breach of contract claim are (1) the making of an agreement; (2) performance of the agreement by one party; (3) breach by the other party; and (4) damages") (citations omitted).

### A.    <u>The existence of a valid and enforceable contract</u>

The Matrix Contract is a written document, which was introduced in evidence at the trial as an exhibit. There is no dispute that the Contract is genuine, that it was signed by authorized repre-sentatives of the debtors and that it was signed on behalf of Matrix by Glen Nelson, who was one of the two principals of Matrix and a principal and "Managing Member" of Matrix' affiliate, ZPG. There is no dispute that the Contract bound the debtors to sell and Matrix or its designated affiliate ZPG to purchase the assets covered by the Contract in accordance with the terms of the Contract. And there is no dispute

that representatives of both the debtors and Matrix worked diligently to do what had to be done to enable the parties to close the purchase and sale called for under the Contract until shortly before June 10, 2005 when Matrix' principals, Glen Nelson and Richard Nieto, apparently influenced by Dunkin' Donuts' concern that the purchase price was too high, decided that they were no longer interested in closing on the transaction in accordance with the Contract.

Accordingly, the first element of plaintiffs' case — the existence of a valid and enforceable contract — has been established.

### B.   Anticipatory breach of Contract by Matrix

Nor can there be any doubt that Matrix repudiated the Contract in June 2005 by its June 10 letter (quoted above), confirmed by its conduct thereafter and by the statements of its counsel and one of its principals in open court at the June 29 hearing (quoted above).   The repudiation was unequivocal and final.

The Matrix Contract was governed by New York law.  Under New York law a party to a contract commits an anticipatory breach of the contract when, prior to the time set for performance under the contract, it declares expressly or by its conduct that it will not perform its part of the bargain.  *In re Asia Global Crossing, Ltd.*, 326 B.R. 240, 249 (Bankr. S.D.N.Y. 2005), *adhered to in part on reorg.*, 332 B.R. 52 (Bankr. S.D.N.Y. 2005) ("An anticipatory repudiation occurs when a party to a contract (1) states that he cannot or will not perform his obligations, or (2) commits a voluntary affirmative act that renders the obligor unable or apparently unable to perform his obligations." (citations omitted); *see also De Lorenzo v. Bac Agency, Inc.*, 256 A.D.2d 906, 681 N.Y.S.2d 846, 848 (N.Y.App.Div. 1998); John D. Calamari & Joseph M. Perillo, THE LAW OF CONTRACTS § 12.4, at 525 (3rd ed.1987); RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981) ("A repudiation is (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243, or (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach."); *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty") (citations omitted).

On the facts and the law, plaintiffs have sustained the second element of their burden of proof to establish a claim for breach of contract. There can be no doubt that Matrix repudiated the Contract in June 2005, before the parties had even discussed setting a date for a closing under the Contract. Matrix thereby committed an anticipatory breach of the Contract.

C.    **The debtors' willingness and ability to perform**

There is no dispute that, at all times prior to Matrix' repudiation, the debtors were not merely willing but extremely anxious to close on the sale to Matrix, and that the debtors' and the Examiner's professionals and Keen were working diligently with Matrix to complete the steps necessary for the sale. At no time did the debtors or their representatives state or express by word or deed that they were unable or unwilling to perform their obligations under the Matrix Contract.

Matrix' principal affirmative defense is that the debtors did not have the ability to perform all of their obligations under the Matrix Contract because they could not deliver all of the assets called for under the Contract. Specifically, Matrix asserts that, if a closing had been scheduled,[5] the debtors could not have delivered two stores (392 East 149 Street and 38 Mill Road), the three "shops not yet opened," four lease extensions, "clear title" to twelve stores,[6] and the certificates to operate the bakery.

The factual defects in this affirmative defense are dealt with in point II.B, below. But there is a basic, overarching defect in Matrix' argument that the debtors did not have the ability to

---

[5]    In fact, a closing was never scheduled. The Matrix Contract provided in Section 1.1 that "The closing shall take place at such time and/or place as shall be mutually agreed upon by the parties hereto. . . ." The parties never agreed upon a closing date, and there is no trial evidence of any discussion of setting a closing date. Matrix has argued that the closing date had to be not later than July 31, 2005 by reason of the Mandatory Sale of Franchises provision of the 2002 Settlement Agreement. But that provision provided that Dunkin' Donuts would extend the July 31, 2005 deadline "as reasonably necessary to complete the transfers. . . ." In fact, Dunkin' Donuts did not object to a December 2005 initial closing date under The Beekman Group contract despite the fact that there was no contract at all for sale of the assets from Matrix' repudiation on June 10 until the TBG contract in November 2005. There is no reason to believe that Dunkin' Donuts would not have granted the debtors and Matrix at least the same extension until December 2005 if the debtors and Matrix had been "proceeding diligently and in good faith to closing."

[6]    Matrix' vague and unsupported contention that the debtors could not deliver "clear title" to twelve stores is incomprehensible. The debtors did not hold title to any of the twenty-four operating stores, the three shops not yet opened or the bakery. The assets consisted of twenty-four operating Dunkin' Donuts stores each with a lease and a franchise agreement, a leasehold interest in the bakery and purported lease and franchise agreements for the three shops not yet opened, i.e., locations that did not have an operating Dunkin' Donuts shop. There was no obligation under the Matrix Contract to convey "clear title" to any real estate.

perform under the Contract, namely, the practical and legal consequences of Matrix' anticipatory breach of the Contract.

The consequences of anticipatory breach are well established.  Anticipatory repudiation by one party precludes fulfillment of the contract by both sides and, therefore, excuses performance by the counter-party.   By foreclosing the future, the breaching party deprives the counter-party of the opportunity to take the necessary actions to tender its performance under the contract.  For this reason, the breaching party is estopped to claim that its own breach does not matter because the counter-party could not have performed anyway.  *See In re Asia Global Crossing, Ltd.*., 326 B.R. at 249 ("If an anticipatory repudiation occurs, the non-breaching party has two mutually exclusive options.  He may elect to treat the contract as terminated and exercise his remedies, or continue to treat the contract as valid. . . .   If he elects to terminate the contract and sue for breach, he is excused from tendering his own performance" (citations omitted)); *De Forest Radio Telephone & Telegraph Co. v. Triangle Radio Supply Co.*, 243 N.Y. 283, 293 (1926) ("[A non-breaching party] is not obliged to go further and perform in the face of a flat refusal and rejection by the other party."); *Pitcher v. Benderson-Wainberg Assocs. II, Ltd Partnership,* 277 A.D.2d 586, 587, 715 N.Y.S.2d 104 (N.Y. App.Div. 2000) (". . . the effect of an anticipatory breach by one party to a contract is the discharge of the other party from its legal obligations") (citations omitted); *Inter-Power of New York Inc. v. Niagara Mohawk Power Corp*., 259 A.D.2d 932, 934, 686 N.Y.S.2d 911 (N.Y. App.Div. 1999) (". . . while an anticipatory breach relieves the nonbreaching party of the need to tender performance, such party nonetheless is required to show that it was ready, willing and able to perform its obligations under the contract"); *Mignon v. Tuller Fabrics Corp*., 1 A.D.2d 174, 148 N.Y.S.2d 605, 607-08 (N.Y. App.Div. 1956) ("The rule excusing further performance when there has been an anticipatory breach and authorizing recovery against the party so indicating an intention to breach is a rule sustained by 'the great weight of authority'. . . .   It is recognized in New York.") (citations omitted); WILLISTON ON CONTRACTS, § 39:37 (4th ed. 2000) ("Where one party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived and before a default justifying the repudiation has occurred, the other party is relieved from performance on his or her side") (footnote omitted); John D. Calamari & Joseph M. Perillo, THE LAW OF CONTRACTS § 12.8, at 485

(4th ed. 1998) ("The repudiation, however, relieves the party of any necessity to tender performance")

(footnote omitted).

In cases where it may not be possible to know whether the counter-party would have

been able to perform, anticipatory repudiation by the breaching party relieves the counter-party of the

need to prove its ability to perform. In *G.G.F. Properties, LLC v. Yu Mi Hong*, 284 A.D.2d 427, 726

N.Y.S.2d 454, 455-56 (A.D.2d 2001), plaintiff G.G.F. Properties, LLC's repudiation absolved defendant

Hong from her lack of authority to perform. The Appellate Division said:

> "In any event, GGF repudiated the contract when it demanded a reduction in price, and
> insisted on that price reduction after it was 'vehemently rejected'. *The repudiation of the
> contract relieved Hong of any obligation to prove her ability to perform the contract*."
> (citation omitted) (emphasis supplied)

The argument that the debtors could not have delivered the two lease extensions is based

on speculation. Matrix' repudiation of the Contract in early June 2005 foreclosed the future and rendered

it impossible to know whether the debtors could have delivered the other shops and leases in question.

Who is to say that the passage of time measured in weeks or months, persuasive negotiations, changes in

landlord circumstances and the blandishments of money would not have enabled the debtors to deliver

some or all of the assets.

In that connection, it should be noted that the $26,770,000 purchase price under the

Contract so far exceeded the debtors' total liabilities at the time that it was then believed the sale would

have resulted in a substantial return to equity.   "Money talks," as the saying goes, and the Contract price

would have yielded substantial excess funds which might have been used to "buy out" some or all the

obstacles to delivering the units in question.  Of course, that is speculation and one cannot know now

whether the debtors could have delivered all the lease extensions.  But it is equally speculative for Matrix

to assert that the debtors could not have delivered all the lease extensions in question between, say, June

and December 2005, armed with several million dollars of the Matrix purchase price in excess of the

amounts necessary to pay all creditors in the case.  The consequence of that uncertainty must fall on one

side or the other, and as between the breaching party and the counter-party whose ability to perform was

foreclosed by the other's breach, it is the breaching party that must bear the consequence.

Two facts are certain.   One is that Matrix' repudiation precluded the debtors' ability to use the Contract purchase price to fund whatever costs might have facilitated a closing on all the units. The other is that Matrix' repudiation foreclosed the future and made it impossible to know whether the debtors could have delivered all the lease extensions.   The law would pervert justice if it imposed upon the debtors the consequence of this uncertainty which was caused by Matrix' repudiation of the Contract.

But that is not the law.   It is firmly established that a party which breaches a contract and thereby precludes performance of the counter-party cannot invoke the county-party's lack of performance as a defense.   The Supreme Court restated this venerable and still universally-accepted principle of contract law in *R.H. Stearns Co. v. United States*, 291 U.S. 54, 61 (1934):

> The applicable principle is fundamental and unquestioned.   "He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned, for the law says to him, in effect: 'This is your own act, and therefore you are not damnified'" (citations omitted).

For the sake of brevity, this fundamental principle may be conveniently referred to as the "Doctrine of Prevention of Performance."   The effect of the Doctrine is that a contracting party may not claim that the counter-party's non-performance excused its own obligation when performance was wrongfully precluded by the contracting party's own breach.   The Second Circuit Court of Appeals, the New York Court of Appeals and many other courts have restated the Doctrine in countless contexts.   *See also Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 501 (2d Cir. 1989) ("It is true that a condition precedent may be excused if the party whose performance is predicated on that condition somehow blocks its occurrence. 'It is a well settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself'") (citations omitted); *A H.A. Gen. Constr., Inc. v. New York City Hous. Auth.*, 92 N.Y.2d 20, 31, 677 N.Y.S.2d 9, 699 N.E.2d 368 (N.Y. 1998) ("A condition precedent is linked to the implied obligation of a party not to 'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract'") (citation omitted); *Kirke La Shelle Co. v. The Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (N.Y. 1933) (noting the principle that "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract"); *Kooleraire Serv. & Installation Corp. v. Bd. of Educ.*, 28 N.Y.2d 101, 106, 320 N.Y.S.2d 46, 268 N.E.2d 782 (N.Y. 1971) ("The general rule is . . . that a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition"); *Arc Elec. Constr. Co. v. George A. Fuller Co.*, 24 N.Y.2d 99, 104, 299 N.Y.S.2d 129, 247 N.E.2d 111 (N.Y. 1969) (a party cannot "'rely on [a] condition precedent . . . where the non-performance of the condition was caused or consented to by itself'") (internal citation omitted); *Stern v. Gepo Realty Corp.*, 289 N.Y. 274, 277, 45 N.E.2d 440 (N.Y. 1942) ("An allegation, therefore, that title did not close because of the vendor's neglect and refusal to discharge hens [sic, should read liens] against the property is sufficient to avoid the defense of non-performance of a condition precedent, . . . the performance of which he himself has rendered impossible") (citations omitted); *Amies v. Wesnofske*, 255 N.Y. 156, 162-63, 174 N.E. 436 (N.Y. 1931) ("If a promisor himself is the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure . . . . It is a well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself") (citations omitted); *Patterson v. Meyerhofer*, 204 N.Y. 96, 100-01, 97 N.E. 472 (N.Y. 1912) ("In the case of every contract there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part. This proposition necessarily follows from the general rule that a party who causes or sanctions the breach of an agreement is thereby precluded from recovering damages for its non-performance or from interposing it as a defense to an action upon the contract") (citations omitted); *Vandegrift v. The Cowles Eng'g Co.*, 161 N.Y. 435, 443, 55 N.E. 941 (N.Y. 1900) ("[I]f the impossibility [of performance] arises, directly or even indirectly from the acts of the promisee, it is a sufficient excuse for non-performance. This is upon the principle that he who prevents a thing may not avail himself of the non-performance which he has occasioned") (citation omitted); *Lager Assocs. v. City of New York*, 304 A.D.2d 718, 719, 759 N.Y.S.2d 116 (N.Y.App.Div. 2003) (noting "a party to a contract cannot rely on the failure of another to perform a condition precedent where the party has frustrated or prevented the occurrence of the condition") (citation omitted); *Rochester Cmty. Individual Practice Assoc. v. Finger Lakes Health Ins. Co., Inc.*, 281 A.D.2d 977, 979, 722 N.Y.S.2d 663

