**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

In re

FOOD MANAGEMENT GROUP, LLC,
KMA I, INC.,
KMA II, INC.,
KMA III, INC.,
BRONX DONUT BAKERY, INC.,

Debtors.

-------------------------------------------------------X

MATRIX REALTY GROUP, INC.,

Defendant-Appellant,

v.

FOOD MANAGEMENT GROUP, LLC,
KMA I, INC., KMA II, INC., KMA III,
INC., and BRONX DONUT BAKERY,
INC.,

Plaintiffs-Appellees,

-------------------------------------------------------X

Chapter 11

Case No. 04-22880 (ASH)
Case No. 04-22890 (ASH)
Case No. 04-22891 (ASH)
Case No. 04-22892 (ASH)
Case No. 04-20312 (ASH)

(Jointly Administered)

Civil Case:08-cv-5956 (DAB)

On Appeal from the United
States Bankruptcy Court for
the Southern District of New
York,Case No. 05-8636-ASH

---

## BRIEF OF APPELLANT MATRIX REALTY GROUP, INC.

---

**LAZER, APTHEKER, ROSELLA**
**& YEDID, P.C.**
David Lazer (DL 7441)
225 Old Country Road
Melville, New York 11747
(631) 761-0800
(631) 761-0013 (fax)

*Appellate Counsel for Defendant-Appellant*
*Matrix Realty Group, Inc.*

TABLE OF AUTHORITIES ................................................................. i

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION ........................................1

STATEMENT OF THE ISSUES PRESENTED ...........................................................1

APPLICABLE STANDARD OF APPELLATE REVIEW ...........................................................2

STATEMENT OF THE CASE ...........................................................2

    Nature of the Instant Case, the Course of the Proceedings,
    and Disposition in the Court Below ...........................................................2

    Statement of Relevant Facts ...........................................................3

ARGUMENT

POINT I ...........................................................9

    MATRIX DID NOT ANTICIPATORILY REPUDIATE,
    BUT PROPERLY CANCELLED THE CONTRACT
    WHEN DUNKIN' REJECTED MATRIX AS PURCHASER ...........................................................9

    A.    DUNKIN' DONUTS REJECTED MATRIX AS PURCHASER
        UNDER THE CONTRACT ...........................................................10

    B.    MATRIX'S CANCELLATION OF THE CONTRACT UPON
        DUNKIN'S REJECTION WAS PROPER AND NOT
        AN ANTICIPATORY REPUDIATION OF THE CONTRACT ........................12

    1.    Dunkin's Rejection of Matrix Was a Failure of an Express Condition Precedent 12

    2.    Matrix Was Not Required to Find a Substitute Operating Principal and
        Reapply for Franchisor Approval Before Electing to Cancel Upon
        Dunkin's Rejection ...........................................................13

        (a)    *No Contract Provision Required Matrix to Replace a Key Member Upon*
             *Dunkin's Rejection* ...........................................................13

        (b)    *Matrix Had No Implied Duty to Replace a Key Member With a Stranger*
             *Satisfactory to Dunkin'* ...........................................................14

        (c)    *The Terms of the Purported "Implied Duty" Imposed Below are*
             *Unenforceably Vague* ...........................................................18

3.     <u>Matrix's Dissatisfaction With the Economic Aspects of the Contract is</u>
<u>Legally Irrelevant Where Cancellation Was Proper Based Upon the Failure</u>
<u>of the Approval Condition</u> ........................................................................20

4.     <u>Cancellation was Proper Irrespective of Whether Other Allegedly Untenable</u>
<u>Grounds Were Also Asserted or Whether Matrix May Not Have Performed</u>
<u>in Any Event</u> .............................................................................................22

**POINT II**

<u>ASSUMING *ARGUENDO* THAT MATRIX WAS NOT ENTITLED TO CANCEL,</u>
<u>DEBTORS WAIVED ANY ALLEGED "REPUDIATION" AND THEN WRONGFULLY</u>
<u>DECLARED MATRIX IN DEFAULT</u> ............................................. 23

A.     DEBTORS ELECTED TO WAIVE ANY ANTICIPATORY REPUDIATION ....25

1.     <u>Debtors, By Their Counsel's June 16, 2005 Letter, Waived Any Alleged Repudiation</u>
<u>and Elected to Proceed Under the Contract</u> ..........................................26

2.     <u>By Continuing to Prosecute their Motion to Compel Dunkin's Acceptance of Matrix,</u>
<u>Debtors Confirmed their Waiver of any "Repudiation" and Elected to Proceed Under</u>
<u>the Contract</u> ............................................................................................27

3.     <u>Debtors, By Their Attorney's July 5, 2005 Letter, Once Again</u>
<u>Reaffirmed the Contract</u> .........................................................................28

B.     HAVING WAIVED ANY ANTICIPATORY REPUDIATION BY
MATRIX, DEBTORS' UNAUTHORIZED DECLARATION OF
A 5-DAY DEADLINE FOR MATRIX TO REPLACE ITS
OPERATIONS PRINCIPAL WAS PATENTLY UNREASONABLE ................29

C.     AS OF THE DATE DEBTORS COMMENCED THEIR
ADVERSARY PROCEEDING, MATRIX WAS NOT IN BREACH
OF THE CONTRACT ....................................................................30

**POINT III**

<u>DEBTORS FAILED TO MEET THEIR BURDEN TO PLEAD AND PROVE THEIR</u>
<u>OWN ABILITY TO PERFORM</u> .................................................................31

A.     THE BANKRUPTCY COURT MISAPPLIED NEW YORK LAW IN
RELIEVING THE DEBTORS OF THEIR OBLIGATION TO
DEMONSTRATE THAT THEY WOULD HAVE BEEN READY,
WILLING AND ABLE TO PERFORM ..............................................32

B.   MATRIX'S PURPORTED REPUDIATION WAS NOT THE REASON DEBTORS WERE UNABLE TO PERFORM ....................................................34

POINT IV

DEBTORS FAILED TO PROVE THE EXISTENCE OF A COMPLETE CONTRACT BINDING ON MATRIX ............................................................................37

POINT V

SIGNIFICANT ASSETS PROMISED TO BE SOLD TO MATRIX WERE NEVER AVAILABLE, RENDERING DEBTORS' WARRANTY OF TITLE FRAUDULENT AND THEIR PERFORMANCE IMPOSSIBLE.........................................................  39

POINT VI

THE DECEMBER 15, 2005 ORDER NULLIFIED THE CONTRACT .........................44

POINT VII

DENIAL OF MATRIX'S MOTION FOR RECUSAL WAS AN ABUSE OF DISCRETION ...........................................................................................................46

POINT VIII

MATRIX DID NOT RECEIVE CREDITS TO WHICH IT WAS ENTITLED ..............48

A.   MATRIX WAS ENTITLED TO A CREDIT FOR AVOIDED REMODELING COSTS .........................................................................................48

B.   THE DEPOSIT MADE BY "64 EAST" RETURNED BY THE TRUSTEE WITHOUT COURT APPROVAL SHOULD HAVE BEEN CREDITED IN MITIGATION .................................................................49

CONCLUSION ...................................................................................................................50

## TABLE OF AUTHORITIES

**Page**

**Cases**

Alaska Textile Co. v. Chase Manhattan Bank, 982 F.2d 813 (2d Cir.1992) ................................29

Anheuser-Busch Ice & Cold Storage Co. v. Reynolds, 221 A.D. 174 (1st Dep't 1927) ..............41

Asia Global Crossing, 326 B.R. 240 (Bankr.S.D.N.Y. 2005) ...........................................26, 32, 33

Asia Global Crossing, 379 BR. 490, (Bankr. S.D.N.Y. 2007) .................................31, 33, 34, 35

Baltic v. Rossi, 289 A.D.2d 430 (2d Dep't 2001) ......................................................................30

Big Apple Car, Inc. v. City of New York, 204 A.D.2d 109, (1st Dep't 1994) .............................21

Binks v. Farooq, 178 A.D.2d 999 (4th Dep't 1991) ...................................................................15

Blask v. Miller, 186 A.D.2d 958 (3rd Dep't 1992) .....................................................................15

Bridgeway Corp. v. Citibank, 201 F.3d 134 (2d Cir. 2000) ........................................................45

Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp., 301 A.D.2d 70 (1st Dep't 2002) .....26

Corazza v. Jacobs, 277 A.D.2d 52 (1st Dep't 2000) .............................................................16, 17

Dalton v. Educational Testing Service, 87 N.Y.2d 384 (1995) ...................................................14

Development LLC v. Kronman, 263 A.D.2d 175 (1st Dep't 2000) ..............................................20

Eves v. Bureau, 13 A.D.3d 1004 (3rd Dep't 2004) .....................................................................11

George v. Lumbrazo, 184 A.D.2d 1050 (4th Dep't 1992).............................................................44

Ginett v. Computer Task Group, Inc., 962 F.2d 1085 (2d Cir. 1992) ..........................................42

Gonzalez v. Norrito, 256 A.D.2d 440 (2d Dep't 1998)................................................................31

Granite Partners, LP v. Bear, Sterns & Co., Inc., 17 F.Supp.2d 275 (S.D.N.Y. 1998) ................14

Greene v. Barrett, Nephews & Co., 238 N.Y. 207 (1924)............................................................36

Hall v. S.B.A., 695 F.2d 175 (5th Cir. 1983) .............................................................................48

Hegner v. Reed, 2 A.D.3d 683 (2d Dep't 2003)............................................................30

Henry v. Daytop Village, Inc., 42 F.3d 89 (2d Cir. 1994).............................................23

In re Cody, 338 F.3d 89 (2d Cir. 2003) .........................................................................2

In Re Food Management Group, LLC, 380 B.R. 677 (Bank: S.D.N.Y. 2008)..........5, 49

In re Iridium Operating LLC, 478 F.3d 452 (2d Cir. 2005)...........................................47

In re Manville Forest Prods. Corp., 896 F.2d 1384 (2d Cir.1990) ................................2

Ixe Banco, S.A. v. MBNA America Bank, N.A., Slip Copy, 2008 WL 650403
      (S.D.N.Y. March 7, 2008) ..............................................................................21, 22

Jim Ball Chrysler LLC v. Marong Chrysler-Plymouth Inc., 17 A.D.3d 1113
      (4th Dep't 2005) ...............................................................................................12, 16

Joseph Martin, Jr. Delicatessen v. Schumacher, 52 N.Y.2d 105 (1981) .................19, 20

Klein v. Opert, 218 A.D.2d 784 (2d Dep't 1995)..........................................................30

Krainin v. McCusker, 454 A.D.3d 738 (2d Dep't 2007)................................................11

Kressel, Rothlein & Roth v. Gallagher, 155 A.D.2d 587 (2d Dep't 1989) ...................11

KT Kaltim Prima Coal v. AES Barbers Point, Inc., 180 F.Supp.2d 475 (S.D.N.Y. 2001) ..........15

Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847 (1988).............................48

Liteky v. U.S., 510 U.S. 540 (1994) ..........................................................................2, 48

Lucente v. International Business Machines Corp., 510 F.3d 243 (2d Cir. 2002) ............25, 26, 29

Macho Assets, Inc. v. Spring Corp., 128 A.D.2d 680 (2d Dep't 1987).........................15

Magnolia Development Corp. v. Lockwood, 160 A.D.2d 774 (2d Dep't 1990)..........................16

Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc., 61 N.Y.2d 106 (1984)................12

Mocca Lounge, Inc. v. Misak, 94 A.D.2d 761 (2d Dep't 1983)....................................19

Munson v. Germerican Assoc., 224 A.D.2d 670 (2d Dep't 1996)................................16
North Triphammer Dev. Corp. v. Ithaca Associates, 704 F.Supp. 422 (S.D.N.Y. 1989)..............30

Record Club of Am., Inc. v. United Artists Records, Inc., 890 F.2d 1264 (2d Cir.1989)............33

Refinemet Intern. Co. v. Eastbourne N.V., 815 F.Supp. 738 (S.D.N.Y. 1993),
    aff'd, 25 F.3d 105 (2d Cir. 1994)....................................................................22

Rogers-Pyatt Shellac Co. v. Starr Piano Co., 212 A.D. 792 (1st Dep't 1925) ..............................24

Rossi v. Simms, 119 A.D.2d 137 (1st Dep't 1986) ............................................16, 17, 30

Sabo v. Delman, 3 N.Y.2d 155 (1957) ....................................................................44

Severini v. Wallace, 13 A.D.3d 434 (2d Dep't 2004) ................................................16

Stevens v. Cliffs at Princeville Associates, 67 Haw. 236, 684 P.2d 965 (1984) ..........................15

Time, Inc. v. Kastner, 972 F.Supp. 236 (S.D.N.Y. 1997)(Baer, J.)................................37

Tipton v. Feitner, 20 N.Y. 423 (1859) ....................................................................41

Young v. United States Dep't of Justice, 882 F.2d 633 (2d Cir. 1989)........................................45

Ziehen v. Smith, 148 N.Y. 558 (1896) ....................................................................36

## Statutes and Rules

28 U.S.C. §158(a)(1) ........................................................................................ 1

28 U.S.C. §455(a) ............................................................................................48

Fed.R.Civ.P. 8(d)(2) ........................................................................................23

## Other Authorities

Restatement, Contracts 2d, §224 ........................................................................12

Restatement, Contracts 2d, §255 ........................................................................22

Williston, Contracts (4th Ed.) §45:4.....................................................................41

Williston, Contracts (4th Ed.) §45:7.....................................................................42

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. §158(a)(1), the appeal being one as of right from a final judgment and order of Hon. Adlai S. Hardin, Jr. (U.S.B.C., S.D.N.Y.). The appealed judgment and order finally determined an adversary proceeding between Debtors and appellant involving claims and counterclaims that concluded with an award of damages to Debtors

## STATEMENT OF THE ISSUES PRESENTED

1.      Did the Bankruptcy Court err in finding that Matrix anticipatorily repudiated the Contract, where Matrix cancelled the contract when franchisor Dunkin' Donuts ("Dunkin'"), whose consent was required, rejected Matrix/ZPG as purchaser of the stores?