(N.Y.App.Div. 2001) ("A condition precedent is linked to the implied obligation of a party not to do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract") (citations omitted); *Pitts v. Davey*, 40 Misc. 96, 81 N.Y.S. 264 (N.Y. Sup.Ct. 1903) ("A plaintiff cannot recover in an action against another for breach of contract . . . if it appears that he, directly or indirectly, prevented the other party from performing, and the default of the other party is primarily due to the act or neglect of plaintiff, then no recovery can be had, but the party prevented from performing in full may recover pro rata.   Otherwise[,] the plaintiff would recover the damages flowing from his own acts").

The Doctrine of Prevention of Performance is articulated in RESTATEMENT (FIRST) OF CONTRACTS § 295 (1932) as follows:

§ 295 Excuse Of Condition By Prevention Or Hindrance

If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened nonperformance of the return promise does not discharge the promisor's duty, unless

(a)  the prevention or hindrance by the promisor is caused or justified by the conduct or pecuniary circumstances of the other party, or

(b)  the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party.

Matrix chose to repudiate the Contract on June 10, 2005.   It cannot now evade the consequences of that breach by asking the Court to speculate that the debtors could not have performed if Matrix had not breached.  As a matter of fact Matrix' breach precluded, and therefore as a matter of law excused, the debtors' performance under the Contract.

**D.    <u>Damages resulting from the breach</u>**

With Court approval the parties have agreed that evidence and argument on damages should await the Court's determination on the issue of liability.  Nevertheless, to establish liability the plaintiffs must make at least a *prima facie* showing that the defendant's breach of contract was the proximate cause of some economic harm or damage.

Plaintiffs have sustained their burden of making a *prima facie* showing of damage and causation. The Matrix Contract called for payment on closing of $24 million in cash (the Deposit of $2,400,000 plus $21,600,000 by certified or cashier's check at closing) plus a $2,770,000 promissory note, payable, with interest, over ten years. By contrast, the TBG Sale Agreement will result in payment to the debtors' estates a maximum of $18 million less substantial deductibles. The differential constitutes *prima facie* evidence of damage resulting from the Matrix breach.

The foregoing is without prejudice to Matrix' right to present evidence and argument in a subsequent hearing that as a matter of fact or law the debtors suffered no causily-related economic harm, or that the damages should be limited to forfeiture of the Matrix Deposit, or that the *prima facie* contract damage differential should be reduced in any other manner. Nor are the plaintiffs precluded from presenting argument and evidence that the damage to the debtors' estates from Matrix' breach exceeded the *prima facie* contract differential.

## II.    Matrix' affirmative defenses

At various points in the course of this adversary proceeding Matrix has asserted a veritable farrago of differing defenses. In order to pin down precisely the points of contention between the parties, the Court requested both sides to submit post-trial briefs and reply briefs setting forth definitively the claims and defenses upon which each side relies. Upon reviewing Matrix' post-trial brief, fearing that the parties may have misunderstood this instruction, in a conference call on the record on January 8, 2007 I ordered Matrix to submit a supplemental post-trial brief substantiating in fact and law any defenses omitted from its post-trial brief and reply, with the Trustee to respond on a schedule to be agreed by the parties. I also ordered Matrix' counsel to specify precisely by street address each asset which Matrix argues the debtors could not have delivered and the evidence in the record supporting such assertion, and the Trustee to reply with respect to each such asset.

I shall address all of the points raised by Matrix' counsel in Defendant's Post-Trial Memorandum, Defendant's Post-Trial Sur-Reply Brief and Defendant's Supplemental Post-Trial Brief, upon the assumption that any arguments previously made but not set forth in these post-trial submissions have been waived.

Before turning to specific defenses, it will be useful to address a basic misconception which appears to be a premise of the defense.  Matrix argues in heading I. of its Post-Trial Memorandum that:

The Uncontroverted Evidence Introduced at Trial Clearly Proves that the Plaintiff did not Satisfy the Conditions Precedent and *Therefore Cannot Prove that Matrix Breached the Sales Agreement* (emphasis supplied)

Under this general heading Matrix sets four sub-headings of specific alleged "Conditions Precedent" and a fifth heading of "Other Conditions Precedent."  Each of these points will be discussed separately below.

Preliminarily, however, it must be observed that this purported "defense" is fundamentally flawed both conceptually and legally.   Conceptually, the question of whether the debtors did or did not fulfill conditions precedent under the Contract is quite distinct from the separate and different question of whether Matrix repudiated and thereby breached the Contract.  A breach by the debtors may or may not have some consequence, either as to liability or damages.   But the fact (if it were a fact) that the debtors failed to perform some duty or obligation under the Contract does not mean that Matrix did not repudiate and thereby breach the Contract.  Moreover, Matrix' argument that the debtors failed to perform under the Contract and that this failure nullifies Matrix' repudiation is legally defective because, under the case law cited and quoted at length in points I.B and C, above, a breach of contract by one party that precludes performance by the counter-party relieves the counter-party of its obligation to perform, or to prove that it could have performed where, as here, it cannot be known whether performance would have been possible.

Matrix' central argument — that the debtors could not perform their part of the bargain — is addressed in points II.A and B immediately below.  Each of Matrix' other affirmative defenses will be considered under points II.C *et seq.* that follow.

A.      <u>The divisibility of the Contract</u>

Matrix argues that the Contract was indivisible, and that a partial breach should be treated as a breach of the entire Contract.  Thus, it asserts, if the debtors failed to perform any aspect of the Contract, Matrix should be entitled to cancellation of the entire Contract and refund of its deposit.

The nature and terms of a contract, as well as the parties' intentions, determine whether a contract is divisible. *In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 81 (2d Cir. 1996) (citations omitted). Matrix argues that the Contract is indivisible because it had no allocation of the purchase price, there was only one closing date, and partial performance would be impossible. Likening this transaction to a deal for machine equipment, Matrix thus concludes that the failure of any piece of the Contract dooms the remainder in its entirety.

However, Matrix' argument overlooks fundamental elements of this Contract. This was not an all-or-nothing contract, rather it involved numerous discrete risks. This was a purchase from bankrupt companies owned and previously operated by two brothers known to be of dubious character and integrity who pleaded guilty to and are now in federal prisons for tax fraud. The sale was governed by a Bidding Procedures order that contained sweeping disclaimer statements, as did the Offering Memorandum. Sections 3.14 and 3.15 of the Contract expressly provided for credits to Matrix from the purchase price in the event the debtors would be unable to deliver the properties. The parties incorporated the possibility, indeed the likelihood of part performance into the Contract terms.

Moreover, Matrix continued to perform despite the failure of parts of the Contract. The Contract was signed on April 18, the same date on which four lease extensions under Section 3.13 ostensibly became due. Matrix' principal knew when he signed the Contract that the lease extensions had not been obtained and might never be obtainable. Even though the extensions were not delivered, Matrix did not treat the Contract as breached, as it would if the Contract were indivisible. Rather, with the knowledge of Matrix' principals Nelson and Nieto, Krischer continued to actively work with the debtors to obtain the lease extensions, and he personally worked with at least three of the landlords long after April 18. Krischer's April 27 email to Nelson admits that three of the landlords "will most likely not give us extensions until we are in, and there is a very good chance that at least 2 of them never will." Yet Matrix went forward on the Contract. In a May 10 email to all parties, Krischer announced "we have retained the law firm of Kera, Graubard & Litzman to represent us in the upcoming closing." That same day, Krischer emailed Dunkin' Donuts confirming that Matrix' "attorneys are still finalizing the [ZPG] partnership agreement." Matrix' actions waived any claim that obtaining the extensions was a drop-dead

issue, and unambiguously demonstrated that Matrix did not consider the Contract to be indivisible. Obtaining the lease extensions was only a component of the larger purchase and sale agreement. Failure to obtain any of the four extensions did not doom the entire $26,770,000 deal.

Each store could be and was individually valued. Section 3.14 of the Contract entitles Matrix to $750,000 if the lease extension for the store at 392 East 149 Street was not delivered. Section 3.15 entitles Matrix to a credit of up to $1,000,000 for the store at 38 Mill Road. The 2002 Settlement Agreement also notes that Dunkin' Donuts has a specific business evaluation formula for each store, should delivery become impossible.

Krischer confirmed this divisibility in his correspondence with Dunkin' Donuts. On April 27, 2005, when Dunkin' Donuts' attorney requested an allocation of the purchase price, store by store, Krischer replied that he could readily supply one. Thereafter, Matrix furnished a spreadsheet (included in an exhibit in evidence) that specifically allocated the value of each of the several stores to the exact dollar amount. Matrix attributed a price tag to each store and contemplated the unique value of each of the premises. The stores were severable. If a few premises become impossible to deliver, and that failed delivery does not affect the preponderance of what is contracted for, the seller remains entitled to enforce the contract with a diminution in its purchase price. *See, e.g., Columbus Ry., Power & Light Co. v. City of Columbus*, 249 U.S. 399, 411–12 (1919). The buyer, however, is not released from its responsibilities under the contract. *See Benefit Concepts N.Y., Inc. v. Benefit Sys., Inc.*, 1992 U.S. Dist. LEXIS 3811, No. 93 Civ. 1961, 12–13 (S.D.N.Y. Mar. 28, 1995).

Rather than machinery parts, which necessarily depend on each component for the unit to function, this Contract contemplated twenty-four separate parcels of real estate in nine different cities (not including the three "shops not yet opened"). There are nine stores in Yonkers, five in White Plains, three in the Bronx, two in Scarsdale, and one in Harrison, Pleasantville, Eastchester, Hartsdale, and Goldens Bridge. The failure of one does not forestall performance on the others. While the bakery plays a central role to the franchise, Matrix' claim that the bakery could not be delivered is entirely incorrect, as is discussed in point II.C below. The parties made independent valuations and thus intended the Contract to be divisible if necessary. The debtors would have been able to substantially perform under the Contract,

even if their performance had been fully due upon Matrix' repudiation on June 10, which it was not.  If the debtors had been unable to deliver all twenty-eight properties, that might bear on the question of damages.  But it certainly would not entitle Matrix to repudiate its obligation to purchase the great majority of the assets under the Contract, which the debtors were indisputably ready, willing and able to deliver.

**B.**      **The debtors' alleged inability to deliver certain assets**

Shorn of generalities and rhetoric,[7] Matrix argues that the debtors could not deliver the following assets:

> 392 East 149 Street
> 38 Mill Road
>
> 53 Spencer Place
> 42 Lake Street
> 260 Halstead Avenue
> 195 East 161 Street
>
> 200 Westchester Avenue
> 987-A Central Park Avenue
> 307 South Broadway
>
> 2620-1/2 Central Park Avenue
>
> The Commissary Bakery

Let us examine the facts with respect to each of these assets.

**392 East 149 Street** and **38 Mill Road** are the stores listed in Sections 3.14 and 3.15 of the Contract which provide for reductions in the purchase price in the event of the debtors' failure to deliver leases or lease extensions on these two properties.  The non-delivery of these assets was contemplated and accounted for in the Contract.   There could be no breach or contractual failure to perform by the debtors in respect of these two stores.