2.      Did the Bankruptcy Court err in not finding that Matrix properly cancelled the Contract upon Dunkin's rejection which was a failure of an express condition precedent and where the Contract did not require Matrix to find a substitute operating principal and reapply for approval?

3.      Was it error to hold that Matrix's alleged dissatisfaction with the economic aspects of the Contract was the reason for the repudiation, where cancellation was proper due to the failure of the approval condition regardless of Matrix's motivation?

4.      Even if Matrix's cancellation constituted an anticipatory repudiation, was it error not to find that Debtors waived that repudiation and elected to proceed with the Contract and then repudiated the Contract themselves by wrongfully and prematurely declaring Matrix in default?

5.      Did the Bankruptcy Court err in not finding that Debtors' performance of the Contract was rendered impossible where significant assets promised to be sold were unavailable, and in finding the Contract was "divisible" to excuse Debtors' misrepresentations and inability to deliver?

6.      Did the Bankruptcy Court err in not holding that Debtors failed to meet their burden of pleading and proof of their own ability to perform in this anticipatory repudiation damages case?

7.    Did the Bankruptcy Court err in not finding that the Contract was induced by fraud?

8.    Did the Bankruptcy Court err in failing to find that the Contract was incomplete and nonbinding on nonsignatory Matrix due to missing attachments, the never finalized and unexecuted Dunkin' Rider, the lack of Matrix's signature, and the lack of Bankruptcy Court approval?

9.    Did the Bankruptcy Court err in denying motions for nullification of the Contract based upon the doctrine of judicial estoppel and for recusal?

10.    Did the Bankruptcy Court err in not allowing a reduction of damages for: (a) past due "remodeling costs" under the franchise agreements of at least $4,500,000; and (b) the $2,100,000 deposit of "stalking horse" bidder 64 East released by the Trustee, as mitigating damages?

## APPLICABLE STANDARD OF APPELLATE REVIEW

The Bankruptcy Court's findings of fact are reviewed for clear error. Fed. R. Bankr.P. 8013. A finding of fact is clearly erroneous if the court is left with the definite and firm conviction that a mistake has been committed, In re Manville Forest Prods. Corp., 896 F.2d 1384, 1388 (2d Cir.1990). Conclusions of law are reviewed *de novo*. In re Cody, 338 F.3d 89, 94 (2d Cir. 2003). Denial of the motion for recusal is reviewed to determine if the judge's remarks reveal a high degree of antagonism as to make fair judgment impossible. Liteky v. United States, 510 U.S. 540, 555 (1994).

## STATEMENT OF THE CASE

Nature of the Instant Case, the Course of the Proceedings, and Disposition in the Court Below

The judgment and order appealed from finally determined an adversary proceeding commenced by debtors Food Management Group, LLC, KMA I, Inc., KMA II, Inc., KMA III, Inc., and Bronx Donut Bakery, Inc. (collectively, "Debtors") on July 21, 2005. Debtors sought damages for

for breach of an April 15, 2005 Purchase and Sale Agreement ("Contract")(Pl's15)[1] pursuant to which defendant-appellant Matrix Realty Group Inc. ("Matrix") allegedly agreed to buy substantially all of Debtors' assets, including 24 operating franchised and leased Dunkin' Donuts ("Dunkin'") stores, three more stores to be opened, in Westchester and Bronx Counties, and a bakery/commissary that supplied them, for $26,770,000. Approval of the Contract, including the Purchaser, by Dunkin' and by the Bankruptcy Court, were essential preconditions. Neither approval was obtained. After Dunkin' twice refused to approve Matrix as Purchaser, Matrix requested the Contract be cancelled and its downpayment refunded. Instead, Debtors moved to compel Dunkin' to accept Matrix but, after a hearing on June 29, 2005, the Bankruptcy Court upheld Dunkin's rejection of Matrix.

On July 21, 2005, Debtors commenced this adversary proceeding alleging that Matrix anticipatorily repudiated the Contract, and demanding the downpayment and additional damages (Pl's 88). Matrix answered on August 10, 2005 and counterclaimed for its $2,400,000 downpayment and a "break up fee" (Pl's 89). A year after a three-day trial, the court issued its 52-page Decision on July 25, 2007 (D95); finding Matrix had breached the Contract. Thereafter, the parties submitted confidential damages analyses for *in camera* review and a joint statement of issues of fact and law. Following additional briefings and hearings, Judge Hardin issued a damages order dated May 28, 2008 (D119) and final judgment for Debtors (Trustee) in the sum of $9,196,114.11 (D120). Matrix filed its notice of appeal from the judgment and interlocutory orders on June 4, 2008 (D122).

<u>Statement of Relevant Facts</u>

In 2002, Dunkin' and Debtors' principals, whose entities were referred to as the "Gus Companies", entered into an agreement ("2002 Settlement")(Pl's 1). The Gus Companies operated the

---

1 Trial exhibits in evidence are referred to as "Pl's" or "Deft's", for Debtors' and Matrix's, respectively. Transcript portions are referred to by "Tr." and date. The July 25, 2007 liability decision is referred to as "Decision." Docketed items in this adversary proceeding are referred to by "D" and the official docket number.

the franchised Dunkin' restaurants that appellant Matrix/ZPG later sought to purchase (Decision p. 4). Under the 2002 Settlement, the Gus Companies' principals were to sell the assets in arm's length transactions to new entities in which the principals had no involvement. The Gus Companies were to submit purchase agreements to Dunkin' for approval by March 31, 2005 and the transactions were to close by July 31, 2005 (*id.*). In 2004, the Debtors filed for bankruptcy (see Decision  p. 5). On December 3, 2004, the court, by stipulation and order, transferred all of the Gus Companies assets into Debtors' estate to be auctioned as a going concern pursuant to the Bankruptcy Code (*id.* at 6). The court set up bidding procedures and the assets were put out to bid (Pl's 5).

ZPG Restaurant Associates, LLC ("ZPG"), whose principals were Glen Nelson and Daniel Krischer (6/19/06 Tr.217-218 (D73)), Krischer being the only principal in either ZPG or Matrix experienced in running restaurants (Pl's 86 p. 161), made a "stalking horse" bid of $16 million on March 18, 2005 for Debtors' assets (see Decision p.7). Dunkin's representative testified that Dunkin' requires that at least one of the principals of any franchisee must be the operator (6/19/06 Tr. 84). Krischer had previously worked for Dunkin' (see Deft's EE p."3 of 13").

On March 23, 2005, after Debtors had asked the Court to approve ZPG as the stalking horse (see Decision p.7 (referring to the bidder as "Matrix")), non-party 64 East 126th St, LLC ("64 East") entered into a competing "stalking horse" agreement with Debtors to buy the assets for $21,000,000 (*id.*). 64 East made a $1,200,000 downpayment that, in December, 2005, was refunded by the Trustee after 64 East was rejected by Dunkin' (see Pl's NN p. 2)[2]. Following 64 East's bid, ZPG made a new bid to purchase the assets itself for $26,770,000 (see Decision p. 8).

---

2  In a separate adversary proceeding, Bankruptcy Judge Glenn later sustained the sufficiency of the Trustee's claims that 64 East's bid was a fraudulent attempt to circumvent the 2002 Settlement's prohibition against any principal of the Gus Companies acquiring an interest in the estate's assets, and that Debtors' counsel Rattet and

ZPG and Debtors executed the Contract dated April 15, 2005 (Pl's 15) for the sale of the assets for $26,770,000. Handwritten amendments of unestablished origin changed the definition of "Purchaser" in the first paragraph of the document from ZPG to "MATRIX REALTY GROUP, INC. and/or its affiliates" (*id.*). A $2.4 million downpayment check was delivered (see Decision p. 8).

The Contract refers to exhibits to be attached and incorporated containing additional terms, which were not attached. Both parties' obligations were conditioned upon Dunkin's approval of the Contract including but not limited to approval of Matrix/ZPG as the buyer (Pl's 15, ¶¶ 4.2 and 6.2 (D82)). Dunkin's approval was also conditioned upon the parties' completion and execution of Dunkin's Rider (Deft's Q) that, by its terms, would modify the Contract and supersede any inconsistent provisions, including prohibiting any "as is" sale (¶II(5)). Dunkin' mandated completion and execution of the Rider (6/20/06 Tr. 18-22), and it is undisputed that it was never finalized or executed by either party. Dunkin' would not permit Matrix/ZPG to execute the Rider until Debtors did, and Debtors never supplied the required "seller's information" for the Rider (*id.* 36-37). Other conditions precedent included, *inter alia*, judicial approval by July 31, 2005 (¶¶ 4.3 and 6.3), and Seller (Debtors) securing from Dunkin' a "Commissary Production Licensee Agreement" ("CPL") for at least 20 shops for the Bronx Donut Bakery (¶4.5); neither occurred.

Dunkin' set up a special approval process, in terms of the people involved, for the massive transaction (6/19/06 Tr.84-85). It investigated the backgrounds of all Matrix/ZPG principals, required interviews and detailed financial disclosure statements (Pl's 86 p. 60, *et seq.*). The principals supplied the requested documentation and Krischer attended the required interview (*id.* 163, *et seq.*). By motion of May 23, 2005 and initially returnable June 21, 2005 (Pl's 61), Debtors sought approval of

---

his firm were complicit in the alleged fraud. In Re Food Management Group, LLC, 380 B.R. 677 (Bankr. S.D.N.Y. 2008).

sought approval of the Contract and the sale to Matrix, a stated condition precedent (¶¶4.3, 6.3). That motion was never decided.

By May 25, 2005 letter (Pl's 63), Dunkin' advised Debtors and Matrix's principals that "[a]fter careful consideration of the relevant backgrounds of the proposed Buyers, we have decided not to approve them as franchisees . . .", citing Krischer's unsuitability, and that "the proposed Buyers . . . believe the financial terms and conditions do not enable them to meet their obligations to us and that, if approved, they would not meet certain obligations." It added: "[i]t is our position that the Sellers have forfeited their rights to sell their franchises, because they did not timely submit a purchase and sale agreement, as required by the Settlement Agreement, and are otherwise in default."

On June 1, Debtors moved to compel Dunkin' to accept Matrix (see Decision p.17 fn.3). Dunkin', by letter of June 8 (Pl's 70), withdrew its economic objections but reiterated its rejection based on Krischer as operator of the stores. It maintained that Krischer's past dishonesty rendered him unfit to run a large number of Dunkin' stores, and that Dunkin' was unwilling to consider approving Matrix unless it replaced Krischer.

On June 10, responding to Dunkin's June 8 letter, counsel for ZPG and Matrix wrote to Debtors' counsel requesting cancellation of the Contract and return of its downpayment (Pl's 71), because Dunkin' had rejected it as Purchaser, ending its obligations under the Contract, and because Debtors' made material misrepresentations regarding the status and value of the franchises. Debtors' attorney's June 16 letter (Pl's 73) responded that Debtors would not cancel and return the downpayment, dismissed Matrix's fraud allegations, and urged it to await the decision on Debtors' motion seeking to compel Dunkin' to accept Matrix at the June 29, 2005 hearing.

On June 29, 2005, Debtors, Dunkin' and Matrix appeared for that hearing in a separate adversary proceeding (No.05-8505)(See 6/29/05 Tr., Pl's 86). Dunkin's counsel framed the issue as

"whether Dunkin' Donuts properly rejected the [Contract]" (*id.* at 15). Matrix's attorney opined that there was no reason for hearing on Dunkin's rejection because Matrix was no longer interested in the Contract due to Debtors' misrepresentations (*id.* at 18). Debtors' counsel Rattet urged that the matter was not moot and the court should proceed. Rattet explained that if it is found that "Matrix was improperly rejected and, therefore, is a contract vendee then we'd have to deal with the issues with Matrix another day" (*id.* at 19). Judge Hardin agreed: "[r]ight now it's not moot even if Matrix <u>is</u> <u>going</u> to declare that it's not going forward" (*id.* at 22)(emphasis supplied).

At the hearing, three Dunkin' representatives and Krischer as "lead operator of [the] restaurants" (*id.* at 149) testified. Judge Hardin stated that Dunkin' was required to "show cause as to the reasons for their rejection of Matrix and demonstrate that their conduct in rejecting Matrix was reasonable and sustainable as a matter of fact and law" (*id.* at 196), and held that "Dunkin' Donuts has sustained that burden and that for the reasons and under the letter dated June 8, 2005 that Dunkin' Donuts was justified in declining to approve Matrix as the franchisee" (*id.*).

The only communication between Debtors and Matrix after the June 29, 2005 hearing upholding Dunkin's rejection of Matrix was a July 5, 2005 letter from Rattet to Matrix (the third business day after the hearing), urging that Dunkin's June 8 letter and the results of the hearing offered Matrix an opportunity to close without Krischer (Pl's 87). That July 5 letter demanded that Matrix present a substitute for Krischer by July 11 or be sued for the downpayment and additional damages. Contract ¶9.4 authorized giving notices by overnight delivery (not by fax) with notice being deemed given upon receipt: here, on July 6, five calendar and three business days prior to the date for performance. The 2002 Settlement (Pl's 1) and Contract (¶6.3) contemplated an asset sale closing by July 31, 2005, i.e., three weeks later than the demand date set by Debtors. Matrix did not respond to Rattet's July 5 letter and was sued 16 days later, 10 days <u>before</u> the Contract closing date.