**53 Spencer Place, 42 Lake Street, 260 Halstead Avenue** and **195 East 161 Street** are the four shops referred to in Section 3.13 of the Contract, which required the debtors to deliver written lease extensions prior to closing.  As noted above, Krischer continued to work with the debtors and the

---

[7]      For example, the argument that the debtors could not deliver "clear title" to thirteen of the shops.  *See* footnote 6, above.

landlords at three of the four locations to obtain lease extensions, and he emailed to Nelson the opinion that none of these lessors would probably agree to extend their leases until "after we are in" and that two probably never would.   Nevertheless, Matrix never declared a default under Section 3.13 and continued to work on these locations until Dunkin' Donuts' May 25 letter advising that Matrix had contracted to pay too much for the franchises.   In fact, the debtors did obtain lease extensions on two of these properties, 42 Lake Street and 260 Halstead Avenue.  The remaining two stores, 53 Spencer Place and 195 East 161 Street, were delivered to TBG without lease extensions.

      **200 Westchester Avenue, 987-A Central Park Avenue** and **307 South Broadway** were the three "shops not yet opened."  As already noted, the debtors had no obligation under the Contract to conduct any further construction, obtain permits or perform any work or do anything whatever with respect to these three shops not yet opened other than to deliver "as is" whatever interests the debtors had in those assets.   The debtors held a Dunkin' Donuts franchise contract and a lease in respect of 987-A Central Park Avenue.  There is no dispute that the franchise and the lease for this location could have been conveyed to Matrix in accordance with the Contract.  The fact that at one time a building permit had been denied (a matter of public record) is not germane to the debtors' ability to deliver the lease and franchise agreements.  It would obviously be up to Matrix to apply for a building permit if they chose to do so, whether a building permit had previously been granted or denied to a different applicant on a different building plan.  As to the 200 Westchester Avenue location, the debtors had a lease but, as disclosed in the Offering Memorandum, no franchise agreement.   There is no dispute that the debtors could have delivered the lease in accordance with the Contract.   Matrix points out that 987-A Central Park Avenue and 200 Westchester Avenue were not conveyed to TBG, but the TBG contract, unlike the Matrix Contract, did not require TBG to purchase locations, such as these two, which were related to Gianopolous' entities.   Accordingly, in April 2006 the Trustee rejected these two unexpired leases, having no market for them. At the time of the Contract, the debtors had both a franchise agreement and a lease for 307 South Broadway.  Subsequent to April 15, 2005, Taco Bell, the lessor, commenced a proceeding in this Court for a determination that the debtor-lessee had previously breached the lease entitling Taco Bell to terminate the lease.  The Court sustained Taco Bell's position.  That left the debtors

with the remaining asset, a franchise agreement for the location which could have been transferred to a new location.  Debtors' counsel offered to negotiate with Dunkin' Donuts on Matrix' behalf to transfer the franchise to a new location or, in the alternative, for a credit against the Contract purchase price.  Matrix declined both alternatives.   But the debtors' obligation to deliver "as is" the transferable franchise for 307 South Broadway was not breached by the loss of the lease for that asset.

**2620-1/2 Central Park Avenue** is discussed at length in point II.J, below.  Suffice it here to state that the debtors were ready, willing and able to deliver this location to Matrix under a month-to-month lease, which is what the debtors had.  This asset was conveyed to TBG under the month-to-month lease.   Matrix' objection as to this location is that a schedule in the Offering Memorandum listed 2620-1/2 Central Park Avenue as having a lease expiring September 30, 2013, which was in error.  As amplified in point II.J, below, the debtors' obligation was to deliver its assets "as is" with numerous explicit disclaimers.  Matrix could have discovered before April 15, and did discover within a few weeks after April 15, that the termination date of September 2013 was a mistake.  Under these circumstances, the debtors cannot be held in breach of the Contract by reason of this inadvertent error in the Offering Memorandum.   In any event, at most the error would give rise to an issue regarding damages.

**The Commissary Bakery** is dealt with in point II.C, immediately following.   Suffice it to say that the debtors unquestionably could have delivered the Bakery in accordance with the Contract.  As the evidence showed, the only reason that the Bakery has not yet been conveyed to TBG is that the TBG contract contained a provision precluding delivery of any asset in which the Gianopolous' brothers had any interest, and a Gianopolous entity is the landlord for the Bakery.  The Matrix Contract did not contain a no Gianopolous connection provision such as that in the TBG contract.

What then remains of Matrix' central argument that the debtors could not perform their obligations under the Contract?  Almost nothing.

Two of the shops, 392 East 149 Street and 38 Mill Road, were covered by Sections 3.14 and 3.15 of the Contract, and failure to deliver those assets could not breach the debtors' obligations under the Contract.   Lease extensions under two of the four Section 3.13 locations were in fact obtained.  The debtors were in fact able to deliver the assets that they had on an "as is" basis with respect to the

three shops not yet opened.  And the debtors unquestionably could have delivered the Commissary

Bakery and, on an "as is" basis, the franchise and month-to-month lease for 2620-1/2 Central Park

Avenue, although the debtors did not have a lease extension to September 2013 as erroneously reflected

on the Exhibit E spreadsheet in the Offering Memorandum.

       The bottom line is that the trial evidence compels the conclusion, and I so find, that the

only assets which the debtors arguably were unable to deliver in accordance with their obligations under

the Contract were lease extensions for two of the stores referred to in Section 3.13 of the Contract, 53

Spencer Place and 195 East 161 Street (both of which were delivered to TBG without lease extensions), a

lease extension to September 2013 for 2620-1/2 Central Park Avenue, which was not expressly required

under the Contract but which was erroneously referred to as extant on Exhibit E in the Offering Memo-

randum, and the lease for one of the three shops not yet opened, although the franchise for this address

could have been delivered and transferred to a new location   But as to the lease extensions for these three

assets, one must refer back to the legal principles expounded in points I.B and C, above.  Matrix'

repudiation of the Contract in June 2005 foreclosed the future and precluded the debtors from obtaining

lease extensions for these three shops.  Matrix' repudiation deprived the debtors and their professionals,

soon thereafter replaced by the Trustee, of literally millions of dollars in excess of the amount necessary

to pay all creditors in full.[8]   With financial resources vastly in excess of the values inherent in any of the

three leases in question, and in the absence of any evidence in the trial record of facts demonstrating or

suggesting that any of the three landlords would have declined lease extensions at any price, it appears

more likely than not that the Trustee could have negotiated lease extensions if the alternative were to lose

a $26.77 million Contract.

       As a matter of law, the debtors were relieved of their obligation to prove that they had the

ability to obtain these three lease extensions, because Matrix' repudiation deprived the debtors of that

ability.  The party which preemptively breaches a contract and thereby precludes the counter-party from

---

[8]     The Matrix Contract at $26.77 million exceeded the TBG contract by almost $9 million, and the amount the Trustee will ultimately receive under the TBG contract will be far less than $18 million by reason of provisions in the TBG contract not found in the Matrix Contract.

rendering its performance cannot look to the counter-party's lack of performance to exonerate its own breach of contract.

One further point must be made with regard to the debtors' failure to deliver lease extensions on these three stores. Nothing in the Matrix Contract provides that any of the lease extensions constituted a condition precedent to the obligations of Matrix to close. Only Section 7.1 of the Contract recited conditions precedent that would entitle a non-defaulting party to terminate the Contract. Section 7.1 listed only Sections 4 and 5 as provisions non-compliance with which would entitle a party to declare a default. In short, nothing in the Contract justified Matrix' repudiation of the Contract in June 2005.

As shown in point II.A, the Matrix Contract was divisible such that the debtors' inability to fully perform did not entitle either party to repudiate the Contract as a whole. The debtors' inability to deliver lease extensions on three shops may or may not be germane to the issue of damages, but it did not entitle Matrix to repudiate the Contract.

C.    **The CPL and the CO for the Bronx Donut Bakery**

Little need be said of Matrix' contentions regarding the debtors' purported inability to obtain a commissary production license ("CPL") from Dunkin' Donuts or a certificate of occupancy ("CO") for the Bronx Donut Bakery.

The fact is that a CPL was issued by Dunkin' Donuts to Sunapee Food Services LLC, a Gus Company which was the corporate predecessor of Bronx Donut Bakery Inc., the Tom Company which is now a debtor. There was no trial evidence that the Sunapee CPL is no longer in full force and effect. Any issues between Dunkin' Donuts and the debtors relating to the Bakery were resolved in negotiations between Dunkin' Donuts and the Chapter 11 Trustee, as shown in the testimony of Dunkin' Donuts' counsel cited and quoted at pages 6-8 of Plaintiffs' Post-Trial Reply Brief.

The trial evidence also showed that a CO was issued in 1975 covering the premises on which the Bronx Donut Bakery has operated at all times, as successor to Sunapee, and no evidence was presented by Matrix suggesting that the CO has ever been withdrawn. In fact, the Bronx Donut Bakery has at all times prior to and during these bankruptcy proceedings to date been operated as the bakery

supplying product to all of the debtors' Dunkin' Donuts franchise shops including those which have been sold to TBG.

### D.    Assumption of the 2002 Settlement Agreement

Matrix asserts that "It was the Debtors' responsibility to assume the October 2002 Settlement Agreement which operated as the functional equivalent of the franchise agreements which comprised the bulk of the sale of the assets in this case." From this baseless premise, Matrix argues that the debtors had various obligations to "cure" and that the debtors failed to effect the supposedly requisite cure.

The debtors were not parties to the 2002 Settlement Agreement. Indeed, it does not appear that the debtors even existed as corporate entities at the time of the 2002 Settlement Agreement. Nor can it possibly be said that the 2002 Settlement Agreement was "the functional equivalent of the franchise agreements," and Matrix has offered no rationale or explanation for this groundless assertion.

The 2002 Settlement Agreement was certainly a factor that loomed large in the debtors' bankruptcies because of the Mandated Franchise Sales provision under which Tom, a signatory to the 2002 Settlement Agreement and owner of the Tom Companies which became the debtors, had an obligation to sell the debtors' franchises by mid-2005, failing which Dunkin' Donuts had the right, in substance, to take back the franchises at a price determined under its own formula and convey the franchise rights to others.

But the debtors were not parties to the 2002 Settlement Agreement, and the concepts of assumption and cure with respect to that Agreement are simply not relevant.

Of course, the debtors were parties to franchise agreements with Dunkin' Donuts, and the debtors had obligations to cure with respect to those agreements, as fully disclosed in the Offering Memorandum. But any obligations to cure which the debtors may have had under the franchise agreements ran to Dunkin' Donuts, not to Matrix, and Dunkin' Donuts never objected to the Matrix Contract or to transfer of the franchises to Matrix on the grounds that the debtors were in default of any obligation to cure.

The debtors' obligations to Matrix were only those that arose under the Matrix Contract. Putting aside the shop remodel obligations, discussed below, the debtors' cure obligations owed to Dunkin' Donuts were all resolved between the debtors and Dunkin' Donuts and were of no concern to Matrix.

### E.     The shop remodeling obligation

Before signing the April 15 Contract, Matrix became aware that Tom and Gus had not remodeled certain stores in accordance with Dunkin' Donuts' franchise requirements and that Dunkin' Donuts would require Matrix to remodel those ten stores upon acquisition. As of April 15, Matrix apparently had not done its due diligence as to the exact number of stores to be remodeled or hoped it could limit the requirement to four or five stores. Matrix also hoped that it would be able to keep the stores open during remodeling, which Dunkin' Donuts forbade.

Matrix now argues that such remodeling requirements were not covered under the broad disclaimers because they are new obligations on Matrix, rather than store conditions subject to the "as is" clause, and therefore Matrix need not assume those costs. This argument fails because the "as is" disclaimers cover Matrix' obligations and because Matrix repeatedly acknowledged that it, not the debtors, bore the obligation for the remodeling.

Matrix is correct that Section 5.6 of the Contract does not require Matrix to assume new obligations unless explicitly written. However, the remodeling requirements were not new obligations. They were old requirements that Tom and Gus failed to perform and that passed on to the purchaser at acquisition. The exact details of which and how many stores required remodeling were all available to Matrix in the Franchise Agreements and the Level II Due Diligence materials prior to their decision to sign the Contract. If Matrix' principals or Krischer felt that Dunkin' Donuts did not provide enough information prior to signing the Contract, they didn't have to sign it. The information was there. Matrix simply hoped that when they got around to reading it, it would be as favorable as they wished.

Matrix clearly understood that it, and not the debtors, was responsible for the remodeling. Krischer explicitly acknowledged this in his April 27, 2005 email to Dunkin' Donuts, stating:

I believe this paragraph talks to the actual remodeling of some of the existing restaurants. We have always been told it was a few, 4 or 5, and we have also always been told that we would be required to do these remodels, which we agreed to do. We were never told that the stores may have to be closed from the takeover until the stores are actually remodeled… .