In November, 2005, the Trustee entered into a contract with The Beekman Group ("TBG") for the sale of many (but not all) of the same assets for $18,000.000 (see Decision p. 19).

At a November 23, 2005 hearing in Matrix's absence, Judge Hardin spoke to the Trustee and other attendees of Matrix's "repudiation" although the litigation concerning precisely that issue was pending before him (Deft's G p. 38).   On December 15, 2005, the court granted "in its entirety" the Trustee's motion that included a request to declare the Contract null and void (Main Case Docket No. 519) and specifically granted the nullification prong (Deft's NN) as required for the referenced sale to TBG at a substantially lower price. In support of that successful motion (Deft's AA), the Trustee represented that the Contract had "terminated upon [its] own terms by virtue of failing to meet a condition precedent: Dunkin' Donuts' approval" and by Matrix's "withdrawal" (¶45; also see ¶40). The Trustee also acknowledged that Matrix's bid "included franchises that are no longer part of the Debtors' estates" (¶39).   On March 10, 2006, the court denied the Trustee's motion to approve a settlement with Matrix refunding its $2,400,000 deposit (Main Case No. 633; Ex. H to Notice of Appeal), although the $2,100,000 deposit of 64 East had been refunded by the Trustee in December, 2005 (see nullification order, Deft's NN p. 2) after that bidder had been rejected by Dunkin', also based on the unsuitability of its principal (see Trustee's motion, Deft's AA ¶38, citing 64 East's principal's misdemeanor conviction and "multiple felony" charges).

On June 6, 2006, Matrix moved for Judge Hardin to recuse himself, as statements strongly suggested he had already determined Matrix to have anticipatorily repudiated the Contract (D47). The motion was denied by order of June 14, 2006 (D59).  Prior to the commencement of the liability trial, Matrix moved for an order *in limine* based on the December 15, 2005 Order that granted the Trustee's motion to declare the Contract null and void, and the Trustee's statements therein declaring the Contract terminated for failure of a condition precedent (D62). The Decision denied that motion.

8

Over a year after the three day trial on liability, Justice Hardin issued his Decision (D95) finding that Matrix had anticipatorily repudiated. On May 28, 2008 Judge Hardin issued a damages order (D119) and final judgment for Debtors (Trustee) in the sum of $9,196,114.11 (D120), representing the difference between the Contract's Purchase Price and the proceeds obtained from the sale to TBG of most but not all of the "Assets" that Matrix allegedly contracted to purchase, with credits given for some but not all undeliverable Assets.

## POINT I

### MATRIX DID NOT ANTICIPATORILY REPUDIATE, BUT PROPERLY CANCELLED THE CONTRACT WHEN DUNKIN' REJECTED MATRIX AS PURCHASER

Contract ¶6.2 (Pl's 15) required as one of the "Conditions to Obligations of Purchaser" that:

> DUNKIN DONUTS shall have either actually, or by judicial decree of the Court, consented to this AGREEMENT (including, but not limited to, approval of PURCHASER) . . . .

Debtors' own obligations were similarly conditioned (¶4.2). Thus, Debtors and Matrix contemplated that Dunkin' might not approve Matrix or might otherwise decline consent to the Contract, and/or that the Bankruptcy Court might decline to issue a decree directing Dunkin' to so consent. In any of such events, it is abundantly clear that the Contract would be unenforceable. On this record, Dunkin' did not "actually, or by judicial decree of the Court" consent to the Contract. Indeed, it affirmatively rejected Matrix having determined that Matrix's operating manager Daniel Krischer was unacceptable. Dunkin's rejection was upheld by Judge Hardin on June 29, 2005.

In finding after trial that Matrix had anticipatorily repudiated the Contract, the court relied on two principal grounds: a) because Dunkin's rejection left open a hypothetical possibility of approval if Matrix's operating manager were replaced, Matrix had an affirmative obligation to use its "best efforts" to find a replacement satisfactory to Dunkin' and failed to do so; and b) Matrix's

representatives indicated Matrix would not complete the purchase due to what the court called "buyer's remorse" concerning the deal's economics.  Both grounds are erroneous as a matter of law.

The court's June 29, 2005 hearing decision (Pl's 86), denying Debtors' motion to compel Dunkin' to accept Matrix, judicially confirmed the propriety of Matrix's cancellation.  However, in his liability Decision, Judge Hardin imposed upon Matrix retroactively the burden to have replaced Krischer with some stranger who might have proved acceptable to Dunkin' and who would then run the 28-unit group to be bought for nearly $27 million.  This was clear error as a matter of law.

A.    DUNKIN' DONUTS REJECTED MATRIX AS PURCHASER UNDER THE CONTRACT

Dunkin's May 25, 2005 letter (Pl's 63) advised that Dunkin' "decided not to approve [the proposed Buyers] as franchisees . . .," citing the unsuitability of Krischer as operating principal, and the likelihood that the "Buyers" would be unable to meet their obligations to Dunkin'.  Debtors moved on June 1 to compel Dunkin' to accept Matrix.  Dunkin's June 8 letter retracted its economic basis for rejecting Matrix but reasserted its disapproval based on Krischer's unacceptability (Pl's 70). Debtors' counsel' June 16 letter to Matrix acknowledged that Dunkin's rejection of Krischer amounted to an "indirect" rejection of Matrix (Pl's 73).

At the June 29 hearing upholding Dunkin's rejection, Judge Hardin correctly referred to Dunkin' "declining to approve Matrix as the franchisee" (Pl's 86 p. 196).  Then, in a strangely nuanced variation, he stated that "Dunkin' Donuts made clear that it would approve Matrix despite its misgivings on the financial sides of the purchase price but only on condition that Mr. Chrischia [sic.] be replaced by an appropriate operating principal" (*id.* at 204).  Even in that formulation the court recognized that Matrix had not been approved, even conditionally, and that it could never be approved by Dunkin' unless it found a new and "appropriate operating principal" (*id.*).

Somehow, although the facts had not changed, the court's characterization of them did. The trial Decision cited Dunkin's June 8 rejection letter that it "would be willing to accept [Nelson and Nieto] if they brought in a new principal . . .", then characterized the June 29 hearing as having determined that Dunkin's "conditional approval was entirely appropriate" (Decision p.42). Then, Judge Hardin declared that the lack of an executed Rider to the Contract was mooted "by Dunkin' Donuts' actual approval of Matrix, subject to Matrix using good faith to hire a moral and capable operations manager" (Decision p. 44), a standard not imposed by Dunkin' or the Contract. Somehow an operating principal had morphed into an "operations manager." Thus, the June 8 letter that, on June 29, 2005, was found to "not unequivocally reject Matrix as a franchisee" had become one granting conditional actual approval (an oxymoron).

Putting the court's semantics aside, the record is clear that Matrix had been rejected. Of course, if Matrix had been approved, the court would not have had to search for legal theories in order to impose an obligation upon Matrix to try again to secure Dunkin's approval. Moreover, the court's statement that "[a]t the June 29 [2005] hearing, [it] ruled that Dunkin' Donuts' conditional approval was entirely appropriate" is manifestly incorrect. The court had then ruled that Dunkin's rejection of Matrix was justified. That ruling <u>denied</u> Debtors' motion to compel Dunkin' to accept Matrix. It did not grant some phantom motion to compel Matrix to proceed. Where, as here, preconditions to approval are imposed, approval has not been granted. See, *e.g.*, <u>Eves v. Bureau</u>, 13 A.D.3d 1004 (3rd Dep't 2004)(seller with mortgage contingency in contract permitted to terminate where buyer obtained only a conditional mortgage commitment letter with approval conditions to be satisfied prior to closing). See also, <u>Kressel, Rothlein & Roth v. Gallagher</u>, 155 A.D.2d 587 (2d Dep't 1989)(conditional mortgage commitment "subject to" sale of buyer's home does not satisfy contingency clause); and <u>Krainin v. McCusker</u>, 454 A.D.3d 738, 738-739 (2d Dep't 2007).

Matrix was never approved. It was merely told that Dunkin' would let it to reapply following the two rejections but only if it replaced its key operating principal. Whether replacement would then have led to approval would still have been up to Dunkin' or a court hearing overruling Dunkin'. Even if Dunkin's response could be deemed a "conditional approval," the condition was one that Matrix was not obliged to perform. In either event, Matrix was fully entitled to cancel.

B.    MATRIX'S CANCELLATION OF THE CONTRACT UPON DUNKIN'S REJECTION WAS PROPER AND NOT AN ANTICIPATORY REPUDIATION OF THE CONTRACT

1.    Dunkin's Rejection of Matrix Was a Failure of an Express Condition Precedent

Dunkin's approval of the Contract under ¶¶4.2 and 6.2, including without limitation approval of the "Purchaser," was an express condition precedent to both parties' "obligations and ability" to perform. Dunkin' declined to approve Matrix as Purchaser and thus declined to approve the Contract. Judge Hardin's final June 29 order refused to compel such approval. Thus, the express condition to Matrix's obligations failed. See Jim Ball Chrysler LLC v. Marong Chrysler-Plymouth Inc., 17 A.D.3d 1113 (4th Dep't 2005)(duty to perform never arose where contract was conditioned upon franchisor approval that was not obtained). As noted, the Trustee conceded the Contract had terminated by its own terms for failure of the condition in her successful motion to nullify the Contract to clear the way for the TBG sale (Deft's AA ¶45).

The New York Court of Appeals in Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc., 61 N.Y.2d 106, 112 (1984), quoting *Restatement, Contracts 2d*, §224, explained that "[a] *condition . . . is an event, not certain to occur, which must occur unless its non-occurrence is excused, before performance under a contract becomes due*" (italics orig.). The seller was required to produce a title policy and mortgage certification pursuant to a provision entitled "Conditions Precedent to Purchaser's Obligation to Close." The language is virtually identical in the instant Contract. When

Contract. When seller failed to produce the referenced documents, the Court of Appeals found as a matter of law that the buyer's performance was excused. *Id.* at 113. The same result is dictated here.

2.    <u>Matrix Was Not Required to Find a Substitute Operating Principal and Reapply for Franchisor Approval Before Electing to Cancel Upon Dunkin's Rejection</u>

Essential to sustaining the determination that Matrix repudiated is identifying some duty requiring Matrix to oust and replace proposed equity partner Krischer after Dunkin's rejection. Matrix principal Nieto explained that Matrix could not go forward without Krischer: "[o]ur whole interest was always predicated upon his involvement in the deal . . . So without Dan, we wouldn't have the interest or capacity . . ., we don't feel we have an obligation to go try to find somebody else who we are going to trust on a $20 million asset" (Decision p. 43).

The question, then, is whether Matrix was required, as Judge Hardin held, to find a stranger to became a partner and run the 28-unit Dunkin' Donuts empire for which it would be paying nearly $27 million (assuming the stranger proved acceptable to Dunkin') -- and find him within three business days as Debtors demanded! -- failing which it would be liable for millions in damages. No terms of the Contract impose any such extraordinary obligation, and none may fairly be implied.

(a) *No Contract Provision Required Matrix to Replace a Key Member Upon Dunkin's Rejection*

Nothing in the Contract required Matrix to replace its operating principal/equity owner if the franchisor rejected the Purchaser and found such individual unacceptable. The Contract is silent as to Purchaser's duties in the event of any "conditional rejection" or "conditional approval" by Dunkin. Nonetheless, Judge Hardin held that Matrix was obliged, and failed, to use "best efforts" to replace Krischer and seek again, perhaps several times, to obtain Dunkin's approval (Decision p. 42).

In support of his conclusion that Matrix had been required to use its "best efforts" to satisfy this extraordinary precondition, Judge Hardin relied upon Contract ¶1.4. That provision mandates

that Purchaser "use its best efforts to provide, to the satisfaction of each landlord, lessor, and Dunkin'

Donuts or the Bankruptcy Court, or both, <u>adequate</u> assurance of *future* <u>performance</u> under the leases,

FRANCHISE DOCUMENTS and other relevant executory contracts as required under Section 365 of

the Bankruptcy Code" (underlining original, italics supplied).  Review of ¶1.4 in its entirety, and to

referenced 11 U.S.C. §365, readily confirms that this "best efforts" provision pertains to the transfer of

the Debtors' executory contracts and unexpired leases to the Purchaser, not to the process of obtaining

the franchisor's threshold approval of the Contract.

The issue was what effort, if any, Matrix was required to make to seek Dunkin's approval, an

express condition precedent to Matrix's obligations (Contract ¶6.2).  No language in the Contract

requires Matrix to try to cure a rejection by Dunkin'.  The fact that ¶1.4 does not mention the approval

process but specifies the post-closing obligations to which it does apply warrants a finding that the

omission was intentional: "*inclusio unius, exclusio alterius.*"  There is no proof evidencing a contrary

intention. Judge Hardin's finding of liability is based upon a misreading of the Contract's "best

efforts" provision which, properly understood, negates the court's rationale.

(b) *Matrix Had No Implied Duty to Replace a Key Member With a Stranger Satisfactory to Dunkin'*

In addition, the court erred in holding that "every contract also implies a duty of good faith and

fair dealing, which Matrix breached by not seeking to find a replacement for Krischer" (Decision p.

42).  The implied duty of good faith is a promise that neither party to a contract "shall do anything

which will have the effect of destroying or injuring the right of the other party to receive the fruits of

the contract."  <u>Dalton v. Educational Testing Service</u>, 87 N.Y.2d 384, 389 (1995)(citation and

quotations omitted).  It is equally well-settled that the implied covenant does not create new rights

beyond those embodied in the express terms of an agreement. See <u>Granite Partners, LP v. Bear, Sterns

& Co., Inc.</u>, 17 F.Supp.2d 275 (S.D.N.Y. 1998)("Any purported duty of good faith cannot add to,

14

to, detract from, or alter the terms of the contract itself.")(citation and quotations omitted); see also KT Kaltim Prima Coal v. AES Barbers Point, Inc., 180 F.Supp.2d 475 (S.D.N.Y. 2001). The Contract is devoid of terms imposing duties to take specific action upon rejection.