No where [sic] in our agreement between us and the sellers (which as we all know has been approved by the court and other interested parties) does it say anything about us having to close stores upon takeover until we complete any remodel.

Doing so would obviously cause a financial burden, which will not be borne out by the buyers. This is something that has to be satisfactorily worked out between the sellers and Dunkin'.

The same paragraph says we will have to show we have sufficient reserves to pay for the remodels, we are prepared to do so, please advise. As far as getting the stores remodeled as quickly as possible, we absolutely see the benefit in doing so and we are prepared to start the process ASAP. After visiting all the locations, we acknowledge that we will be spending much time, energy and money cleaning up and sprucing up ALL the locations, even the ones that don't require an immediate full or partial remodel. We clearly understand how that is necessary to enhance and maintain brand equity and maximize a store's profits!

In an April 30 email to Dunkin' Donuts, Krischer similarly acknowledged that Matrix was willing to go forward on its obligation to remodel, stating

From what I could read at least 5 of the 10 shops you are talking about were due to be remodeled in 2003 and 2 more in 2005. As I said in my previous correspondence to you, my company has every intention of doing these remodels and construction of shops, we (Dunkin and my company) just have to come up with a schedule that is equitable and fair to both of us.

Matrix knew that it bore the obligation to remodel. It just hoped that there would be fewer stores, or regretted not having discovered how many before signing the Contract.

Matrix' defense that they performed "substantial" due diligence does not entitle them to back out of the obligations they assumed. Substantial due diligence can still be insufficient. The broad "as is" disclaimers, including Exhibit N, explicitly mention the remodeling requirements and that the purchaser could not rely on any alleged representations without conducting its own investigations.

The issue of closing the stores during remodeling was the subject of numerous negotiations between Matrix and Dunkin' Donuts. Despite its original position and Matrix' contractual obligations, Dunkin' Donuts was willing to allow Matrix to stagger its remodeling over time, as explained above (point (g)). But Dunkin' Donuts still required the stores to close during their remodeling, and

Matrix failed to account for the lost revenue during that time.   It was only during Matrix' May 17, 2005 meeting with Dunkin' Donuts that they finally realized that the stores would have to remain closed.  Only then did Matrix realize the extent of the remodeling and the revenue they would lose during the store closures.

What emerges is that despite having access to all the information they sought prior to signing the Contract, Matrix failed to discover the details of its obligations until after signing the Contract.  The Contract indicated that because the stores were past due in their remodeling obligations, the debtors made no warranties and Matrix accepted all properties "as is."  Matrix knew that "as is" applied to its obligation to remodel, as evidenced by Krischer's emails.   It was only later that Matrix realized the extent of the remodeling, the lost revenues it would face during the closures, and that Dunkin' Donuts considered Matrix' purchase price to be too high.  Only then did Matrix begin to feel buyer's remorse.

### F.    <u>The argument that Matrix did not repudiate</u>

As discussed above, Matrix wrote in its June 10 letter, "we respectfully request a cancellation."  It wrote that future negotiations would be "pointless."  It declared its refusal to go forward in open court.  *See* point (h) under The Facts and point I.B, above.

Matrix now contends that it did not repudiate since any modifications must be in writing and "any alleged oral statements" are insufficient.  But Matrix' repudiation was in writing in its June 10 letter.  Its oral repudiation was in open Court on June 29, 2005, and those alleged oral statements are preserved for posterity on the official Court record.  Matrix cannot now backpeddle from its own public declarations.  Even if a termination is considered a modification, the June 8 letter is in writing.  Matrix repudiated both orally and in writing; it had no intention of honoring its obligations.

Matrix claims that it declared that it was the debtors that were in default "having realized the debtors could not perform."  But the debtors were never in default and never wavered in their declared intention to perform under the Contract.  *See In re Asia Global Crossing, Ltd.*, 332 B.R. 520, 526 (Bankr. S.D.N.Y. 2005).  It requires more than an intuitive "realization."  The debtors' requests to renegotiate when Matrix threatened to and then did renege were not in any way a rejection of the Contract by the

debtors or a declaration of inability to perform.  If Matrix doubted the debtors' ability to perform, Matrix could have demanded assurances.  But it was not free to abdicate its duties.  Matrix did not declare the debtors in default.  It declared its own default.

G.     **The argument that a closing was not set and Matrix still had time to cure**

Matrix argues that a closing date was not set, and that even if one was, it still had time to cure its repudiation.  Matrix also argues that it was entitled to cancel the Contract because the debtors would not be able to perform by the closing date.  The inconsistency of these positions is obvious.  Matrix' affirmative defense is based on the very opportunity to cure that it denies the debtors.  The parties may have been hoping for a  July 31 closing date, based on the 2002 Settlement Agreement.  Matrix' June 10 repudiation left an additional 51 days until July 31 to perform.  The 2002 Settlement Agreement even provided that the closing date could be extended if the parties were working toward closing in good faith.  The debtors were willing to proceed and were working diligently to obtain the lease extensions until and even after Matrix' June 10 repudiation of the Contract.  But Matrix' repudiation was definitive and it was final.

H.     **Dunkin' Donuts' rejection of Krischer**

Matrix argues that since Dunkin' Donuts conditioned its approval on Matrix finding a replacement for Krischer, that Dunkin' Donuts actually rejected Matrix.  Dunkin' Donuts' June 8 letter stated, "We would be willing to accept [Nelson and Nieto] if they brought in a new principal…"  Matrix also argues that since Dunkin' Donuts required a new principal, it required Matrix to "reconstitute its very corporate essence."  Additionally, Matrix claims that there is no assurance that Matrix could ever offer someone that Dunkin' Donuts would accept.

This defense is no defense at all.  It certainly does not justify Matrix' repudiation and was not proffered as a justification at the time.  The June 29 hearing was scheduled to determine the reasonableness of Dunkin' Donuts' rejection of Krischer.  Matrix appeared at that hearing solely to repudiate the Contract, regardless of whether Krischer was properly rejected.  In other words, even if the Court ordered Dunkin' Donuts to accept Krischer, Matrix still rejected the Contract.  As Matrix' then counsel stated, "So it's kind of irrelevant whether Mr. Krischer is acceptable or not because they just did

not want to pursue this deal any further."  Nieto also stated "it's moot to have this big effort as to whether [Krischer] is properly rejected or not when I think everybody knows we're not going through with the deal."  Matrix cannot now use Dunkin' Donuts' rejection of Krischer as grounds to justify its pre-planned repudiation.

Matrix' representation of Dunkin' Donuts position is also incorrect.  As discussed above, in its June 8 letter Dunkin' Donuts approved everything about Matrix except its proffer of a confessed felon as operating manager.  At the June 29 hearing, this Court ruled that Dunkin' Donuts' conditional approval was entirely appropriate.  As a practical matter, the effect of Matrix' position is that the Dunkin' Donuts' June 8 letter created an option for Matrix, whereby Matrix could choose to find a replacement if it wished, which would bind the debtors to the Contract, or alternatively Matrix could choose not to submit anyone new to Dunkin' Donuts and thereby allow the Contract to fall by the wayside.

That position is untenable.  Dunkin' Donuts' June 8 letter did not create an option at Matrix' sole discretion.  Section 1.4 of the Matrix Contract requires Matrix to "use its best efforts to provide, to the satisfaction of . . . Dunkin' Donuts . . . adequate assurances of future performance."  Matrix was contractually obligated to use its best efforts to meet Dunkin' Donuts' requirements.  It was entirely reasonable for Dunkin' Donuts to require that Matrix present a non-felon to run its franchises.  In addition to the express Contract "best efforts" provision, every contract also implies a duty of good faith and fair dealing, which Matrix breached by not seeking to find a suitable replacement for Krischer.

Matrix' counsel argues that Matrix presented someone else for Dunkin' Donuts to con-sider.  However, the sworn testimony of both Nelson and Nieto refutes that notion.  At trial, Nelson admitted that Matrix did not present anyone else to Dunkin' Donuts.

Q.     When Mr. Krischer was not approved by the June 8th by Dunkin' Donuts, Matrix didn't do anything to replace him did they?

A.     Absolutely not. No.

Q.     They didn't take a single step?

A.     Well --

Q.     It's a Yes or No answer.  You didn't take a single step?

> A.    No, we did not, sir.

Similarly, Nieto acknowledged in his testimony that Matrix was unwilling to find a substitute for Krischer.

> Q.    Would you go forward with this deal without Krischer?

> A.    I don't think we would be able to do that, no.  Our whole interest was always predicated on his involvement in the deal . . . So without Dan, we wouldn't have the interest or the capability of taking care of this, and we don't really want, we don't feel we have an obligation to go try to find somebody else who we are going to trust on a $20 million asset.

In short, Matrix did not feel it had an obligation to satisfy its express "best efforts" obligation under Section 1.4 of the Contract, or its implied obligation of good faith and fair dealing.

Matrix' corporate restructuring argument is also flawed.  Krischer was not a principal, officer, director, or shareholder of Matrix.  He was not a part of its corporate structure.  He was a hireling.  Dunkin' Donuts did not address Matrix' corporate structure, it wanted a different liaison between itself and Matrix.  If Dunkin' Donuts wanted the liaison to be a "principal," Matrix could satisfy this request through its ZPG sub-entity.  That is precisely what Krischer's May 10 email to Dunkin' Donuts stated: "Our attorneys are finalizing the partnership agreement between my partners, Glen Nelson and Richard Nieto and myself. . . .  We will have an LLC and all the locations we will be under an 'Umbrella' LLC.  Ownership is divided 37.5% Glen Nelson, 37.5% Richard Nieto and 25% for Dan Krischer."

Despite its claim, Matrix did not have to reconstitute its very corporate essence.  Matrix' claim implies that Dunkin' Donuts' requirements were unreasonable and therefore Matrix was not bound to comply.  Yet Dunkin' Donuts' requirements were reasonable, and Matrix bound itself to those requirements by signing the Contract.

Throughout the transaction, Matrix contemplated that the stores would be held in a new special purpose entity named ZPG or some other name, which was to be 75% owned by Matrix' principals.  Dunkin' Donuts reasonably required Matrix to find a new manager and compensate him with an equity interest in the new entity (not with an equity interest in Matrix), presumably as an incentive and to guarantee accountability and continuity in operating the stores.  With only a minority interest, this manager would still be subject to the direction and control of Matrix' principals Nieto and Nelson.  Under

Section 1.4 of the Contract, Matrix obligated itself to use best efforts to find a manager acceptable to Dunkin' Donuts. Dunkin' Donuts simply called for an honest, capable, responsible manager to operate the Dunkin' Donuts franchise stores. As confirmed by both Matrix principals, Matrix made no effort at all to comply.

The evidence makes clear that the issue for Matrix was not Krischer — it was economics. Krischer was a hired man, replaceable like any hired person. As Matrix' counsel and its principal Nieto said at the June 29 hearing, "it's kind of irrelevant whether Mr. Krischer is acceptable or not because they [Nieto and Nelson] just did not want to pursue this deal any further," and "it's moot to have this big effort as to whether [Krischer] is properly rejected or not when I think *everybody knows we're not going through with this deal*" (emphasis supplied).

I. <u>**The argument that the Dunkin' Donuts' Rider was not yet signed**</u>

Matrix argues that "Dunkin' Donuts' approval was conditioned upon the receipt of the executed rider," referring to a document titled "Rider to Contract for Sale" (the "Rider").

The short answer to this argument is that the Rider is not referred to in nor is it a part of the Matrix Contract, and it was not a condition precedent under the Matrix Contract. The Rider was a Dunkin' Donuts document. It was Dunkin' Donuts' policy to require an executed copy of the Rider at some point prior to the sale of a franchise. Failure to provide the Rider might perhaps have been a ground for Dunkin' Donuts to withhold approval of the transfer, or Dunkin' Donuts might waive the requirement. But this is rendered moot by Dunkin' Donuts' actual approval of Matrix, subject to Matrix using good faith to hire a moral and capable operations manager.

It is clear from the trial testimony of Dunkin' Donuts' counsel that time was not of the essence for the furnishing of an executed Rider, and the fact that a Rider had not been completed when Matrix repudiated the Contract in June 2005 was never mentioned by Dunkin' Donuts as an obstacle to its approval of the Matrix Contract. Indeed, the Rider in respect of the sale of the debtors' franchises to The Beekman Group was not delivered to Dunkin' Donuts until the day of the closing, without objection by Dunkin' Donuts. The Rider for the Matrix Contract was in preparation before Matrix' June 10 repudiation. Since final preparation and execution of the Rider could have been completed by the time a closing

date was set, and Matrix' anticipatory repudiation foreclosed that possibility, Matrix may not claim that non-delivery of the Rider by June 10 justified its repudiation.