If Matrix had any implied duty at all, it was simply to make a genuine effort to secure third-party approvals and act in good faith, e.g., Binks v. Farooq, 178 A.D.2d 999 (4th Dep't 1991). Also see, Blask v. Miller, 186 A.D.2d 958, 959 (3rd Dep't 1992)("[a]bsent an express promise by a prospective purchaser to apply to a particular bank or to make a specified number of loan applications, a mortgage contingency clause in a sales contract only requires a good-faith attempt to procure a loan in the amount specified"); Macho Assets, Inc. v. Spring Corp., 128 A.D.2d 680 (2d Dep't 1987)(buyer applied for a mortgage and was rejected; the contract was silent as to additional obligations of buyer after rejection; buyer's cancellation was proper despite seller's offer to finance the purchase); Stevens v. Cliffs at Princeville Associates, 67 Haw. 236, 684 P.2d 965 (1984)(buyers, rejected for mortgage after making bona fide application, based solely on insufficient income, not obligated, as a matter of law, to secure additional borrowers). Matrix, like those buyers, satisfied its contractual obligation by making a bona fide application for third-party approval.

Here, a buyer was held liable for more than $9 million in damages because it declined to change its corporate structure and lose the only principal with relevant franchise experience. Had Matrix taken that radical action, it would have qualified only for the privilege of being permitted by Dunkin' to reapply for approval with no assurance the replacement principal would be acceptable. There is ample evidence that Matrix brought Krischer into the deal precisely because he had the requisite background and experience. Krischer had been a valued and successful Dunkin' employee and had significant experience operating franchise restaurants, and in 25 years had not been rejected as a franchise operator (Pl's 86, pp. 131, 161, 164, 169; also see Deft's EE p."3 of 13"). Krischer's May

May 10, 2005 letter transmitting financial information assured Dunkin' that he "will be in place as the President" (Deft's RR). Krischer was the central figure in the Matrix team from the inception.

A contract made subject to the obtaining of third party approval, which approval is granted only upon performance of conditions, is properly cancelled where the conditions cannot be satisfied, e.g., Severini v. Wallace, 13 A.D.3d 434 (2d Dep't 2004); Jim Ball v. Marong, supra; Munson v. Germerican Assoc., 224 A.D.2d 670 (2d Dep't 1996). See also, Magnolia Development Corp. v. Lockwood, 160 A.D.2d 774 (2d Dep't 1990)(buyer permitted to cancel where seller obtained only conditional subdivision approval and was unwilling or unable to fulfill conditions as to two of 22 lots). Debtors adduced no affirmative proof that Matrix could have found a replacement equity participant with the special business attributes that would have assured Dunkin's approval of Matrix and the Contract, particularly in three business days in which the Debtors demanded it be done.

The law is clear that a purchaser is not obligated to attempt to satisfy every precondition set by a third-party for approval before the purchaser may invoke its right to cancel for lack of approval. Where a condition that is unreasonable under the circumstances, performance of that condition will not be required. Thus, in Corazza v. Jacobs, 277 A.D.2d 52, 53 (1st Dep't 2000), the vendee was permitted to cancel a contract that made the sale of a co-op unit contingent upon the board's approval, where no approval was ever provided after the board attempted to "to impose an unreasonable residency requirement." In Rossi v. Simms, 119 A.D.2d 137 (1st Dep't 1986), the court noted that the plaintiff vendee had recovered his down payment after the co-op board had withheld its consent to the sale because the vendee refused to agree to a surcharge for his professional use of the apartment. In neither of these cases did the court require a demonstration that the vendee made a "best efforts" or "reasonable" attempt comply with the conditions imposed by the third-party, nor did the decisions indicate that compliance with the conditions was impossible. There was no affirmative determination

There was no affirmative determination that the vendee in <u>Corazza</u> could not have met the residency requirement, or that the vendee in <u>Rossi</u> could not have afforded to pay the demanded surcharge.

The court grossly understated the challenges Matrix would have faced had it been obligated to replace Krischer. Judge Hardin stated it was "reasonable" to demand that Matrix expel Krischer because he was a mere "hireling" who Matrix could readily replace without having to "reconstitute its very corporate essence" (Decision p. 43), and "a hired man, replaceable like any hired person" (*id.* at 44). In fact, Krischer was Matrix/ZPG's essential point man on a $26,770,000 investment in a vast network of "Dunkin'" stores, and the only team member with franchise operation experience. Krischer was no mere "hireling" and neither would his hypothetical replacement have been. Dunkin's June 8 letter stated that Dunkin' "would be willing to accept [Nelson and Nieto] if they brought in a new <u>principal</u> . . ." (emphasis added), not a new "hireling." Dunkin' required that any replacement would need to have a stake in the operation. Krischer testified that he was a principal in ZPG (6/19/06 Tr.157), the entity that applied to Dunkin' to acquire the assets (see Deft's EE).

The court itself understood that any replacement for Krischer would be given an equity interest. Thus, Judge Hardin found that Dunkin' wanted the liaison for the franchisee to be a principal, which the court declared that Matrix could satisfy "through its ZPG sub-entity" (Decision p. 43). Record support for that conclusion is not evident. The court noted that Krischer, in a May 10, 2005 email memorandum to Dunkin' said that he and the others in the group were finalizing a partnership agreement under an "Umbrella LLC." Judge Hardin found that Matrix contemplated the stores would be held in ZPG or a new special purpose entity to be 75% owned by Matrix's shareholders Nelson and Nieto and 25% by Krischer, and that Dunkin' reasonably required Matrix to find a new operations manager and compensate him with equity in the "new entity" (*id.*). Thus, Krischer was much more than a mere "hireling" and the court's rationale was based on a fallacy.

Judge Hardin thus discounted Matrix's argument that replacing Krischer would have required Matrix to "reconstitute its very corporate existence" (*id.*). Yet, as a practical matter, that was precisely what was involved: "Matrix" was its two existing shareholders, Nelson and Nieto, and its chosen franchise operations principal, Krischer. Quite obviously, the most crucial of the three to the business plan was Krischer, who was to be responsible for the active management of the 28 units. As noted, Dunkin' required a principal of the franchisee to be the operator (6/19/06 Tr. 84). Even based on Judge Hardin's own findings, the operations principal would have a 25% equity interest, albeit in a "new entity" and not in Matrix *per se* (*id.*).

To suggest that Krischer held a ministerial position at Matrix that could be filled from those scanning the "help wanted" ads trivializes the operating principal's role in this monumental undertaking. The seriousness with which Dunkin' scrutinized the Matrix/Krischer candidacy, in light of the importance to Dunkin' of the 28-unit group's success, precludes any inference that a new manager would be an easy hire -- let alone a 3-day hire -- if Matrix simply looked for one.   It is manifest that replacing Krischer was not only something Matrix could not have been expected to do easily and on absurdly short notice. It was something Matrix could not have been forced to do at all.

(c)    *The Terms of the Purported "Implied Duty" Imposed Below are Unenforceably Vague*

The court held that exercise of a cancellation right prior to exhaustion of efforts to "cure" Dunkin's rejection constituted repudiation, but the Contract nowhere defines the limits to which Matrix needed to go. The holding begs the question: what was Matrix required to do and for how long, to satisfy the "implied duty" the court imposed? It is submitted the purported "duty" is so vague and indefinite that, even if it were inferrable, it would be unenforceable as a matter of law.

As the New York Court of Appeals has instructed:

> before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves. Thus, definiteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do.

Joseph Martin, Jr. Delicatessen v. Schumacher, 52 N.Y.2d 105, 109 (1981)(citations omitted).

Especially instructive is Mocca Lounge, Inc. v. Misak, 94 A.D.2d 761 (2d Dep't 1983). Applying Martin Delicatessen, the Appellate Division held a contract to buy a business unenforceably uncertain and vague where it required the buyer to obtain a lease from the non-party landlord as a condition precedent to the sale but omitted to supply the material terms the lease would have to contain before the buyer would be obligated to accept it. The buyer prenegotiated terms with the landlord but rejected the lease as proffered because it had different terms deemed unacceptable to the buyer. The seller argued that an implied promise required the buyer to make a good faith effort to negotiate an acceptable lease within a reasonable period of time. The Mocca court held that an implied duty of good faith performance arises from "an obligation which is definite and certain" (*id.* at 763), but even where "best efforts" performance is expressly required, objective standards must be stated in the contract or be capable of being implied from the circumstances presented. The court refused to imply the terms the seller proposed as to do so "would be to impermissibly make a new contract for the parties rather than to enforce a bargain they parties themselves had reached" (*id.*).

Judge Hardin held that Matrix was bound to do *something* and, because Matrix made no efforts to replace Krischer, it breached the Contract. Mocca holds to the contrary where, as here, the nature and scope of the obligations remain wholly unstated. Did Matrix only have to *try* to replace Krischer

19

Krischer or was it bound to interview multiple candidates until it found someone Dunkin' accepted? How many candidates did it have to proffer and for how long? The Contract is silent, and the duty implied by the court does not "invite[] recourse to an objective extrinsic event, condition or standard" by which to determine how Matrix could have met its supposed performance obligations. See Joseph Martin, Jr. Delicatessen, *supra*, 52 N.Y.2d at 110.

In Timberline Development LLC v. Kronman, 263 A.D.2d 175 (1st Dep't 2000), a provision in a "stalking horse" agreement for the purchase of a bankruptcy estate's asset that "Seller shall use reasonable efforts to obtain approval from the Bankruptcy Court of the private sale to Purchaser contemplated hereby" was held insufficiently definite to permit enforcement. "In the abstract, the question of the extent of the 'reasonable effort' required from defendants to consummate the private sale is problematical," *id.* at 179. What Matrix would have had to do to satisfy the obligation implied by Judge Hardin is far more problematical.

The Decision effectively nullified the express condition ¶6.2 to Matrix' obligations because it held that Matrix was bound to do *something* to try again to gain approval, even absent criteria in the Contract and any objective way to measure whether Matrix had made its "best efforts" attempt. Even if the Contract could be found to contain an implied provision obligating Matrix to attempt to replace Krischer, such a provision would be unenforceably vague and indefinite as matter of law. Matrix cannot have breached or repudiated an "obligation" that, in reality, is no "obligation" at all.

3.    Matrix's Dissatisfaction With the Economic Aspects of the Contract is Legally Irrelevant Where Cancellation Was Proper Based Upon the Failure of the Approval Condition

Judge Hardin relied heavily upon the suggestion of an economic motive behind Matrix's cancellation. He found that "[t]he evidence makes clear that the issue for Matrix was not Krischer—it was economics" (Decision p. 44), and repeatedly cited statements of Matrix's representatives at the

June 29 hearing expressing a desire, in the court's view, to abandon the Contract regardless of whether Dunkin' were directed to accept Krischer. In essence, Judge Hardin concluded that Matrix used Dunkin's rejection as a pretext to scuttle the deal because Matrix determined that it could not make money running the stores. The Decision cites no authority for the proposition that alleged evidence of motive is germane where as here the issue is whether a party has good grounds to cancel. Ironically, at the June 29 hearing, Judge Hardin correctly rejected Debtors' counsel's attempt to adduce proof of Dunkin's improper economic motives, i.e., that Dunkin' was "trying to make sure that Matrix was turned down so that they [Dunkin'] could try to exercise any rights they have in the contract to buy the stores as cheap as possible" (Pl's 86 p. 33), holding it would be irrelevant if Dunkin' "has acted in a nefarious and skullduggerous -- if that's a word -- manner from the basest of crass, economic motives," if "they had a proper ground for turning down Matrix" (*id.* at 33-34).

To make "ulterior motive" a reason for disqualifying a party from exercising its cancellation rights would substantially vitiate the law of conditions. Parties do not elect to exercise cancellation rights where agreements are beneficial. Judge Hardin's reliance upon Matrix's dissatisfaction with the economic terms of the transaction after franchisor Dunkin' had shown Matrix that the acquisition was very likely to fail financially was reversible error on a point of law.

In Ixe Banco, S.A. v. MBNA America Bank, N.A., Slip Copy, 2008 WL 650403 (S.D.N.Y. March 7, 2008), Judge Preska recently reconfirmed that "New York courts will not examine the actual motives behind a decision to exercise" an option to terminate a contract, citing Big Apple Car, Inc. v. City of New York, 204 A.D.2d 109, 111 (1st Dep't 1994). The plaintiff alleged, similarly to the Debtors here, that the stated reason for defendants' termination (failure to obtain regulatory approvals and close by a stipulated date) was "pretextural" and that the defendants had changed their minds as to the desirability of the deal, an improper ground for termination. See *id.* at *3. Judge Preska held that

Preska held that allegations that the defendants had an "improper" motive for terminating the contract "are irrelevant to the breach of contract inquiry, including the inquiry into whether Defendants breached any covenant of good faith and fair dealing. *Triton Partners, LLC v. Prudential Secs., Inc.*, 301 A.D.2d 411, 411 (1st Dep't 2003)," 2008 WL 650403 at *7.

Similarly, in <u>Refinemet Intern. Co. v. Eastbourne  N.V.</u>, 815 F.Supp. 738, 742 (S.D.N.Y. 1993), <u>aff'd</u>, 25 F.3d 105 (2d Cir. 1994), the Second Circuit upheld Judge Sprizzo who ruled that where the defendant had a valid ground for terminating the contract, it was "legally irrelevant whether [defendant] was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract [citations omitted]."