### J.      Fraud in the inducement

Matrix argues that it was fraudulently induced to sign the Contract by an Offering Memorandum that misrepresented certain facts. Throughout its trial submissions, Matrix alludes broadly to misrepresentations, yet it articulates only three. First, that a lease extension to 2013 was in place for the store at 2620-1/2 Central Park Ave. Second, that the debtors had a leasehold interest in the 307 South Broadway store. Third, omitting that a permit was denied for building the shop not yet opened at 987-A Central Park Ave.

The only place in the Offering Memorandum that addressed leases for the various locations was in Exhibit E at the end of the Offering Memorandum. Exhibit E, titled "Franchise and Lease Expiration Dates (h)(i)" contains a chart, not text. It lists all twenty-four operating stores, the bakery, and the three "shops not yet opened."

The fourth row down lists 2620-1/2 Central Park Ave. In this row, under the sixth column, titled "Lease Expiration Date w/ Options," appears the date 9/30/2013. This date, an error, represents that an extension was in place when, in fact, the lease was only month-to-month. The month-to-month lease was successfully conveyed to TBG in December.

The twenty-eighth row down is for 307 South Broadway, the "Taco Bell location," a shop not yet open. Under the sixth column appears the date 10/31/2023. This date, an error, also represents that an extension was in place when, in fact, none was.

At a May 24, 2005 hearing, the lease for the Taco Bell location was deemed to not be property of the estate. However, under the fourth column, titled "Franchise Agreement Expiration Date," appears the date 7/31/2015. This date indicates that the estate did own the valuable right to a Franchise Agreement with Dunkin' Donuts that it was able to convey, which Matrix did not challenge. A footnote on the chart also indicates that "Dunkin' Donuts will extend the franchise agreement 10 years beyond the closing date." Matrix was unwilling to negotiate relocating this valuable Franchise Agreement to another location, as discussed in point II.B, above.

As to Matrix' third alleged misrepresentation, the Offering Memorandum made no reference to a rejected building permit for 987-A Central Park Ave. There was no misrepresentation, however, because there was no statement concerning the building status anywhere in the Offering Memorandum. The Contract provided that the debtors had no building obligations for the "shops not yet opened," as noted above. Further, the status of any building permits was available as a matter of public record. Matrix could have and did discover this with due diligence, albeit after the Contract was signed.

These two errors and one omission are the only "misrepresentations" Matrix has identified in the Offering Memorandum. As to the two mistakes on the Exhibit E chart, the unprecedented disclaimers quoted in point (f) above specifically cover this exact scenario. As shown in point (f), there were prominently displayed disclaimers in the Contract terms, in the Bidding Procedures, and in the Offering Memorandum itself. In fact, there were disclaimers on the very page with the errors. The title of Exhibit E refers to footnotes (h) and (i). Footnote (h) reads "All financial data is per unaudited internal company records. The related tax returns have not been filed and FMG's books have not been reconciled." The bottom of that page contains another disclaimer, "Subject to the Conditions of Use referenced within the text of this report."

As discussed above, Section 1.5 of the Contract recites that all assets are to be conveyed "as is where is." No representations or warranties are made. Section 9.8 integrates the Bidding Procedures Order into the Contract. The paragraph from page 2 of the Bidding Procedures quoted in full in point (f) in the Facts section, above, expressly states that:

> Each bidder . . . shall be deemed to acknowledge . . . (c) that it had an opportunity to, or waived any right to, inspect and examine the applicable Lease and all other pertinent documents with respect thereto prior to making its Bid and that each such Bidder relied solely on that review and upon its own investigation and inspection of the Assets in making its Bid and (d) that the Bidder is not relying upon any written or oral statements, representations, or warranties of the Debtors, their agents, representatives, consultants and/or attorneys.

With regard to the charts, the Bidding Procedures Order also recites that "all information and/or documentation provided to prospective Bidders (a) has been prepared for informational purposes only." Further, it "does not purport to be all-inclusive or to contain all of the information that a prospective buyer may desire. In all cases, interested parties should conduct their own investigation." The Offering

Memorandum also warns that no information has been independently verified.  It was known and repeatedly made known to all parties that the Gianopolous' records were not reliable and that extensive due diligence would be necessary, especially since their records had not been reconciled since 2003.

Matrix' argument that it was fraudulently induced is excluded as a matter of law.  The Contract disclaimers are binding on Matrix and precisely cover this claim.  There were only twenty-eight assets total.  Matrix was on notice that it had to obtain documentation for those twenty-eight stores and verify that if a lease was represented on the chart, it should be corroborated with an actual lease extension.

Matrix' agent Krischer did in fact identify the two alleged misrepresentations and omissions in the course of his post-April 15 due diligence — the failure to do so before signing the Contract was at Matrix' own risk.  Despite its current contention, Matrix acknowledged that it assumed this risk.  At trial, Krischer testified:

> Q.     Did you understand from the offering memo that whatever you were told by Mr. Rattet or Keane or others, including the Debtors, was not something that you could rely on in making your bid?  . . .
>
> A.     I absolutely thought I couldn't rely on it.
>
> THE COURT.   You thought you could have?
>
> A.     Thought I couldn't rely on it.
>
>                           * * *
>
> Q.     Do you think it's reasonable for you to rely on statements made by the Debtors or by the Debtors' advisor team, consultants, or others in light of the language in this section that you read?
>
> A.     It's not a yes or no answer.
>
> Q.     Well, I'm asking you. Do you think it's reasonable?
>
> A.     I don't think it's reasonable.

The trial evidence wholly refutes Matrix' claim of fraud in the inducement both as a matter of fact and law.[9]

---

[9]     Matrix' claim that it "relied" on unidentified misrepresentations in the Rider is equally baseless.  Work on the Rider began after Matrix signed the Contract.  While the parties exchanged various drafts of the Rider, Matrix concedes that the Rider was never put into final form or executed.

### K.    The fraudulent 64 East bid

Counsel argues that the Contract should be voided because Matrix was induced to increase its $16 million contract to $26.77 million (an increment of over 67%) by 64 East's fraudulent $21 million stalking horse contract.  The argument borders on the ridiculous.  Assuming that Matrix' final contract bid was motivated by the 64 East bid, so what?  These debtors' estates and their constituency of creditors were not responsible for any infirmity in the 64 East bid, and this defense of "reliance" on representations outside the Contract is barred by the Contract itself.

Moreover, 64 East's bid did not force Matrix to aggressively outbid 64 East by $5.77 million, nor did it force Matrix to require a Court order to cancel the auction and declare Matrix the successful bidder.  Any plaint Matrix might have had against 64 East does not annul Matrix' decision to increase its bid by almost 28% over 64 East and sign a Contract with the debtors.

Finally, the evidence compels the conclusion, and I so find, that Matrix' final Contract was motivated not by 64 East but by the prospect of a $24 million offer by TBG.  Both Krischer and Nelson testified that they knew of the prospective TBG $24 million bid before submitting their $26.77 million bid.  This also explains why Matrix did not incrementally bid to trump the $21 million bid, for example, by bidding $22 or $23 million.  Rather, Matrix knew of and was induced by TBG's $24 million bid, regardless of 64 East's bid.

### L.    Impossibility/frustration of purpose

This defense is totally irrelevant to the facts here.  The impossibility defense is reserved for extraordinary circumstances such as a building burning down or a ship's cargo sinking in Mid-Atlantic.  *See e.g.*, *Taylor v. Caldwell*, 3 B. & S. 826 (1863).  In such cases, an unexpected and totally unforeseeable supervening event frustrated the entire purpose underlying the contract.  *See also* U.C.C. § 2-615 (1977).  Even the outbreak of war may not be sufficiently unforeseeable.  *See, e.g.*, *Peerless Cas. Co. v. Weymouth Gardens,* 215 F.2d 362, 364 (1st Cir. 1954) (increased costs caused by the unexpected outbreak of war do not release obligations of the contract).

Matrix argues that since the debtors could not deliver every store, the Contract's purpose was frustrated.  The divisibility analysis in point II.A sets this argument to rest.  This defense neither

applies nor excuses Matrix' breach.  Matrix accepted the risk of purchasing from a bankruptcy estate previously operated by the Gianopolous brothers.  The "as is" provision of the Contract and the extra-ordinary and pervasive disclaimers in the Offering Memorandum and the Bidding Procedures Order put all parties including Matrix on notice that the debtors might not be able to deliver some stores, and the Contract provided for credits in that event.  The debtors' alleged inability to deliver two of the four lease extensions mentioned in Section 3.13 was neither unexpected nor unforeseeable.  Certainly delivery of all the shops and their lease extensions was not a "basic assumption on which the contract was made."  RESTATEMENT (SECOND) OF CONTRACTS § 265 (1981).

Finally, it should be noted that even if any of Matrix' assertions here were credible, the doctrine of Partial Impossibility would still require Matrix to perform on those stores where performance was not allegedly frustrated.  *See, e.g., Yost v. City of Council Bluffs*, 471 N.W.2d 836, 840 (Ia. 1991) (holding that when a substantial portion of the performance was still possible, the impossibility of performing some portion of the work did not release the defendant from the remainder of his contract); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 270 (1981) ("Where only part of an obligor's per-formance is impracticable, his duty to render the remaining part is unaffected if it is still practicable for him to render performance that is substantial.").  *See* the analysis of divisible contracts under point II.A, above.

Of the twenty-four stores, four lease extensions, three "shops not yet opened," and commissary contemplated in the Contract, Matrix complains that two stores, the lease extensions, the "shops not yet opened" and the bakery certificates could not be delivered (the deficiencies in these claims are all addressed in point II.B, above).  Even if such alleged non-performance could be considered a frustration of purpose, the vast majority of the Contract still could be performed.  Matrix acknowledges that twenty-two of the twenty-four operating stores could be delivered.  As demonstrated above, the commissary and at least two of the four lease extensions could also be delivered, as well as credits for the two stores as per the Contract.  The debtors could have performed the substantial majority of the Contract.

M.    **The December 15 Order**

    To obtain Court approval of the sale to TBG and to avoid any possible argument that the Matrix Contract or the earlier stalking horse contract with 64 East ("Borek") had not theretofore been terminated, the Trustee filed an omnibus motion on November 18 for *inter alia* an "Order Determining That The Debtors' Prior Contracts With Two Former Potential Buyers Be Deemed Null And Void" which was signed on December 15 (the "December 15 Order").  This belt-and-suspenders Order precluded any possible claim, however spurious, that either Matrix or Borek had any remaining Contract rights to the debtors' assets which were being sold to TBG.

    Matrix now argues at the eleventh hour that the December 15 Order "nullified" the Matrix Contract, retroactively abrogated the debtors' breach of contract claims asserted in this adversary pro-ceeding since July 2005, and released Matrix from any liability on account of its Contract repudiation.

    The argument is frivolous.

    The December 15 Order provided in its operative decretal paragraph:

    ORDERED, that the Debtors' prior agreements or contracts with two former potential buyers, Matrix and Borek be deemed terminated and of no further force or effect. . . .

Nothing in the December 15 Order purports to impair or affect any claims in this adversary proceeding. Nothing in the December 15 Order purports to effect a release or abrogation of the debtors' claims against Matrix.  And, of course, nothing in the omnibus motion even intimates that the Trustee intended or contemplated that millions of dollars of pending and actively litigated breach of contract claims were to be waived or released by the December 15 Order.

    In stating that the Matrix Contract "be deemed terminated and of no further force or effect" the December 15 Order did no more nor less than what common law recognizes as the conse-quence of an anticipatory repudiation.  *See* the discussion and case law in point I.B, above.  As stated by the Court in *In re Asia Global Crossing, Ltd.*, "If an anticipatory repudiation occurs, the non-breaching party has two mutually exclusive options.  He may elect to treat the contract as terminated and exercise his remedies, or continue to treat the contract as valid."  326 B.R. at 249.  In this case, Matrix declared unequivocally in its June 10 letter and by its attorney and one of its principals at the June 29 hearing that

the Contract was terminated so far as it was concerned.  For their part the debtors and, subsequently, the

Trustee elected to treat the Matrix Contract as terminated and commenced this adversary proceeding to

enforce the debtors' remedies.  The December 15 Order did no more nor less than provide the contracting

parties to the TBG sale with the comfort of a court order providing expressly what both parties had de-

clared by their actions and the common law declared as a rule of law — that the Matrix Contract was

terminated.  It was terminated by Matrix' repudiation of its obligation to proceed with the sale, the

debtors' election to treat the Contract as terminated and sue for damages, which it did, and the

December 15 Order binding on all parties confirming that the Contract was, indeed, terminated.  But no

rule of common law, no conduct by the parties and nothing in this Court's December 15 Order purported

to abrogate, release, waive or otherwise impair the breach of contract claims which have been contested in

this Court since July 2005.