Thus, Judge Hardin's reliance upon the legally irrelevant fact that Matrix desired to be relieved of whatever contractual obligations it may have had due to "economics" was clear error.

4.  <u>Cancellation was Proper Irrespective of Whether Other Allegedly Untenable Grounds Were Also Asserted or Whether Matrix May Not Have Performed in Any Event</u>

Closely related to the Decision's "motive" rationale is its emphasis upon the June 29 hearing statements that Matrix did not wish to go forward because of Debtors' misrepresentations as to the assets. Clearly, Judge Hardin had determined to hold Matrix in breach despite his finding that Dunkin' properly rejected Matrix, because he believed Matrix would not have performed in any case. It is respectfully submitted that Judge Hardin's rationale is <u>precisely the opposite of what the law compels</u>. Assertion of an allegedly untenable ground for cancellation does not vitiate a proper one.

*Restatement, Contracts 2d*, §255, "Effect Of A Repudiation As Excusing The Non-Occurrence Of A Condition," provides this Illustration (2) to its Comment (a):

> On February 1, A contracts to sell and B to buy a house for $50,000, B's duty being "conditional on approval by X Bank of B's pending mortgage application." On March 1, B repudiates by telling A that he will not buy the house. On March 10, the X Bank, which is unaware of

of B's repudiation, disapproves B's application on financial grounds. A has no claim against B. The non-occurrence of the condition, approval by X Bank, is not excused because B's repudiation did not contribute materially to its non-occurrence.

As applied here, Matrix's request for cancellation by its June 10 letter, which the court found constituted an anticipatory repudiation, "did not contribute materially to [the] non-occurrence" of the condition, i.e., Dunkin's approval of Matrix and the Contract. Moreover, that nonapproval predated Matrix's alleged "repudiation," having been announced in Dunkin's May 25 letter, and reiterated in its June 8 letter, thus providing an even more compelling example than that in the Restatement.

Assuming that Matrix did not have a viable fraud claim, its assertion of that ground in its June 10 cancellation letter, reasserted at the June 29 hearing, did not vitiate as an alternative ground the fact that it had been rejected by Dunkin'. Of course, Fed.R.Civ.P. 8(d)(2) expressly permits alternative pleading. A party may assert multiple, even inconsistent, theories for relief. See Henry v. Daytop Village, Inc., 42 F.3d 89, 95 (2d Cir. 1994). In sum, upon Dunkin's rejection, Matrix had no further obligations to proceed under the Contract and all other claims and considerations were moot.

## POINT II

### ASSUMING *ARGUENDO* THAT MATRIX WAS NOT ENTITLED TO CANCEL, DEBTORS WAIVED ANY ALLEGED "REPUDIATION" AND THEN WRONGFULLY DECLARED MATRIX IN DEFAULT

Only if it is concluded that Matrix was not entitled to cancel on June 10, 2005 is it even sensible to consider whether Matrix anticipatorily repudiated the Contract some time before July 21, the date the adversary proceeding was commenced. Obviously, if the Contract was cancelled on June 10, it could not be "repudiated" thereafter. While that proposition is self-evident, Judge Hardin found dispositive what Matrix did and did not do after invoking its right to cancel, leading to an unsustainable liability determination. We respectfully submit that the court's attention should more

23

properly have been focused on the actions of the <u>Debtors</u> after June 10, which manifested a rejection of Matrix's alleged "repudiation" and a reaffirmance of the Contract. For purposes of this waiver and ratification analysis <u>only</u>, it will be assumed -- contrary to the facts and law -- that Matrix was not entitled to cancel the Contract on June 10.

Judge Hardin found Matrix's June 10 letter stating "we respectfully request a cancellation" and that future negotiations would be "pointless" to have anticipatorily repudiated the Contract. The court also commented that Matrix declared its refusal to go forward at the June 29 hearing on Dunkin's rejection. In the June 10 letter, Matrix expressed its concerns and frustrations with Dunkin's rejection of Krischer and the "financial reality of the proposed transaction." (Pl's 71 ¶¶2-3). Matrix "respectfully request[ed]" both "a cancellation of the underlying Purchase and Sale Agreement…and . . . an immediate return of" the downpayment (*id.* ¶1). A mere request for a cancellation is not a repudiation, *e.g.*, <u>Rogers-Pyatt Shellac Co. v. Starr Piano Co.</u>, 212 A.D. 792 (1st Dep't 1925). If, however, the letter did constitute a repudiation and not a permitted cancellation, Debtors' counsel's June 16 letter did not treat it as one.

The June 16 letter argued against Matrix's substantive positions, but implored Matrix to refrain from taking action to cancel the Contract until Debtors obtained a ruling from Judge Hardin on their motion to compel Dunkin' to accept Matrix/Krischer. Had Debtors viewed and wished to treat Matrix's June 10 letter as a repudiation, the June 16 letter would have said so expressly and the pending motion against Dunkin' would have been withdrawn as moot. Quite obviously, it did not.

While the court ultimately treated Matrix's June 10 letter as *the* repudiation event, it also referred extensively to two statements made by Matrix representatives immediately prior to the commencement of the June 29 hearing. Both statements were made during arguments as to whether the court should hold the hearing on Dunkin's rejection of Matrix based on Krischer's unsuitability.

Matrix's co-principal Nieto explained the reason for his speaking was to apprise the court of Matrix' problems and concerns with the deal as a whole. (Pl's 86 p. 23). Nieto also stated that he may make an "official application for the return of [the] deposit" in the future (*id*. pp. 23-24) but did not do so at that hearing.  In discussing Matrix's testimony concerning its reluctance to replace Krischer, the court, at Decision p. 43, quoted from Nieto's June 21, 2005 deposition, but omitted the following response to Dunkin's counsel's question, "So you were not interested in going forward with anybody else?"  A. [Nieto]:  "I don't believe so, and it's subject to change, but I don't believe so.  Unless you know somebody who's a really good operator that you guys actually like" (Pl's 74, minuscript p. 27). These statements do not evince an unequivocal repudiation.

Even assuming that the June 10 letter manifested a clear anticipatory repudiation as Judge Hardin found, such repudiation was waived by Debtors' repeated elections to reaffirm the Contract.

A.    DEBTORS ELECTED TO WAIVE ANY ANTICIPATORY REPUDIATION

In Lucente v. International Business Machines Corp., 510 F.3d 243, 258-259 (2d Cir. 2002), cited at Decision, page 21, the Second Circuit summarized New York law pertaining to a non-repudiating party's rights, explaining that "the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit. [Citations omitted.]"  The non-repudiating party may not treat the contract "as broken and subsisting" at the same time (*id.*) "Once a party has elected a remedy for a particular breach, his choice is binding with respect to that breach and cannot be changed [citations omitted]" (*id.*) The "operative factor" in determining which election has been made "'is whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that he made an election.'

election.' *Bigda v. Fischbach Corp.,* 898 F.Supp. 1004, 1013 (S.D.N.Y.1995)" (*id.*).   Also see, Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp., 301 A.D.2d 70, 80 (1st Dep't 2002).

Judge Hardin cited Lucente for its statement that "[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty" (*supra*, at 258; Decision p.21), but failed to apply the law in the above passages that followed.  Instead, citing Asia Global Crossing, 326 B.R. at 249, the Decision declared that Matrix repudiated on June 10 and June 29 and that "[f]or their part the debtors and, subsequently, the Trustee elected to treat the Matrix Contract as terminated and commenced this adversary proceeding to enforce the debtors' rights" (Decision pp. 50-51).  Judge Hardin could not have been more wrong.

After both events cited by the court, Debtors manifested their election to proceed with the Contract, thus waiving any potential right to cancel and sue for breach based on an alleged repudiation.  As discussed below, Debtors repudiated the Contract themselves by improperly declaring that Matrix had three weeks less time to satisfy the approval condition than provided by the Contract, and by commencing this adversary proceeding 10 days prior to the closing date anticipated by the Contract, and when Matrix was not in breach.  The court's failure to so hold was clear error.

1.   Debtors, By Their Counsel's June 16, 2005 Letter, Waived Any Alleged Repudiation and Elected to Proceed Under the Contract

Debtors' response to Matrix's June 10 letter -- the alleged act of anticipatory repudiation -- was a June 16 letter from their attorney Rattet that confirmed conclusively that Debtors did not consider, or elect to hold, Matrix in immediate breach.  Quite the opposite – they sought to move forward with the Contract (Pl's 73). Nowhere in the June 16 letter did Rattet state that Debtors considered Matrix to have repudiated. Instead, Rattet argued that rejection of Krischer was not rejection of Matrix, and asserted that, if Debtors' motion to compel Dunkin's acceptance of Matrix proved unsuccessful, then

proved unsuccessful, then Matrix would be required to find a replacement for Krischer. Most significantly, Rattet declared that "*[i]f* Matrix is unwilling or unable to do so, *then* it will be in breach of contract" (*id.* at p. 1)(emphasis added). Thus, Debtors declared that, as of June 10, they did not consider Matrix to be in breach.

2.   By Continuing to Prosecute their Motion to Compel Dunkin's Acceptance of Matrix, Debtors Confirmed their Waiver of any "Repudiation" and Elected to Proceed Under the Contract

Debtors' actions in prosecuting the June 29 hearing made their election to proceed with the Contract unmistakable, despite what Judge Hardin later concluded was Matrix's anticipatory repudiation on June 10 and June 29, pre-hearing. By continuing to ask the Court to force Dunkin' to take Matrix and Krischer, Debtors treated the Contract as in full force and effect and elected to proceed toward closing. Debtors took this course of action nearly three weeks after Matrix supposedly repudiated and Rattet never mentioned the June 10 letter at the hearing.

Moreover, Rattet insisted that the June 29 hearing proceed even after the statements of Matrix's representatives that, the court later concluded, confirmed Matrix's alleged repudiation. When the court asked whether the statements made the whole proceeding "moot," Rattet had a choice. He could have said "yes, your Honor, we will commence suit against Matrix for anticipatory repudiation promptly." This would be an election of "choice (a)" under Lucente, *supra*. Instead, Rattet replied, "I don't think so, Your Honor" (Pl's 86 p.18) and, accordingly, the court held the hearing to compel Dunkin' to accept Matrix. If Debtors treated the Contract as repudiated by Matrix three weeks earlier, or even, *arguendo*, in the courtroom that day, the hearing indeed would be "moot" as Judge Hardin posited.

Thus, assuming the June 10 letter repudiated the Contract, Debtors' counsel's June 16 letter declined to accept it as such and reaffirmed the Contract. As to the statements of Matrix's

representatives at the June 29 hearing, Debtors' actions spoke louder than their words.  Debtors'

prosecution of the June 29 hearing seeking to compel Dunkin' to accept Matrix was a second

unmistakable waiver of repudiation and reaffirmance of the Contract.  Quite obviously, Debtors hoped

to succeed at the hearing so to judicially compel Dunkin' to accept Matrix and to proceed with the

Contract.  Judge Hardin surely did not hold that hearing with the expectation that Matrix would not be

entitled to proceed under the Contract if he were to rule for Debtors and against Dunkin', which would

have been the case if Matrix had already repudiated and Debtors had accepted that repudiation and

treated the Contract as terminated.  The fact that Debtors lost at the June 29 hearing does not change

the analysis. Matrix could not have been placed in a less favorable position as a result of Judge

Hardin's denial of Debtors' motion.  By the close of the June 29 hearing, any prior alleged

"repudiation" by Matrix, if there ever was one, was no longer operative.

3.      Debtors, By Their Attorney's July 5, 2005 Letter, Once Again Reaffirmed the Contract

        Having prosecuted the June 29 hearing and lost, Debtors' next move was crucial to the legal

analysis – and very telling.  Debtors' counsel wrote to Matrix on July 5, 2005, a week after the denial

of their motion to compel Dunkin' to accept Matrix (Pl's 87).   That letter, effective on receipt by

overnight delivery on July 6 (Contract ¶9.4) notified Matrix that it had an "opportunity to close on the

transaction," that Dunkin's June 8 letter and the events at the June 29 hearing "invite[] Matrix to

replace Mr. Krischer," and warned that if Matrix "fails to avail itself of the opportunity to replace Mr.

Krischer, and to identify such replacement to this office and counsel to Dunkin' Donuts by or before

the close of business on July 11, 2005," Debtors would sue Matrix for "the deposit of $2.4 million . . .

and for judgment for the balance of the purchase price, less any credits to which you are entitled

pursuant to Paragraphs 3.14 and 3.15 of the [Contract] . . . ."  There can be no dispute that this letter

further evidenced Debtors' election to proceed under the Contract and close with Matrix.

Thus, for at least the <u>third</u> time following any so-called "repudiation", Debtors had clearly manifested their election not to accept any alleged "repudiation" and to go ahead with the Contract. As the Second Circuit instructed in <u>Lucente</u>, *supra*, once the non-repudiating party elects to treat a contract as subsisting, rather than as broken, it is bound by that election. Thus, even assuming Matrix had repudiated by its June 10 letter or June 29 statements to Judge Hardin, Debtors, by demanding that Matrix perform, clearly elected to waive that repudiation, and were bound by that election.

B.    HAVING WAIVED ANY ANTICIPATORY REPUDIATION BY MATRIX, DEBTORS' UNAUTHORIZED DECLARATION OF A 5-DAY DEADLINE FOR MATRIX TO REPLACE ITS OPERATIONS PRINCIPAL WAS PATENTLY UNREASONABLE

Debtors' July 5 letter (Pl's 87) asserted that Dunkin's June 8 letter and the results of the June 29 hearing offered Matrix an opportunity to close under the Contract without Krischer. The July 5 letter demanded that Matrix present a substitute for Krischer within only five days or be sued, even though the Contract set July 31, 2005 as the deadline for court approval of a sale of Debtors' assets (Contract ¶6.3), three weeks later than Debtors' deadline.