The Trustee and Matrix have expended enormous effort and resources litigating the breach

of contract claim here decided through pleadings, arduous discovery, cross-motions for summary

judgment, other substantive motions *in limine*, a trial and two sets of post-trial submissions.  To argue for

the first time on the eve of trial that all this time, effort and expense was a gigantic waste of time and

money because an Order entered on December 15, 2005 should be construed *post hoc* as having nullified

the debtors' claims in this adversary proceeding surely ranks at the highest level of *chutzpah* in legal

advocacy.

    **N.**    **Failure to join ZPG as a necessary party**

The argument that the adversary proceeding must be dismissed for failure to join ZPG as a

necessary party is also frivolous.  *See* point (e) in The Facts section, above.

### Conclusion

The debtors are entitled to judgment against Matrix on the issue of liability for breach of the Matrix Contract.  Counsel for the parties are directed to confer together, agree upon and file a Scheduling Order for a trial in November on the issue of damages.

Dated: White Plains, NY
     July 25, 2007

                /s/ Adlai S. Hardin, Jr.
                      U.S.B.J.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                          :        Chapter 11
                                                :
FOOD MANAGEMENT GROUP, LLC,                     :        Case No. 04 B 22880 (ASH)
KMA I, INC.,                                    :        Case No. 04 B 22890 (ASH)
KMA II, INC.,                                   :        Case No. 04 B 22891 (ASH)
KMA III, INC.,                                  :        Case No. 04 B 22892 (ASH)
BRONX DONUT BAKERY, INC.,                       :        Case No. 04 B 20312 (ASH)
                                                :        (Jointly Administered)
                           Debtors.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
FOOD MANAGEMENT GROUP, LLC,                     :
KMA I, INC., KMA II, INC.,                      :
KMA III, INC.,                                  :
and BRONX DONUT BAKERY, INC.,                   :
                                                :
                          Plaintiffs,           :        Adv. Proc. No. 05-8636A
                                                :
          -against-                             :
                                                :
MATRIX REALTY GROUP, INC.,                      :
                                                :
                         Defendants.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM AND ORDER
## DENYING MOTION FOR RECUSAL

By notice dated June 6, 2006 defendant Matrix Realty Group, Inc. ("Matrix") has made a

motion for my recusal and has requested an order shortening time to schedule a hearing on the motion.

Rather than scheduling a hearing, I shall deny the motion forthwith for the reasons set forth below, in

order to afford Matrix' counsel the opportunity to present the matter to the District Court if so advised

before the trial in this adversary proceeding scheduled to commence June 16.[1]

---

[1]    The adversary proceeding has been pending since May 2005.  In April 2006 Matrix moved for summary
judgment and the Chapter 11 Trustee cross-moved for summary judgment, both contending that there were
no material issues of fact in dispute and that the adversary proceeding was ripe for final adjudication.  The
cross-motions were argued May 4.   I concluded that there may be issues of fact requiring a trial.  Since
both sides had fully marshaled the facts and the law, I scheduled the trial for June 16.   It is essential to
these two-year old Chapter 11 cases to resolve the issues with Matrix promptly and, if the adversary
proceeding is not tried as scheduled, it may be difficult or impossible to schedule the trial until September
or October.

Recusal is sought based on remarks I made in open court on three occasions which Matrix argues "appear to the reasonable person to rise to a level that at the very least give the appearance of impartiality [sic — presumably read "partiality"]."   Each of the three will be addressed.

## November 23, 2005

The November 23 hearing concerned a number of matters not involving Matrix, which was not represented at the hearing.   The colloquy which Matrix complains of occupies less than two pages (Tr. 37-39) in a 41-page transcript.

In that colloquy the Chapter 11 Trustee informed the Court that she had reached a settlement with Matrix (the "Matrix Settlement") in which she would return the Matrix contract deposit of $2,400,000 and dismiss this Adversary Proceeding in which the debtors seek to retain the $2,400,000 deposit and recover substantial damages[2] for breach of contract.   After describing the settlement, the Chapter 11 Trustee stated "I was hoping, Your Honor, that I could submit a proposed order and put it in presentment," which would mean that the Trustee would not submit a motion with supporting papers setting forth the material facts and explaining the justification for the Matrix Settlement.

I responded to the Chapter 11 Trustee by rejecting her request to proceed by a simple notice of presentment without supporting papers, and in the colloquy that ensued (Tr. 38-39) I explained why I would require the Trustee to expend the time, effort and cost to the debtors' estates of preparing full motion papers by stating:

---

[2]    Matrix and the debtors executed a contract dated as of April 15, 2005, under which Matrix agreed to purchase the debtors' assets for a purchase price of $26,770,000.   The debtors ultimately sold their assets to another purchaser for $18,000,000 with price reduction clauses which will result in substantially lower proceeds to the estates.

THE COURT: No, I think you'd better make a motion.

\* \* \*

THE COURT:  I could foresee creditors objecting to the settlement and requiring a full illumination given the particular facts here involving Matrix' repudiation of the agreement.

\* \* \*

THE COURT:  Yes.   Because it may be very significant to the creditors.   I mean the deposit is a significant issue.

\* \* \*

THE COURT:  You're talking about a lot of money that could render an insolvent estate fully solvent.

\* \* \*

THE COURT:  . . . [I]t is a motion which I would be surprised if some creditors did not object to given the fact that creditors are quite likely not going to be paid in full and I would think, for example, that the principals here might object since it may effect litigation against the principals but, anyway, I'll hear the motion.

It may be that it's provident and it may not be.   I don't know.

MS. GRUBIN: Thank you, Judge.

THE COURT:  I always abide the event on matters that might be contested.[3]

Matrix has objected to my statement at the November 23 hearing in the following passage

at pages 3-4 of its motion:

> In essence, the Court was doing more than ruling on any motion before it.  Rather it was advocating a position.  It was suggesting to parties represented by sophisticated counsel that it was prepared to entertain certain motions and objections given the posture of the case.  Further, it stated that Matrix repudiated the contract.  The Court did not state that Matrix allegedly repudiated the contract, it did not state that it had been alleged that Matrix had repudiated the contract.  Rather, the Court stated as a matter of fact that Matrix repudiated the contract.  That issue is an open issue that must be determined in the pending adversary proceeding.

---

[3]    It should be noted that the Chapter 11 Trustee was not appointed until September 2, 2005, after the hearing on June 29, 2005 which is central to the debtors' claims against Matrix and Matrix' defenses, and it appeared to me at the November 23, 2005 hearing that the Trustee may not have been familiar with the events at the June 29, 2005 hearing.

In this colloquy with the Trustee I was not "suggesting" that I would entertain certain motions — I was instructing the Trustee that I would not permit her to seek approval of the Matrix Settlement by notice of presentment, and I was ordering that she make a motion on full motion papers and notice to all creditors to explain and justify the settlement.  The notion that I was "suggesting to parties represented by sophisticated counsel" that they should file objections to the settlement is ridiculous — these Chapter 11 cases have been uncommonly contentious, and the creditors, the debtors, and the debtors' principals, all of whom have indeed been represented by capable counsel, have never hesitated to litigate any matter of substance.   Moreover, it was a certainty that there would be objections which would need to focus on whatever the Trustee might say by way of justification.  And finally, even if there had not been objections filed, I would have needed sound reasons from the Trustee to approve the Matrix Settlement which, on its face, was not a settlement but a capitulation with no discernible *quid pro quo*.

Matrix' basic objection is that "the Court stated as a matter of fact that Matrix repudiated the contract."   The problem with this objection is that Matrix' repudiation of the contract is a matter of undisputable fact recorded in the transcript of the hearing in this Court on June 29, 2005.  At the June 29 hearing, the principal agenda item was the debtors' objection to the validity of Dunkin' Donuts' rejection of Matrix as a franchisee based on the dishonest conduct of an individual named Krischer who was proffered by Matrix as a principal who would manage the Dunkin' Donut franchises.   Rather than supporting the debtors' effort to win approval of their contract with Matrix over Dunkin' Donuts' objection, Matrix sought to persuade the Court not to proceed with the June 29 hearing by declaring unambiguously that the issue was moot because, regardless of the outcome, Matrix did not intend to perform the contract.  Matrix was represented at the June 29 hearing by its attorney, Mr. Kera, and one of its two shareholders and principals, Mr. Nieto.  Mr. Kera made the following statement (Tr. 18):

MR. KERA:   Matrix is here, Mr. Nieto is here and I think there's one significant issue that I think the Court should be aware of.

THE COURT:   All right.

MR. KERA:   Matrix is not interested any further in pursuing this offer.   They feel there have been a lot of misrepresentations on the stores that are available and financials.   So it's kind of irrelevant whether Mr. Chrischia [sic] is acceptable or not because they just did not want to pursue this deal any further.

After colloquy between the Court and other counsel in which I concluded that "right now it's not moot even if Matrix is going to declare that it's not going forward" (Tr. 22), the following statements were made by Messrs. Kera and Nieto (Tr. 22-23):

MR. KERA:   Your Honor, this is Richard Nieto.   He's just appeared.   He's an attorney also.   He's one of the principals of Matrix.   He'd like to be heard.

THE COURT:   Why don't I get your name.

What is your name?

MR. NIETO:   Richard Nieto, N-I-E-T-O.

I'm a principal of Matrix as well as an attorney in New York.

THE COURT:   Okay.

MR. NIETO:   I've been very familiar with this from a financial standpoint as well as on a legal basis.   I was involved in depositions last week at Mr. Rattet's office.   I was also involved in some meetings that [sic] Mr. Rattet's office before we had put the offer in.

I mean it's clear that there are many and multiple misrepresentations and inaccuracies in a verbal way as well as in an offering memorandum

The defendants have approached us to try to renegotiate over towards renegotiating the sales price.   For example, like the Taco Bell guy who was just here — the attorney — that was in issue with respect to things that are listed that we're not going to get on a deal, for instance, that particular location.

There's so many, I don't want to get into it right now but it's clear that no one is expecting us to go through with this transaction based on the purchase of sale agreement that was executed two months ago and we feel its [sic] moot to have this big effort as to whether Dansch [Ph.] is properly rejected or not when I think everybody knows we're not being [sic] going through with the deal and that the offering memorandum needs to be revised so that it's accurate so when other people show an interest in this in the future that they're not going to run into the same problems we're running into which is they're going to see issues and they're going to not want to go through with it.

These statements by Matrix' counsel of record and its principal that Matrix did not intend to proceed with its contract with the debtors regardless of the outcome of the June 29 hearing on Dunkin' Donuts' objection to Krischer was unambiguous and unequivocal.  Thus, Matrix' repudiation of the contract at the June 29 hearing was not "an open issue that must be determined in the pending adversary proceeding," and my reference to Matrix' repudiation of the contract at the November 3, 2005 hearing did not reflect either a lack of impartiality or prejudgment of the dispute between the debtors and Matrix.  The fact that I had not prejudged the impending controversy between the debtors and Matrix is reflected in the June 29, 2005 transcript (Tr. 20):

> THE COURT:  Well, that's true but on the other hand if — I suppose you're right if Matrix were to prevail on the claim that there were misleading statements in the offering circular or whatever and that it should be relieved of its contractual obligation but if it were not to prevail then I suppose that the debtor would be seeking damages from Matrix or at least the forfeiture of the deposit.

The fact that I have not prejudged the outcome of the debtors' dispute with Matrix even now is evident from the fact that I denied both sides' motions for summary judgment and set the case down for trial on June 16.

## March 15, 2006

The March 15, 2006 hearing served, in part, as an updating pretrial conference in the debtors' adversary proceeding against Matrix.  At that time it appears that cross-motions for summary judgment had been filed.  The following dialogue took place (Tr. 10-11):

> MR. BROOKS:  Correct.   And there's a motion for summary judgment that's been filed by the trustee — by the debtor at the time as well as a cross-motion that is filed by Matrix.  What I would propose if it's —

> THE COURT:   I would suggest that you examine, you and Mr. Rosen examine that motion with a view of determining whether or not it's a viable motion either way.

> MR. BROOKS:   I've done that.

> THE COURT:   It would appear to me that there may be issues of fact that maybe may claim would preclude summary judgment.   Do you have a view, Mr. Rosen?