Debtors having elected to proceed by demand letter, Matrix was at least entitled to a reasonable time in which to perform, not three business days. As the Second Circuit, applying New York law, has stated, "'[r]easonable time' is a term of art with well-developed implications in the law. What constitutes a reasonable time necessarily depends upon the nature, purpose, and circumstances of each case [citations omitted]," <u>Alaska Textile Co. v. Chase Manhattan Bank</u>, 982 F.2d 813, 823 (2d Cir.1992). Five days was patently insufficient to find a substitute operations manager with the experience, and willingness to operate this chain within a chain. For Matrix, a $26,770,000 investment was at stake; for Dunkin', its reputation in a large market was at stake. A successful candidate for the Krischer position would need to satisfy Matrix and Dunkin' and reach an acceptable financial arrangement with Matrix.

To state the obvious, the Debtors knew no replacement could be found, informed, "vetted," and hired in five days, particularly where a Saturday and Sunday were part of the allotted time. In Klein v. Opert, 218 A.D.2d 784, 786 (2d Dep't 1995), the purchaser's refusal to provide the sellers with a reasonable time to obtain certificates and permits (28 days was given), knowing they could not be obtained by the law date, "was tantamount to an anticipatory breach [citations omitted]."

Debtors' declaration of a 5-day period to replace Krischer was premature and a repudiation of the Contract by the Debtors. As any alleged repudiation by Matrix was waived in favor of setting a date for Matrix's performance (e.g., Hegner v. Reed, 2 A.D.3d 683, 684-685 (2d Dep't 2003)), Matrix was at least entitled to the opportunity perform according to the Contract's terms. Moreover, Debtors' acceleration of the date for Matrix to satisfy this condition or be held in default contravened the New York rule that no law date may be declared until the contract closing date has passed, e.g., North Triphammer Dev. Corp. v. Ithaca Associates, 704 F.Supp. 422, 430 (S.D.N.Y. 1989); Baltic v. Rossi, 289 A.D.2d 430 (2d Dep't 2001)("plaintiffs were not entitled to declare that time was of the essence before the date set forth in the contract"). The July 5 letter could not accelerate any portion of Matrix's time for performance, and constituted a repudiation of the Contract by Debtors relieving Matrix of any further obligations.

C.    AS OF THE DATE DEBTORS COMMENCED THEIR ADVERSARY PROCEEDING, MATRIX WAS NOT IN BREACH OF THE CONTRACT

The record shows that after Judge Hardin's June 29, 2005 denial of Debtors' motion to compel Dunkin's approval of Matrix, through and including July 21, 2005 when this adversary proceeding was filed, Matrix did not repudiate the Contract. As discussed above, Matrix's noncompliance with Debtors' counsel's unauthorized demand to replace Krischer on five days' notice was entirely proper and, a fortiori, not some manner of implied anticipatory repudiation. Accordingly, irrespective of

Accordingly, irrespective of what Matrix might have expressed at or prior to the June 29 hearing, on July 25 when this proceeding was commenced, Matrix either had never repudiated the Contract or had not "re-repudiated" after Debtors had wiped clean the proverbial slate by seeking to hold Matrix to the Contract. In either case, Matrix was not in breach when Debtors sued. The claims Debtors asserted were not ripe and were insufficient as a matter of law.

Indeed, when Debtors commenced this baseless proceeding, after an absurd 5-day demand for performance, before the Contract's time for performance, and in the absence of any "law date," Debtors anticipatorily repudiated the Contract as a matter of law, relieving Matrix of any remaining executory obligations. See, *e.g.*, Gonzalez v. Norrito, 256 A.D.2d 440 (2d Dep't 1998)(vendee recovered downpayment where vendor wrongfully declared default).

## POINT III

### DEBTORS FAILED TO MEET THEIR BURDEN TO PLEAD AND PROVE THEIR OWN ABILITY TO PERFORM

Judge Hardin characterized as a "basic misconception" (Decision p. 29) Matrix's assertion that Debtors did not satisfy conditions precedent and thus could not prove that Matrix breached. The court declared that "a breach of contract by one party that precludes performance by the counter-party relieves the counter-party of its obligation to perform, or to prove that it could have performed where, as here, it cannot be known whether performance would have been possible" (*id.*).

As discussed below and as Chief Bankruptcy Judge Bernstein held in a December, 2007 decision in Asia Global Crossing, Judge Hardin's statement of the law on this issue was not only wrong, the law is the opposite of what Judge Hardin stated! A party seeking consequential (as opposed to liquidated rescissionary) damages for anticipatory repudiation, while not obliged to tender performance, must plead and prove it is ready, willing and able to perform as part of its *prima facie*

*facie* case. Judge Hardin's holding that a plaintiff is relieved of that burden where the breach prevents performance is also erroneous; the only consequence of Matrix's alleged repudiation was that Debtors did not receive the purchase price in contemporaneous exchange for assets Debtors concededly could not deliver in full.

Debtors did not plead that they were ready, willing and able to perform, and the trial proof established, and Judge Hardin found, that "the only assets which the debtors arguably were unable to deliver in accordance with their obligations under the Contract were lease extensions for two of the stores referred to in Section 3.13 of the Contract, 53 Spencer Place and 195 East 161 Street . . ., a lease extension to September 2013 for 2620-1/2 Central Park Avenue . . ., and the lease for one of the three shops not yet opened . . ." (Decision p.35). The characterization of these three leases as the "only" undeliverable assets notwithstanding -- ignoring Debtors' inability to deliver essential documents for the commissary/bakery and stores at 200 Westchester Ave. and 987-A Central Park Ave.[3], among others -- the court properly understood that, indeed, these three leases were not within Debtors' possession. Thus, the complaint should have been dismissed for failure to plead and sustain the burden to prove a *prima facie* case for damages from an anticipatory breach.

A.    THE BANKRUPTCY COURT MISAPPLIED NEW YORK LAW IN RELIEVING THE DEBTORS OF THEIR OBLIGATION TO DEMONSTRATE THAT THEY WOULD HAVE BEEN READY, WILLING AND ABLE TO PERFORM

Judge Hardin relied on Asia Global Crossing, 326 B.R. 240, 249 (Bankr.S.D.N.Y. 2005), a summary judgment decision, for the inapposite proposition that anticipatory repudiation relieves the non-breaching party from the obligation to *tender* its own performance (Decision p. 23). The court overlooked, however, the relevant holding at pages 249-250 of that same decision: "[t]o recover

---

3  The Trustee ultimately rejected the leases for these unopened stores, which were not delivered to TBG (see Decision p. 33) and for which, improperly, Matrix was given no credit in the calculation of damages.

damages, however, the non-breaching party must also show that he was ready, willing and able to perform his own obligations but for the repudiation [citations omitted]." Also see, *id.* at 257. The issue here is not "tender". It is the elements of a *prima facie* damages case.

In December, 2007, in the decision after trial in that same bankruptcy case, Chief Judge Bernstein disapproved and declined to follow Judge Hardin's subject Decision on this precise point. See, Asia Global Crossing, 379 BR. 490, 496 (Bankr. S.D.N.Y. 2007). Chief Judge Bernstein's thorough analysis of the elements and burden of proof in an anticipatory repudiation damages claim confirms that under New York law the plaintiff's readiness, willingness and ability to perform is an essential element of the claim, following Record Club of Am., Inc. v. United Artists Records, Inc., 890 F.2d 1264, 1275 (2d Cir.1989).

Chief Judge Bernstein distinguished the cases relied upon by the seller in Asia Global Crossing, one of which was Judge Hardin's Decision here. The Chief Judge emphatically disagreed with the proposition that the nonrepudiating party may recover damages without proving it was ready, willing or able to perform, declaring "[t]he Court has considered these authorities, concludes that they do not accurately reflect the law of New York, and adheres to its earlier determination," 379 B.R. at 497. Specifically disapproving Judge Hardin's Decision, the Chief Judge observed:

> . . . while *Food Mgmt.* did state that the non-repudiating party need not prove its ability to perform, it relied on *G.G.F. Props., LLC v. Yu Mi Hong*, 284 A.D.2d 427 (N.Y.App.Div.2001) as its only support. See *Food Mgmt.*, 372 B.R. at 191. *G.G.F.* does not, however, support this proposition. In that case, the buyer of condominium units sued the seller for specific performance. . . . Neither the seller nor the seller's agent were seeking damages on account of the buyers repudiation; the seller was merely seeking relief from the duty to perform. As noted above, the aggrieved party can stop performance without regard to whether it was ready, willing and able.

Asia Global Crossing, 379 BR. 490, 498.

The seller in <u>Asia Global Crossing</u> was required to show that it was ready, willing and able to perform and failed to carry that burden. Chief Judge Bernstein's analysis makes clear that, in damages cases like this one, unlike in rescissionary cases seeking refunds of a downpayment (such as Matrix's counterclaim), plaintiffs must prove their ability to perform. Judge Hardin's reversal of the burdens of proof suggests a failure to distinguish between the non-repudiating party's burden of continued performance (which is excused by anticipatory repudiation) and the non-repudiating party's burden to prove ability to have performed (which is <u>not excused</u> in a damages case).

Here, Debtors failed to carry their burden. The complaint does not allege that Debtors were ready, willing and able to perform their own obligations had Matrix proceeded to closing, nor did they prove they were ready, willing and able to close pursuant to the Contract. It is undisputed that they could not deliver what they promised, including the three leases identified by the court.

## B.  MATRIX'S PURPORTED REPUDIATION WAS NOT THE REASON DEBTORS WERE UNABLE TO PERFORM

In excusing Debtors' inability to deliver the mentioned three contracted-for assets, the court held that Matrix's so-called repudiation "foreclosed the future and precluded the debtors from obtaining lease extensions for these three shops," where the repudiation "deprived the debtors . . . of literally millions of dollars in excess of the amount necessary to pay all creditors in full [footnote omitted]" (Decision p. 35).  The court speculated that said excess could have been used to negotiate with the landlords "if the alternative were to lose a $26.77 million Contract" (*id.*). The court cited the cynical expression "money talks" and to "blandishments of money" while engaging in admitted "speculation" that the assets might have been made available (*id.* p. 24). Judge Hardin held, '[a]s a matter of law, the debtors were relieved of their obligation to prove that they had the ability to obtain these three lease extensions, because Matrix' repudiation deprived the debtors of that ability" (*id.*).

Apart from being wrong on the law, these passages contain three important concessions: (1) the Contract would indeed be "lost" if Debtors could not deliver the leases they promised (a correct conclusion diametrically opposed to the remainder of the Decision, which proceeds on the theory that none of the Debtors' failures could have undermined the Contract because they were either disclaimed, divisible, or excusable); (2) the court could merely speculate as to whether Debtors could ever have performed; and (3) as a general proposition, the law required Debtors to prove their ability to perform (contrary to the court's holding that was disapproved in <u>Asia Global Crossing</u>).

Judge Hardin relieved Debtors of that burden based on a finding that Matrix had agreed to so overpay for the assets that the closing would have generated a substantial surplus that could have been used to entice the three landlords with exorbitant offers to grant Debtors the lease extensions they did not have and would have been unable to deliver to Matrix.  The holding placed the proverbial cart before the horse by allocating some nonquantified sales proceeds for what may be referred to euphemistically as "incentivizing" three separate landlords to grant lease extensions.  However, those extensions are assets that Debtors were required to deliver at the closing <u>concurrently with the receipt of the payment from Matrix</u>.  An Assignment of Leases, as well as copies of all of the "Shops'" leases and licenses then in effect, are among the documents <u>expressly required to be delivered by "Seller" at the closing</u> (Contract ¶2(c) and (d)), not at some unspecified time thereafter.  Matrix was not required to pay for assets then hope that the seller Debtors could take the closing proceeds and try to negotiate lease extensions to deliver at some unspecified later date.  The court's acknowledgement that Debtors could not perform without Matrix's payment in the first instance concedes that Debtors could not have closed at all.

The situation imagined by Judge Hardin is fundamentally different from the familiar closing wherein portions of the purchase price are used to pay off mortgages and other liens and to compel

their satisfaction of record. See, *e.g.*, Ziehen v. Smith, 148 N.Y. 558, 562 (1896). This is not the case here, which involves promised bilateral agreements dependent upon non-parties over which the vendor may have influence but not control. This case does not involve clearing encumbrances but sellers' lack of ownership of assets they warranted they owned and contracted to deliver at closing.

Highly instructive is the New York Court of Appeals' ruling in Greene v. Barrett, Nephews & Co., 238 N.Y. 207 (1924), in which a vendee recovered his downpayment for the purchase of a business and its assets, including leases, where the vendor had tendered lease assignments at closing without obtaining the required consent of various landlords. This infirmity deprived the vendee of the good title to which he was entitled. In view of the purpose of the whole transaction, the defect was held to be material. The court distinguished Ziehen, *supra*, on the grounds that the vendor did not have "the power to obtain this consent. The landlord may or may not give it," *id.* at 211.

Here, as in Greene, the seller of a business that included among its essential assets certain leases was unable to convey good title to all the contracted-for leases. In both cases the vendor lacked power to cure, because the cure would require the consent of landlords who "may or may not give it." While a greater percentage of the leases in Greene suffered from infirmities than here, the "infirmity" affecting these leases was immeasurably more severe, where the assets could not be delivered at all. Greene dispenses with the argument that Debtors' inability to produce the bargained for leases was curable once Matrix's purchase funds were in Debtors' or the Trustee's hands.