After Mr. Rosen made comments concluding "So clearly if those motions were to go forward I know I want to retool it and see if it needs to go by," I made the following statement (Tr. 11-12):

> THE COURT:   I haven't read the summary judgment motions at all.   I just — I have, however, a good deal of background in the matter and it would have surprised me considerably if there weren't issues of fact.   I mean, for example, I have a recollection that Matrix asserted at an early stage that it wasn't going forward with the contract because there had been misrepresentations or something of the sort.   That sounds like the stuff of conflicting facts.

Once again, this comment hardly reflects a lack of impartiality or prejudgment of the controversy.

The context of the colloquy to which Matrix objects in the March 15, 2006 pretrial conference was a discussion among the Court, Mr. Rosen representing Matrix and Mr. Brooks representing the Chapter 11 Trustee.  Both Messrs. Rosen and Brooks were new to the case.  The discussion with Mr. Rosen begins at page 11 of the Transcript.   The discussion with Mr. Brooks begins at page 16 of the Transcript.  Both counsel stated their desire to reexamine the existing cross-motions for summary judgment and supplement the motion papers as their review of the record and their understanding of events in the case might dictate.

Matrix quotes a remark which I made at page 18 of the Transcript — "So that will be part of your record" — and asserts that "to the reasonable person looking at the statements from afar, it appears that the Court is advocating a position rather than making decisions about motions or objections before it."   Of course the Court was not making decisions about motions or objections before it — the colloquy took place in the context of a pretrial conference in which counsel and the Court were discussing procedures for cross-motions that counsel for both sides, being new to the case, wished to reconsider and perhaps refocus.  The entire context of the Transcripts reads as follows (Tr. 17-21):

> MR. BROOKS:   Correct — and possibly actually with respect to the damage award which is the larger issue that is the delta between the bid and what was ultimately obtained which was lower.   Now, the damage amount may be a fact issue but maybe liability isn't because I think it's tied.
>
> What I would suggest — I have read the papers.  I would like, although I acknowledge counsel being new to the case and I understand that, I'm fairly new to the case as well, but I've got a little more time.   I would like to file a brief because I think

something more needs to be said to support the motion that's on file and I would like to respond to the cross-motion. So I can do that in one brief.

THE COURT: Is it a brief or — I haven't looked at the motion papers as is my custom. I don't look at those until sometime that's reasonably near the time it's going to be argued because otherwise I'll forget important things. Do you need to refile a motion in terms of what backs it up, et cetera?

MR. BROOKS: I think I could cover it in a brief that would supplement the motion already on file and respond to the cross-motion. I think we could think about —

THE COURT: In other words, the affidavits and exhibits or whatever is annexed as the support for the motion is all there.

MR. BROOKS: I think it is. I think — frankly, I think we're relying on the purchase agreement and the letters from Dunkin' Donuts.

THE COURT: And presumably the transcript because there were statements made —

MR. BROOKS: On June 29.

THE COURT: — on the transcript. In fact, my recollection is, correct me if I'm wrong somebody, Meredith perhaps, but that at the very outset of the hearing before the hearing really got underway on the objection by the debtor to Dunkin' Donuts objection which I ultimately sustained. But at the very outset of that hearing my recollection is that somebody stood up on behalf of Matrix and said this whole thing is moot because we're not going forward anyway.

MR. BROOKS: That's right, Judge.

THE COURT: So that will be part of your record.

MR. BROOKS: Mr. Kera said that.

THE COURT: Right.

MR. BROOKS: And indeed at the end of that transcript it was repeated and that there were merely a couple of questions I think during the hearing that were asked by Matrix's counsel and that's going to be another part of our motion I think because I think it ties in with this whole other issue.

THE COURT: I'm just — I don't know whether that is part of the record on the motion or not.

MR. BROOKS: Then I just want to say — and it's up to Your Honor how you want to schedule this, but I think with respect to the rest of the case if we don't wrap it all into the summary judgment we might want to take some discovery. I'm willing to do that over a sixty-day period.

THE COURT:   Well, your thought though is that discovery isn't necessary and that you'd like to go forward with the cross-motions for summary judgment amplified by both sides and have an argument and — I'm not terribly against that because even if ultimately a motion for summary judgment can't succeed such motions are often helpful in winnowing down the issues which is a significant part of the role of a trial level judge anyway.

Is that your point?

MR. BROOKS:   Yes.

THE COURT:   Mr. Rosen.

MR. BROOKS:   Can I just comment real briefly on the motion to reconsider? Your Honor is well familiar with the standards under 9023 and 9023.1 I think under the local rules.

It's not an opportunity to make another record.  It's when the Court respectfully has overlooked a material fact or overlooked controlling law and that's not a chance to say I want to put all this other stuff in the record.

THE COURT:   All right.

MR. ROSEN:   I understand that, Your Honor, and I think there were some errors of fact to be corrected then in terms of what went on.  In terms of the transcript, I think also there were reasons why that was done and it relates back to the way I interpret the contract and what went on in terms of what my client was obligated to do or not to do under that.

In terms of the summary judgment motion before he responds to it.  I think I should probably refile it because mine will be substantially different.  I mean one of the issues that comes up now when I talk about subsequent facts is I've looked and I haven't finished going through all of it, but it would appear in terms of the misrepresentation claims.  Without getting to the zipper clauses, without getting to all of that, those misrepresentations claims went to what the debtor and eventually the trustee would actually be able to convey.  Our contract is very different from the contract that ultimately closed because our contract only had exceptions where they could give us a cash deduct for I believe three stores that they could not provide.  One of them was the Mauze store which was under litigation.  I'm learning the case.  It's taking a bit.  The other ones were ones where there were questions.

Ultimately, as I understand it, our contract was impossible to perform because the debtor could not have provided to us title to the assets which they absolutely bound themselves to give us.  So that's one of the issues in terms of summary judgment, why I think it has to be retooled and along with some other issues that were not raised.  There's some procedural problems with it also that I would like to fix so it's a proper motion — there really is no such thing as a cross-motion.  It would be a proper motion for summary judgment if we get there if I'm not able to convince you of the proper business judgment of the trustee.

THE COURT:   Is the trustee standing by your 9019 motion and your settlement?

MS. GRUBIN:   No, Your Honor.

Since the then-pending cross-motions for summary judgment had been prepared by different counsel, both Messrs. Rosen and Brooks as new, incoming counsel wished to reexamine and modify or supplement the motion papers.  There followed further discussion of scheduling at pages 23-28 of the Transcript:

THE COURT:   I will read it with care.   You must know me that well.

MR. ROSEN:   I fully expect that, Judge.

THE COURT:   Okay.  So how much time assuming — which is, let's face it likely that I do not change my mind on disapproving the settlement.   How much time do you want to do a new and different response to the motion for summary judgment and file a different cross-motion?

MR. ROSEN:   Thereafter to get through all of this and put it together, thirty days.   As you know, I'm —

THE COURT:   Do you want to supplement the motion at all or is it founded on the transcripts and the other documents that you would rely?

MR. BROOKS:   I need to supplement it, Judge.

THE COURT:   How long will it take you to supplement?

MR. BROOKS:   I can do that within thirty days.

THE COURT:   No, no, no.   We're stretching on into the dim — I can't even see that far ahead.

MR. BROOKS:   Well, it would be the same thirty-day period I think that —

MR. ROSEN:    But he's going to want to see my papers.

THE COURT:   He has to respond to your motion.  So can you either file a new motion or supplement the one that you've got within ten days?

MR. BROOKS:   If that's what Your Honor wants me to do, I'll do it.

THE COURT:   If you can do it.   I mean you've indicated that the motion that really all you wanted to do was to add a brief or change the brief.  Now, what I'm suggesting is that you consider whether you have all the predicates in the motion, exhibits, transcripts, letters, whatever.

MR. BROOKS:   I think I do.   I think I do, Judge.

THE COURT:   Then that should be possible then to do whatever you need to do to get the motion in its final shape within ten days and then you can have twenty days. It's not going to be much different from what it is.  Let's face it.  You can have twenty days after that to put in a new response.

MR. BROOKS:    There's a cross-motion though that's on file.

THE COURT:   That's part of what he's going to be dealing with.   Right?

MR. ROSEN:   I think what counsel is saying in all fairness he wants to have an opportunity to respond to whatever I'm going to put in.

MR. BROOKS:    Thank you.

THE COURT:   Of course.   Of course.

MR. ROSEN:   So we brought out another —

THE COURT:   You'll have ten days to make the motion, the estates — it was the debtor's now.  It's the trustee's motion as good as you want it.  You will have twenty days to either amend or make a superseding response and cross-motion.  How about that?

MR. ROSEN:   That's fine.  Then I think counsel needs a chance to respond.

THE COURT:   And you will have an additional — how much time?  Let's say —

MR. BROOKS:   It's going to be new stuff as opposed to what's in there.   So I would like more than ten days, sir.

MR. ROSEN:   If I get twenty he should get twenty, Judge.  I mean —

THE COURT:   I can't do that.

MR. ROSEN:    Fair is fair.

THE COURT:   Fourteen.   Let's block this out on a graph because I'm going to set an argument date.

MR. BROOKS:   You must think I write faster, Judge.

THE COURT:   Ten days for you.  I'll make it — we'll put down dates.  Don't you think this is the only way to do this?  I mean the estate has got to know the outcome of this.  Matrix needs to know the outcome of this.  It has been — the whole issue has been moldering for an interminable period of time and let's get done with it.

MR. BROOKS:   We'll do.

THE COURT:   So today is the 15th.  Ten days is a weekend.  The 27th for you to make definitive motions for summary judgment.  Twenty days thereafter —

MR. ROSEN:   I lose an hour with daylight savings time.

- 11 -

THE COURT:  The 7th of April, Friday the 7th of April.

MALE VOICE:  That's only ten days, Judge.

MR. ROSEN:  Thank you.

THE COURT:  All right then.

MR. ROSEN:  You get to rule on a weekend, Judge, because that brings it out to April 17th.

THE COURT:  Yes.  April 17th.

MR. ROSEN:  Which looks like it's —

THE COURT:  If you prefer.  Would you prefer the 14th?

MR. ROSEN:  No.

THE COURT:  I was thinking about your weekend.

MR. ROSEN:  Why when I can do it on Easter Monday, Passover and the day after I have to pay the federal government.  Would I want to pass that up, Your Honor?

THE COURT:  April 17th.

[ Pause in proceedings.]

THE COURT:  Two weeks from there would be May 1.

Now, the argument —

MR. BROOKS:  Judge, in thinking — while you're looking for that, I'm thinking if I get a motion, a cross-motion revised or however it looks from counsel —

THE COURT:  It can't be too different.

MR. BROOKS:  Well, but my concern is this that he has affidavits attached to it, et cetera.  I mean I'm concerned about the compression of time.  I may need to take a deposition.  I don't know what he's going to file.  I have no idea but I'm just anticipating that I get some sort of evidentiary submission that —

THE COURT:  Let's see what it is.  Let's see what it is.

MR. ROSEN:  If there is a material evidentiary issue then [inaudible] only getting summary judgment.

THE COURT:  Right.  I think we should have argument on Thursday, May 4th.  How is that?

MR. ROSEN:  Whatever you say, Your Honor.  What time?

- 12 -

THE COURT:  Great idea.  Now, let me suggest now as you go through these papers and the putting together of the motion and the cross-motion and the reply that you try to anticipate the likelihood or not of there being issues of fact that would deny judgment, summary judgment, and as you do that you will be plotting your discovery, won't you?  You'll be thinking what discovery you need so that — and I really haven't the slightest idea what the outcome will be, but if it should turn out that summary judgment is not appropriate you know at the end of the argument and my ruling I'm going to say how much discovery do you need, you'll know exactly what discovery you need.  Forewarned, forearmed and you will also be forearmed with the certain knowledge that if I'm frustrated by my frustrated zeal in deciding the case by the fact that there are issues of fact that require a trial I will impose scheduling order that will be of great rigger but obviously save everybody money in the long run.  How about that?

Now, it may well be that I'll grant the motion but by thinking of discovery as you go along and whether there's a need for discovery really and what you're going to say if I say why do you need so much discovery when you have been arguing that there are no issues of fact.

MR. BROOKS:  I never heard that before, Judge.

THE COURT:  Be prepared.  The 4th at 11:00.  How is that?

For counsel for Matrix to suggest that this Court's conduct of the March 15 pretrial conference reflects bias or partiality on the part of the Court is baseless.