Moreover, Judge Hardin's rationale that Debtors' ability to perform depended upon Matrix's payment of enough to generate a large surplus is completely untenable. What if a landlord: (a) did not want a Dunkin' tenancy due to its poor performance under the prior lease; (b) wished to lease to a competitor or another user; (c) wanted to sell the property free and clear of leases; (d) wanted to seek

a re-zoning; or (e) wanted an outrageous sum and onerous new terms in order to extend?  Of course, there are many other reasons why a landlord may not wish to extend a bankrupt tenant's lease.

It was speculative in the extreme to find "it appears more likely than not that the Trustee could have negotiated lease extensions" (Decision p.35) as a predicate for a $9.1 million damages award. Judge Hardin acknowledged that "[o]f course, that is speculation and one cannot know now whether the debtors could have delivered all the lease extensions" (*id*. p.24).  The failure to adduce proof that the extensions were in fact obtainable is chargeable to Debtors who, as discussed, had the burden of pleading and proving their ability to perform.  Their failure of proof was total.

### POINT IV

### DEBTORS FAILED TO PROVE THE EXISTENCE OF A COMPLETE CONTRACT BINDING ON MATRIX

Under New York law it is settled that a contract's terms must be set out in sufficient detail that the parties' intentions may be ascertained with reasonable certainty and that "[e]ven where the parties 'believe that they are bound, if the terms of the agreement are so vague and indefinite that there is ... no means by which such terms may be made certain, then there is no enforceable contract.' [Citation omitted]," Time, Inc. v. Kastner, 972 F.Supp. 236, 239 (S.D.N.Y. 1997)(Baer, J.).

The so-called Contract is incomplete and fails to set forth material terms: it is indefinite as to the parties, and Matrix did not sign it; it refers to exhibits setting out material terms that are not identified or annexed, despite express references to their incorporation[4]; and it contemplated the

---

4 The Contract (Pl's 15) refers to four material exhibits that were never annexed. Contract ¶1.2, entitled "Assets To Be Sold Hereunder," purports to set forth the assets being purchased. Section ¶1.2(a) provides that Purchaser will acquire "franchise rights" and purports to delineate those rights by way of "those agreements identified in Exhibit __ attached hereto." Section¶1.2(b) refers to "operating supplies, uniforms, promotional material...as provided for in the attached appraisal annexed hereto as Exhibit __." Contract ¶2 purports to set forth the documents Debtors must deliver at closing.  Paragraph 2(b) provides that Seller would deliver franchise documents "in the form and substance set forth in Exhibit __." Under ¶2(a), Seller was to deliver a bill of sale for the assets "in the form, and of the substance, set forth in Exhibit __ attached hereto."

parties' execution of the Dunkin' Rider (Deft's Q), which never occurred. Completion and execution of the Rider was mandated by Dunkin' as a condition of any approval of the Contract.

Judge Hardin rejected Matrix's argument that the Contract failed because the Dunkin' Rider was never executed (Decision p. 44). But, in bold letters on the first page of the draft Rider itself, the Rider states that Dunkin's approval of the transaction was conditioned upon "Seller and Buyer executing this Rider." In fact, Dunkin' mandated that its Rider be incorporated into the Contract itself, its terms prevailing in the event of conflicts:

> ONCE EXECUTED, THIS RIDER CONSTITUTES A PART OF YOUR CONTRACT FOR SALE, AND IT MAY CONTAIN PROVISIONS THAT CONTRADICT A PROVISION IN THE CONTRACT FOR SALE. IN THE EVENT OF ANY CONFLICT BETWEEN ANY TERM IN THIS RIDER AND ANY TERM IN THE CONTRACT FOR SALE OR THE SELLER'S FRANCHISE AGREEMENT, (AND LEASE WITH US IF APPLICABLE), THIS RIDER SHALL BE DEEMED TO CONTROL.

Deft's Q, p.1, §1.1.

At trial, Dunkin' confirmed the Rider was an absolute pre-condition to Dunkin's approval (6/19/06 Tr. 85-86 (D72); 6/20/06 Tr. 11-12 (D82)). It is undisputed that neither side executed it. Testifying for Debtors, Joseph Corneu admitted he never finished assembling the information required pursuant to the Rider and stopped working towards its execution (6/20/06 Tr. 195-196). Judge Hardin found "the Rider was never put into final form or executed" (Decision p. 47 fn.9). Thus, the undisputed facts establish there was no meeting of the minds on this essential agreement.

Judge Hardin found the non-execution of the Rider was "rendered moot by Dunkin' Donuts actual approval of Matrix" subject to its replacing Krischer (Decision p. 44). In addition to being based on a false premise, this statement misapprehends the approval condition. Even if Dunkin' had "approved" Matrix, such approval was but one element of approving the Contract (see Contract ¶6.2).

¶6.2). Another was the full execution of the Rider, without which there was no possibility of obtaining Dunkin's approval.

The Contract should have been held unenforceable as against non-signatory Matrix. The signature block for "Purchaser" names "ZPG Restaurant Associates," for which Nelson signed as "Managing Member." The Contract's only reference to Matrix is in the introductory paragraph, where a person not identified below crossed out "ZPG Restaurant Associates, LLC" as purchaser, and inserted "Matrix Realty Group Inc. and/or its affiliates." The evidence at trial established that the principals intended ZPG, or an entity to be formed (Deft's RR; 6/19/06 Tr. 221-226 (D73)), to own and operate the franchises. That alone should preclude liability against non-signatory Matrix.

### POINT V

### SIGNIFICANT ASSETS PROMISED TO BE SOLD TO MATRIX WERE NEVER AVAILABLE, RENDERING DEBTORS' WARRANTY OF TITLE FRAUDULENT AND THEIR PERFORMANCE IMPOSSIBLE

At ¶3.4 of the Contract, the Debtors, i.e., "Seller", warranted that "SELLER has and shall continue, to have, through the CLOSING DATE, good and marketable title to all of the ASSETS, which ASSETS are to be sold hereunder to PURCHASER free and clear of all liens, claims, interests and encumbrances of third parties of any kind." Based even on the facts as found by Judge Hardin, it is indisputable that the Debtors' express warranty was and remained false where there were misrepresentations in the Offering Memorandum regarding the availability of leases and extensions. Matrix, which maintains Debtors' inability to perform was even more substantial, was fully justified in its belief, asserted in its June 10, 2005 cancellation letter, that it had been fraudulently induced to sign the Contract. It is indisputable that Debtors could not convey all of what they contracted to sell.

The Decision acknowledged that Matrix articulated three misrepresentations: that a lease extension was in place to 2013 for the store at 2620-1/2 Central Park Ave., that Debtors had a leasehold interest in 307 S. Broadway (the "Taco Bell location"), and that Debtors omitted disclosure that a permit was denied for building an unopened shop at 987-A Central Park Ave. (Decision p. 45). The Decision further acknowledged that the Offering Memorandum Ex. E chart did erroneously list 2620-1/2 as having an extension in place to 9/30/13 when it was only month-to-month, and that 307 S. Broadway had an extension to 10/31/23 where there was none (*id.* p.45). The court afforded no significance to these falsities, and commented that, regarding 307 S. Broadway, the estate owned the "valuable right to a Franchise Agreement," faulting Matrix for not negotiating for relocation. The fact remains that Debtors' express representation and warranty at Contract ¶3.4 that they had, and would have at closing, free and clear title to all assets was false when made as to these three stores. Moreover, as noted, Debtors could not deliver to Matrix or even to TBG, and the Trustee ultimately rejected the leases for, the unopened stores at 200 Westchester Ave. and 987-A Central Park Ave.

Debtors were also incapable of conveying essential documents for the bakery/commissary, which supplies the baked goods for the stores. Debtors were required to produce a Commissary Production License Agreement ("CPL") and a Certificate of Occupancy ("CO") for the bakery/commissary as provided in Contract ¶4.5. These conditions and all others under the franchise agreement and Settlement Agreement (Pl's 1) not specifically referred to in Dunkin's June 8 letter were never waived, and the CPL never existed as Dunkin' confirmed (6/19/06 Tr.99-100; 6/20/06 Tr.34), and as the Trustee acknowledged (6/16/06 Tr.159–160). The court ruled that the Trustee's inability to deliver these items at the time of the alleged breach (i.e., June 10, 2005) did not release Matrix, but even as of the trial date Debtors remained unable to deliver these items to ultimate purchaser TBG (6/16/06 Tr.61). The Trustee testified regarding the need for the CO, required under

the 2002 Settlement (6/16/06 Tr.158-159). No CO was ever produced or offered as evidence by the Trustee. It is undisputed that the Trustee had not obtained the CPL more than a year after the closing should have occurred!!

It is no answer that Debtors' misrepresentations did not pertain to every store. No authority holds that a contract containing misrepresentations must be salvaged for the benefit of the misrepresenting party by forcing the innocent party to take the non-infected portion against its will. Matrix was well within its rights to cancel the $26,770,000 contract where Debtors misrepresented their ability to convey 11% of the store locations and the bakery/commissary.

To get around Debtors' inability to fully perform, Judge Hardin performed "elective surgery" and carved out the offending portions, invoking the law of divisibility of contracts. It is submitted that the court misapplied the applicable rules, resulting in a massive damages judgment against a purchaser misled into believing that it was buying more than the sellers had the ability to deliver.

"There is a presumption against finding a contract divisible [citations omitted], unless divisibility is expressly stated in the contract itself [citation omitted], or the intent of the parties to treat the contract as divisible is otherwise clearly manifested [citation omitted]," Williston, Contracts (4th Ed.) §45:4. "The rationale," Prof. Williston explains, "is that without clear support in the contract document and in the intent of the parties, a contract that is written as a unitary package should not be severed into parts in order to favor the breaching party [citing Stone Forest Industries, Inc. v. U.S., 973 F.2d 1548 (Fed Cir. 1992), and one other]" (id.). Where the terms of the contract are given, whether the contract is divisible or not presents a question of law, Anheuser-Busch Ice & Cold Storage Co. v. Reynolds, 221 A.D. 174, 173 (1st Dep't 1927), following Tipton v. Feitner, 20 N.Y. 423 (1859). "Generally, a contract will not be regarded as severable unless (1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be

of each pair can be treated as agreed equivalents. [citations omitted]," <u>Ginett v. Computer Task Group, Inc.</u>, 962 F.2d 1085, 1098 (2d Cir. 1992).

Reversing the presumption, the court held the Contract divisible, excusing Debtors' inability to perform. The court found the Contract was divisible because it involved 24 "separate parcels of real estate" (Decision p. 31) that could be independently valued. In fact, the Contract was for the purchase of a network of 27 franchised stores with valid leases, with a bakery/commissary that supplied them. This was not an "*a la carte*" offering, purchased for its constituent parts, but a chain within the Dunkin' chain with anticipated economies of scale resulting from its operation as such.

The Contract was one for the purchase of Debtors' "ASSETS" for a unitary "PURCHASE PRICE" subject only to specified "adjustments as herein provided" (*id.* ¶1.6). No allocation was bargained for or stated. "[A] contract is generally considered entire and indivisible where it provides for the payment of a lump or gross sum in a certain specified amount [citing <u>Tibbetts Contracting Corp. v. O&E Contracting Co.</u>, 15 N.Y.2d 324 (1965), among others], whatever the number or variety of items embraced [citation omitted]," Williston, <u>Contracts</u> (4th Ed.) §45:7.

Nor do the Contract's contemplated "adjustments" change the analysis, where only two of the "Assets" were specified as potentially excludable (see ¶¶3.14, 3.15). Rather than indicating that the parties contemplated a store-by-store transaction, the inclusion of these specific provisions precluded any inference that <u>unspecified</u> Assets could be carved out. The nonexistent lease extensions and leasehold identified below as misrepresentations articulated by Matrix <u>are not covered by these provisions</u>. The Contract was not divisible as a matter of law. The court erred in holding otherwise.

In Debtors' own May 23, 2005 motion "To Approve: (1) Sale of Substantially All of the Debtors' Business Assets; And (2) Ancillary Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to Matrix . . ." (Pl's 61), they declared that the December, 2004 asset

42

asset transfer order with the "Gus Companies'" had "resulted in a <u>unified platform</u> of assets to be sold as going concerns . . . " (*id.*, Application p. 3 ¶9)(emphasis supplied).  Dunkin' also understood the contract as entire, not divisible.  Bode testified that the deal was Dunkin's largest "block transfer" to an outsider in New York (6/19/06 Tr. 84).

Judge Hardin "reasoned" that, since the Debtors were of bad character and the deal was risky, the parties somehow contemplated "the likelihood of part performance" (Decision p. 30).   Quite a reward to Debtors for their bad character.  The inference was devoid of logic or legal authority.  The court also placed major emphasis upon the fact that on April 27, 2005, after the Contract was executed, Dunkin' (not Debtors) asked Krischer to prepare a "breakout" of the Contract's purchase price on a store-by-store basis.  The "breakout" was to be part of the Rider that was never finalized.  It was solely for Dunkin's benefit, not an expression of intended "divisibility."

Closely related is the court's flawed analysis in rejecting Matrix's defense asserting impossibility, based on the discovered inability of Debtors to convey all that they contracted to sell. The court stated that the defense was reserved for extraordinary circumstances not present here, and elaborated that Matrix accepted the risk of an "as is" purchase from bankrupt estate and it was not unforeseeable that Debtors could not deliver two of four stores mentioned in Contract ¶3.13.  In its obvious effort to hold Matrix in breach, the court offered rationales that directly contradicted other holdings.  Thus, the unexecuted Dunkin' Rider (execution of which was excused by the court) was a precondition to an approved Contract and precluded "as is" sales.  Finally, Matrix cannot be charged with "foreseeing" that Debtors were lying in their express warranty of ownership.