With the possible exception of attorneys Rosen and Brooks, every attorney involved in the case since the June 29, 2005 hearing has known perfectly well that the statements by Messrs. Kera and Nieto at the June 29 hearing lie at the crux of the debtors' claim for breach of contract against Matrix. My statement to Mr. Brooks at the March 15, 2006 conference "so that will be part of your record" was not an instruction to Mr. Brooks that he should include the June 29, 2005 Transcript in his motion papers on behalf of the Chapter 11 Trustee.[4]  But if I had intended that statement as an instruction to Mr. Brooks, there would have been nothing improper in it because the controversy between the debtors' estates and Matrix in this adversary proceeding obviously cannot be resolved without reference to what happened at the June 29, 2005 hearing.

---

[4]    I do not know at this point and did not know on March 15, 2006 whether the June 29, 2005 Transcript was already included in the summary judgment papers.

**May 30, 2006**

On May 30, 2006 this Court held a hearing on Matrix' motion to stay the trial scheduled for June 16 in order to give Matrix an opportunity to appeal my decision denying the Chapter 11 Trustee's motion under Bankruptcy Rule 9019 to approve the Matrix settlement. My ruling denying Matrix' motion for a stay commenced at page 5 of the Transcript. At page 6 of the Transcript and later in the Transcript I refer to the entity referred to as "ZPG" (standing for ZPG Restaurant Associates, LLG), as the "alter ego" of Matrix. Matrix complains:

> Despite the fact that no determination was ever made that ZPG Associates . . . was an alter ego of Matrix the Court clearly referred to the entity as such. This pre-determination is representative of the decisions made by this Court that give rise to the appearance of partiality or bias and constitute sufficient reasons for this Court to recuse itself.

It has been my clear understanding since March 2005 that ZPG and Matrix were and are both entities under the ownership and control of the two shareholders of Matrix, Messrs. Nelson and Nieto. On March 24, 2005 a hearing was held to consider, among other things, a breakup fee or breakup fees sought by the original, and then a subsequent, stalking horse bidder for debtor's assets. ZPG Restaurant Associates, LLC was the original stalking horse bidder at $16 million. Subsequently, another bidder sought to replace ZPG as the stalking horse bidder with a $21 million bid. Both sought a breakup fee and they eventually reached a "breakup agreement" with the debtor to split the fee, with ZPG retaining the right to $50,000 of the fee. During the hearing an attorney named Graubard appeared and made the following statement (Tr. 26):

> MR. GRABAR [sic]: My client is Matrix Realty who signed the breakup agreement with the debtor because the same people are involved. The funds for the deposit came from Matrix, but ZPG Restaurant Associates, LLC is the entity that is in the restaurant in the food business, Your Honor.

Mr. Graubard's representation that "the same people are involved" in both Matrix and ZPG, that the "funds for the deposit" required of ZPG in respect of its stalking horse bid "came from Matrix" and that Matrix had "signed the breakup agreement" under which ZPG would split the breakup fee between itself and the successor stalking horse bidder would certainly suggest that Matrix and ZPG were controlled by "the same people." Indeed, the Purchase and Sale Agreement between the debtors and Matrix states in its

preamble that it was an agreement "by and between ZPG RESTAURANT ASSOCIATES, LLG" and the several debtors; the name of the ZPG contracting party was stricken out and in place of the ZPG name is handwritten "Matrix Realty Group, Inc. and/or its affiliates."   To this date, even in the Matrix motion for recusal, it has never been suggested by anyone that Matrix and ZPG were not under the common ownership and control of Messrs. Nelson and Nieto.

Yesterday I received the parties' Joint Pretrial Order.  Paragraph 2 of "DEFENDANT'S CONTENTIONS OF FACT" states as follows:

2.  On April 15, 2005, a contract captioned (the "Contract") between the debtors and Matrix, and/or its affiliates executed between the debtors and ZPG Associates in exchange for $26,770,000.  [sic]

Paragraphs 6 and 7 of DEFENDANT'S CONTENTIONS OF FACT state as follows:

6.  Based upon the fraudulent bid of Borek, a new bid was submitted by ZPG to purchase the Assets of the Debtors.

7.  The Contract was signed by Glenn Nelson as the Managing Member of ZPG.

Thus, even Matrix' contentions of fact in the Joint Pretrial Order treat ZPG and Matrix as alter egos, since the "new bid" for $26,770,000 was "submitted by ZPG to purchase the Assets of the Debtors" and the Contract was signed by Glenn Nelson "as the Managing Member of ZPG," although the final contract was between the debtors and "Matrix Realty Group, Inc. and/or its affiliates."

For Matrix' counsel to accuse the Court of bias or partiality is baseless and reprehensible.


## **ORDER**

Upon the foregoing, it is hereby

ORDERED that Matrix' motion for an order recusing this Court is denied.


Dated:  White Plains, NY
         June 14, 2006


      /s/ Adlai S. Hardin, Jr.
                    U.S.B.J.

- 15 -

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

(AJR-4016)

---------------------------------------------------X

In re

**Submission Date: 4/4/06**
**Objections Due: 3/31/06**

FOOD MANAGEMENT GROUP, LLC,
KMA I, INC.,
KMA II, INC.,
KMA III, Inc.,
BRONX DONUT BAKERY, INC.

Case No. 04-22880(ASH)
04-22890(ASH)
04-22891(ASH)
04-22892(ASH)
04-20312(ASH)

Debtors.

---------------------------------------------------X

## NOTICE OF MOTION BY SUBMISSION FOR REARGUMENT
## PURSUANT TO FRCP 60 AND FED. R. BANKR. P. 9024
## OF THIS COURT'S DECISION AND ORDER DENYING
## THE APPLICATION BY MATRIX AND THE CHAPTER 11
## TRUSTEE FOR AN ORDER RESOLVING THE
## ADVERSARY PROCEEDING PURSUANT TO BANKRUPTCY RULE 9019

**PLEASE TAKE NOTICE** that upon the annexed application (the "Application"), dated

March 20, 2006, of Matrix Realty Co., ("Matrix"), the undersigned will move by submitted

motion before the Honorable Adlai S. Hardin, Jr., United States Bankruptcy Judge, at the United

States Courthouse, Southern District of New York, 300 Quarropas Street, White Plains, New

York, on the 4th day of April, 2006, at 10:00 a.m., for the entry of an Order pursuant Fed. R.

Bankr. P. 9024 which incorporates Federal Rules of Civil Procedure 60(b), rearguing and

reconsidering this Court's decision and order denying the application to settle Adversary

Proceeding No. 05-08636 pursuant to Fed. R. Bankr. P 9019 dated March 10, 2006, on the

grounds of mistake, inadvertence, surprise, newly discovered evidence, and fraud, as well as

other reasons justifying relief from the operation of this Court's Order and upon such

reargument, approving the Settlement pursuant to Fed. R. Bankr. P. 9019.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief sought in the Application must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, as modified by any administrative orders entered in this case, and be filed with the Bankruptcy Court electronically in accordance with General Order #462, by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, Microsoft Word, DOS text (ASCII) or a scanned image of the filing, with a hard copy delivered directly to Chambers, and be served in accordance with General Order #462, and upon the Law Offices of Avrum J. Rosen, 38 New Street, Huntington, New York 11743 and the Office of the United States Trustee, so as to be received by no later than 4:00 p.m. on March 31, 2006.

**PLEASE TAKE FURTHER NOTICE** that only those objections that have been timely filed may be considered by the Court.

Dated: Huntington, New York
      March 20, 2006

                    The Law Offices of Avrum J.Rosen
                    Attorneys for Matrix Realty Co.

        BY:    S/Avrum J. Rosen
                Avrum J. Rosen (AJR4016)
                38 New Street
                Huntington, New York 11743
                631 423 8527
                ajrlaw@aol.com

*ORDER*

*Motion Denied*

/s/ Adlai S. Hardin, Jr.
United States Bankruptcy Judge

4-4-06

GARDNER CARTON & DOUGLAS LLP
Janice B. Grubin (JG 1544)
12 E. 49th Street
New York, New York 10017
(212) 812-2100

-- and --

GARDNER CARTON & DOUGLAS LLP
Edwin E. Brooks (EB 4036)
Mark S. Melickian (MM 2375)
191 N. Wacker Drive
Chicago, Illinois 60606-1698
(312) 569-1000

Counsel to Janice B. Grubin, Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------X
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| FOOD MANAGEMENT GROUP, LLC, | : | Case No. 04-22880 (ASH) |
| KMA I, INC., | : | Case No. 04-22890 (ASH) |
| KMA II, INC., | : | Case No. 04-22891 (ASH) |
| KMA III, INC., | : | Case No. 04-22892 (ASH) |
| BRONX DONUT BAKERY, INC., | : | Case No. 04-20312 (ASH) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------X

**ORDER DENYING COMPROMISE AND SETTLEMENT**
**OF ADVERSARY PROCEEDING AGAINST MATRIX REALTY GROUP, INC.**

UPON consideration of the motion (the "Motion") of Janice B. Grubin, Chapter 11

Trustee (the "Trustee") of the above-captioned debtors (the "Debtors"), dated February 10, 2006,

for an order, pursuant to Bankruptcy Rule 9019, authorizing and approving the compromise and

settlement of certain claims asserted by the Debtors against Matrix Realty Group, Inc. ("Matrix),

and certain counterclaims asserted by Matrix against the Debtors in an adversary proceeding

pending in this Court (Adv. No. 05-8636) and a certain break-up fee claim asserted by Matrix

upon the terms and conditions set forth in the Motion; and the Motion having duly come on to be heard before this Court on  March 7, 2006; and it appearing that proper and adequate notice of the Motion and the Proposed Order has been given; and upon the Opposition of Anastasios "Tom" Gianopoulos to Motion of Chapter 11 Trustee Authorizing and Approving Compromise and Settlement of Adversary Proceeding against Matrix Realty Group, Inc., dated March 1, 2006; and upon the Opposition of Eastchester Management Group LLC, MLC Properties, LLC, 57 North Central Avenue Corp., 2501 Third Realty Corp., and 2501 Third LLC to Trustee's Motion for Approval of Settlement with Matrix Realty Group, Inc., dated March 1, 2006; and upon the Objection of Questech Financial, LLC, to the Motion of Chapter 11 Trustee Pursuant to Bankruptcy Rule 9019(a) Authorizing and Approving the Compromise and Settlement of Adversary Proceeding Against Matrix Realty Group, Inc., dated March 3, 2006; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (O); and it appearing that venue is proper in this district pursuant to 28 U.S.C. §1408 and 1409; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**ORDERED,** that the Motion is DENIED.

Dated: White Plains, New York
        March _10_, 2006


                                    /s/Adlai S. Hardin, Jr._____
                                    HONORABLE ADLAI S. HARDIN, JR.,
                                    UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------X

In Re:                                                              Chapter 11

FOOD MANAGEMENT GROUP, LLC,                    Case No. 04-22880 (ASH)
KMA I, INC.                                              Case No. 04-22890 (ASH)
KMA II, INC.,                                            Case No. 04-22891 (ASH)
KMA III, INC.,                                           Case No. 04-22892 (ASH)
BRONX DONUT BAKERY, INC, .                       Case No. 04-20312 (ASH)

                            Debtors.                     (Jointly Administered)

----------------------------------------------------------------------X

FOOD MANAGEMENT GROUP, LLC
KMA, I, INC., KMA II, INC., KMA III,
INC., and BRONX DONUT BAKERY, INC.

                            Plainitffs,                  Adversary Proceeding
                                                        Case No. 05-8636 (ASH)

            V.

MATRIX REALTY GROUP, INC.,

                            Defendants.
----------------------------------------------------------------------X


**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF SUFFOLK        )

    Joanne Tyburski, being duly sworn, deposes and says, that deponent is not a party to this action, is over 18 years of age and resides at South Huntington, New York;

    On the 6th day of June, 2008, deponent served the within **NOTICE OF APPEAL, with exhibits,** to the referenced persons on the annexed list, by depositing a copy of same in a post-paid wrapper, each addressed as shown below, in an specifically designated depository box under the exclusive care and custody of United States Postal Service  within the State of New York:

1

                                             s/Joanne Tyburski

                                             Joanne Tyburski

Sworn to before me this
6TH day of June, 2008

s/Avrum J. Rosen
AVRUM J. ROSEN
Notary Public, State of New York
No. 02RO4872542
Qual. in Suffolk County
Comm. Exp. Sept. 8, 2010

2

TO:

Warren Von Credo Baker, Esq.
Drinker Biddle & Reath LLP
191 N. Wacker Drive
Suite 3700
Chicago, IL 60606-1698

Office of the United States Trustee
33 Whitehall Street, 21st Fl.
New York, New York 10004