Straining to find a reason to hold Matrix liable while conceding implicitly that Matrix was correct that part of the Contract was not performable, Judge Hardin declared that "the vast majority of the Contract still could be performed" and that the Debtors "could have performed the substantial

majority of the Contract" (Decision p. 49).  No authority was cited for the untenable "substantial majority is good enough" proposition.  Moreover, generalized, nonspecific disclaimers, as here, do not preclude a fraud claim under New York law, *e.g.*, George v. Lumbrazo, 184 A.D.2d 1050 (4th Dep't 1992). Also see, Sabo v. Delman, 3 N.Y.2d 155 (1957).  Here, Matrix was justified in relying on Debtors' express warranty of title in ¶3.4, which proved materially false.

### POINT VI

### THE DECEMBER 15, 2005 ORDERS NULLIFIED THE CONTRACT

On November 18, 2005, in connection with obtaining approval of the sale of most of the "Assets" to TBG, the Trustee moved for an order, *inter alia*, "Determining Contracts With Two Other Potential Buyers Be Deemed Null and Void" (Deft's AA, p.1).  In her papers, the Trustee declared: "this deal [with Matrix] ultimately failed for reasons involving one of Matrix's principals, which resulted in Dunkin' Donuts not approving Matrix as a franchisee, then conditionally approving Matrix based upon the condition precedent of replacing its proposed COO" (*id.* ¶37).  In ¶45, the Trustee stated that "the agreements entered between the Debtors and each of Matrix and Borek [i.e., 64 East], respectively, terminated upon their own terms by virtue of failing to meet a condition precedent: Dunkin' Donuts approval, and in the case of Matrix, also by its withdrawal.  The Trustee thus seeks to obtain an order deeming said contracts null and void."

The court issued two orders on December 15 granting the Trustee's November 18 motion. One was an Approval Order in which Judge Hardin declared that "[t]he Motion is granted in its entirety . . ." and that the "terms and provisions of this Approval Order are binding in all respect upon the Trustee . . ." (Main Case Docket No. 519, p. 8); Judge Hardin's liability Decision neglected to mention that order or these provisions.  The other December 15 order specifically granted the prong of the Trustee's motion nullifying and voiding the Contract.

Based on the granting of the Trustee's nullification motion, Matrix argued that the Contract was void based on the granting of the motion and the representations made by the Trustee in support that conceded the termination of the Contract upon Dunkin's failure to approve Matrix (D62)(previously raised in support of Matrix's motion for summary judgment (D23)).  Judge Hardin denied the motion at pages 50-51 of the Decision, disparaging the argument as "chutzpah" and declaring that the nullification order "did no more nor less than what common law recognizes as the consequence of an anticipatory repudiation" (*id.* at 50).  However, that order predated the liability trial by months and the Decision by more than a year and a half (see Point VII, *infra*).

The plain meaning of "null and void" precludes enforcement of the nullified Contract. Had the court intended the nullification to pertain to prospective obligations only, it should have said so.  The court, and the Trustee who made the motion, were well aware of the pending adversary proceeding to declare the Contract repudiated.  Indeed, as noted, the Trustee had declared in her motion that the Matrix Contract "terminated . . . by virtue of failing to meet a condition precedent."  Also see Point I, *supra*.  Moreover, having thus argued in support of her successful motion to have the Contract declared null and void, the Trustee was judicially estopped from taking a contrary position with Matrix at trial. Judicial estoppel applies where, as here, a party successfully argued an inconsistent position in an earlier proceeding, *e.g.*, Bridgeway Corp. v. Citibank, 201 F.3d 134, 141 (2d Cir. 2000). It keeps litigants from playing "fast and loose" with the courts.  Young v. United States Dep't of Justice, 882 F.2d 633, 639 (2d Cir. 1989).  By the granting of the Trustee's nullification motion, the Trustee and the Debtors' estate that she represented were precluded from arguing that the Contract that, as she represented, had been terminated for failure of performance of a condition precedent, was enforceable against Matrix.  Matrix's motion should have been granted, which would have reversed the outcome at trial.

45

## POINT VII

## DENIAL OF MATRIX'S MOTION FOR RECUSAL WAS AN ABUSE OF DISCRETION

The central issue at the liability trial was whether Matrix had anticipatorily repudiated the Contract. However, Judge Hardin revealed repeatedly that he had predetermined that issue against Matrix long before then.  Prior to trial, Matrix moved to have Judge Hardin recuse himself on the principal ground that he had prejudged the merits.  At the November 23, 2005 conference in Matrix's absence, Justice Hardin opined in open court that the Trustee's proposed settlement refunding Matrix's downpayment would be "capitulating" in a case in which repudiation was clear, and that he "could foresee creditors objecting to the settlement and requiring a full illumination given the particular facts here involving Matrix' repudiation of the agreement" (Deft's G p. 38).  Moreover, the grounds Judge Hardin stated for denying Matrix's motion based on the nullification order confirm he had concluded before trial that Matrix anticipatorily repudiated: that order "did no more nor less than what common law recognizes as the consequence of an anticipatory repudiation" (Decision p. 50).  Thus, months before trial and a year and seven months before the Decision, Judge Hardin was on record as having decided against Matrix.

Further grounds for recusal are found in the court's denial of the Trustee's Bankruptcy Rule 9019 motion.  The Trustee advised Judge Hardin that she had reached a settlement with Matrix whereby the Trustee would return the Contract deposit and Matrix's counterclaim to recover the downpayment would be dropped (Deft's G pp. 37-38), i.e., a mutual "walk away" restoring the parties to the positions they had before the Contract was executed.  The court directed the Trustee to proceed by formal motion, which was denied by order of March 10, 2006 without explanation (Main Case No. 633; Ex. H to Notice of Appeal), despite the court's knowledge that the Trustee had refunded 64 East's $2,100,000 deposit after being disapproved by Dunkin' (see Deft's NN p. 2).

It is respectfully urged that denial of the Trustee's motion was an abuse of discretion and showed the Court's obvious bias against Matrix. The Second Circuit has set forth seven "interrelated factors" to be weighed upon a Rule 9019 motion.  See, In re Iridium Operating LLC, 478 F.3d 452 (2d Cir. 2005)(citations omitted).  The court's summary denial reveals no weighing of these "interrelated factors."  Instead, it suggests a predisposition to permit the creditors and Debtors to profit from the Matrix principals' gullibility in offering a grossly inflated purchase price for assets that, to a material extent, could not even be delivered.  If Judge Hardin considered the litigation's "probability of success," the record indicates he did so based on a premature determination against Matrix, which warranted recusal and deprived Matrix of a fair trial.  Indeed, having rejected the proposed settlement, the outcome of the liability trial became even more of a foregone conclusion, as a decision in Matrix's favor would have required Judge Hardin to acknowledge his error in disapproving the settlement. This, we submit, is not the "weighing" Iridium contemplated. The court's predetermination against Matrix and the fact that fewer of the assets were being sold to TBG for millions of dollars less than the Contract price led the court to view this litigation as a multi-million dollar estate asset instead of a potential $0 asset as correctly perceived by the Trustee.

In his June 14, 2006 order denying recusal (D59), Judge Hardin dismissed Matrix's contentions that he had prejudged the case, yet again declared that there could be no dispute that Matrix had repudiated, having made "unambiguous and unequivocal" statements at the June 29 hearing that constituted anticipatory repudiation. Judge Hardin asserted that he maintained an "open mind," yet offered as justification for declining to recuse himself the fact that he had already decided Debtors' *prima facie* case in their favor, months before the liability trial.

The court's general hostility towards Matrix was palpable. Judge Hardin described Dunkin's June 8 letter as approving everything about Matrix except "a confessed felon as operating manager"

(Decision p. 42). Of course, Krischer never "confessed" to being "a felon" and there is no suggestion on this record that he was ever charged with any felony.  At page 51, Judge Hardin gratuitously characterized Matrix's argument based on the Trustee's successful motion to nullify the Contract as "the highest level of *chutzpah* in legal advocacy." In the order denying the recusal motion itself, Judge Hardin chided Matrix and its counsel, calling the claims of bias or partiality "baseless and reprehensible" (Recusal Order p.15).  It is impossible to avoid concluding that this hostility towards Matrix, Krischer, and its other representatives played a material role in the ultimate determination.

28 U.S.C. §455(a) mandates that "[a]ny . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The Supreme Court has held that "'the goal of section 455(a) is to avoid even the appearance of partiality'," Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 860 (1988)(quoting Hall v. S.B.A., 695 F.2d 175, 179 (5th Cir. 1983)).  Remarks by a judge in the course of proceedings can form the basis for recusal even if they are based on information learned in the same or prior proceedings, "if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible," Liteky v. U.S., 510 U.S. 540, 555 (1994).  All the cited comments confirm the court's prejudgment of this case and reveal such a high degree of antagonism towards Matrix that it made the outcome a foregone conclusion despite the myriad fatal shortcomings of Debtors' case. It is respectfully submitted that Judge Hardin abused his discretion in declining recusal.

## POINT VIII

### MATRIX DID NOT RECEIVE CREDITS TO WHICH IT WAS ENTITLED

A.    MATRIX WAS ENTITLED TO A CREDIT FOR AVOIDED REMODELING COSTS

Matrix was given no credit for the remodeling expense Debtors avoided when the Contract was cancelled.  Contract ¶5.6 provides: "Purchaser does not assume any obligations except those arising

48

arising after the closing date unless explicitly provided for in this agreement." It was established at the liability trial that remodeling obligations for ten (10) stores had arisen <u>prior</u> to the Contract or the anticipated closing date (see Decision p. 38) and none had been performed by Debtors. The Trustee's motion for approval of the TBG contract (Deft's AA), stated at ¶49: "[a]s part of the sale price negotiated by the Trustee and . . . TBG has agreed to remodel certain of the subject stores at a cost of more than $5 Million in accordance with the requirements of Dunkin' Donuts." No such provision appears in the Matrix Contract. With misplaced reliance on the generalized "as is" provisions instead of ¶5.6's explicit terms, the court disregarded Matrix's defense that these renovations were Debtors' responsibility, and gave no credit for Debtors' avoided remodeling costs.

Dunkin' estimated that the remodels would cost up to $700,000 each (6/16/06 Tr.97), and averaging $450-500K. Debtors would have had to expend at least that amount (excluding lost income) to have closed under the Contract, reducing its net value, less the credits in ¶¶3.14 and 3.15, to at most $21,000,000. Conversely, since the TBG Contract shifted responsibility for remodels to the Purchaser (Deft's X ¶1.8) the value of that contract increases from the stated $18 million to $22.5MM - $23MM. Under either analysis, Matrix was entitled to a credit of at least $4,500,000.

B.    THE DEPOSIT MADE BY "64 EAST" RETURNED BY THE TRUSTEE SHOULD HAVE BEEN CREDITED IN MITIGATION

Matrix is entitled to credit for 64 East's deposit returned by the Trustee. In the Trustee's motion to approve the TBG contract, the Trustee set out that the "Borek" (64 East) contract was approved Court as a stalking horse bid and that Mr. Borek was deemed not acceptable to Dunkin' because of a criminal conviction (Deft's AA, ¶¶36 to 41)[5]. Although this is the identical basis upon

---

5    The Trustee later brought suit to recover the 64 East deposit upon learning alleged facts suggesting a fraudulent arrangement between 64 East and principals of the Gus Companies and improper actions facilitated by Debtors' then-counsel. See <u>In Re Food Management Group, LLC</u>, 380 B.R. 677 (Bankr. S.D.N.Y. 2008).

which this Court determined that Matrix had to find a new principal, the 64 East deposit was returned. The amount of that $2,100,000 deposit should be credited against the Debtors' damages.

## CONCLUSION

Reviewing the law and the undisputed facts on this record, one is left with the overwhelming sense that it did not matter what Matrix said or did: Judge Hardin was determined to find against it. There are many legal errors here, any one of which would require reversal. Taken together, the appealed judgment simply cannot stand.

It is respectfully submitted that the judgment should be reversed, the adversary proceeding dismissed, and Matrix be granted judgment upon its counterclaim for the return of its downpayment with accrued interest. At a minimum, the judgment should be vacated and the matter remanded for retrial before a different Bankruptcy Judge. In the event this Court does not reverse with respect to liability, the judgment should be vacated and the matter remanded for a new determination of damages, upon application of such credits to which this Court may find Matrix entitled.

Respectfully submitted,

LAZER, APTHEKER, ROSELLA
  & YEDID, P.C.

By: _David Lazer_    _by _____
     David Lazer (DL 7441)
Appellate Counsel for Defendant-Appellant
  Matrix Realty Group, Inc.
225 Old Country Road
Melville, New York 11747
(631) 761-0800

Of Counsel:
David Lazer
Zachary Murdock
Christian Browne

## Certificate of Service

I hereby certify that on August 18, 2008, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Southern District's Local Rules, and/or the Southern District's Rules on Electronic Service upon the following parties and participants:

Warren Von Credo Baker, Esq.
Drinker Biddle & Reath LLP
Attorneys for Plaintiff-Appellees (Trustee)
191 N. Wacker Drive, Suite 3700
Chicago, IL  60606-1698

Warren T. Pratt, Esq.
Drinker Biddle & Reath LLP
Attorneys for Plaintiff-Appellees (Trustee)
1100 N. Market Street, Suite 1000
Wilmington, DE  19801-1254

Janice Beth Grubin (Trustee)
Drinker Biddle & Reath LLP
Attorneys for Plaintiff-Appellees (Trustee)
140 Broadway, 39th Floor
New York, NY 10005

LAZER, APTHEKER, ROSELLA
& YEDID, P.C.

By: _____
ZACHARY MURDOCK (ZM-1913)
Attorneys for Defendant-Appellant
225 Old Country Road
Melville, New York 11747
(631) 761-0800